SUSAN JANE BROWN (OSB #054607)
SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
(503) 914-1323 | Phone
(541) 778-6626 | Phone
brown@westernlaw.org
sangyeij@westernlaw.org

BRODIA NARDI MINTER (OSB #164414)
Klamath Siskiyou Wildlands Center
P.O. Box 102
Ashland, Oregon 97520
(541) 488-5789 | Phone
Brodia@kswild.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, <br><br> *Plaintiffs,* <br><br> vs. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> *Defendant.* | Civ. Case No. 1:19-cv-2069 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*) |

**INTRODUCTION**

1.      This is a civil action against the Bureau of Land Management ("BLM"). Plaintiffs allege the BLM violated the National Environmental Policy Act and Administrative Procedure Act when the BLM issued a Revised Environmental Assessment and Record of Decision approving the Griffin Half Moon Timber Sale on the Medford District in the Ashland Resource Area ("Medford BLM").

2.      In 1994, the BLM and the Forest Service adopted the Northwest Forest Plan ("NWFP") in western Washington, western Oregon, and northern California to coordinate a consistent, region-wide, interagency approach to federal land management across the range of the northern spotted owl ("NSO"), and to implement scientifically sound, ecologically credible, and legally responsible forest practices on federal lands managed by the BLM and Forest Service.

3.      At the time of the NWFP's adoption in 1994, it was unknown whether the reserve network and other existing standards and guidelines would reasonably assure the persistence of rare and poorly understood species thought to be associated with late-successional and old growth forests, including Pacific fisher and great gray owls.

4.      To address the uncertainty around the continued persistence of these rare species, the land management agencies added a set of management standards and guidelines known as "Survey and Manage" to the NWFP. The Survey and Manage program applies to particular species which—either because of rarity or insufficient scientific understanding—might not be adequately protected by other elements of the NWFP.

5.      The Survey and Manage program mandates site-specific and/or landscape scale surveys before habitat-disturbing activities may commence, and require mitigation measures for known occupied sites of rare species.

6.      Great gray owls are one such rare species protected by Survey and Manage requirements of the NWFP.

7.      Specific mitigation measures for the great gray owl include the following: 1) provide a no-harvest buffer of 300 feet around meadows and natural openings; 2) establish 1/4-mile protection zones around known nest sites; 3) develop and implement a standardized protocol for surveys; 4) survey for nest locations using the protocol; and 5) protect all future discovered nest sites.

8.      In 2016, the BLM withdrew from its participation in the Northwest Forest Plan, and revised its land management plans (called resource management plans).

9.      In its 2016 resource management plan revisions, the BLM increased the rate of timber harvest in western Oregon in several ways, including by eliminating the Survey and Manage program and protections from the lands it manages. Survey and Manage therefore no longer apply to BLM lands in southwest Oregon.

10.     The BLM did not replace the Survey and Manage program and protections with similar obligatory protections for the great gray owl in its 2016 RMPs.

11.     The Medford BLM expects the Griffin Timber Sale to produce approximately 9.8 million board feet of timber.

12.     The Oregon and California Railroad Revested Lands ("O&C Lands") consist of a checkerboard land ownership pattern through eighteen counties of western Oregon. These lands contain more than 2.4 million acres of forests with a diversity of plant and animal species, recreation areas, mining claims, grazing allotments, cultural and historical resources, scenic areas, wild and scenic rivers, and wilderness.

13.     These lands, like most railroad grant lands of the time, were divided into a checkerboard in which the railroad received every other 640-acre section. While the public sections of the O&C lands are now controlled by the Bureau of Land Management, the private sections are primarily managed for industrial timber production.

14.     The Griffin Half Moon timber sale is located on O&C Lands.

PAGE 3 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

15.     The Oregon and California Lands Act of 1937, as well as the Federal Land Policy and

Management Act of 1976 and the National Environmental Policy Act of 1969, apply to the

management of the O&C Lands.

16.     Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346

(United States as a defendant), 2201 (injunctive relief), and 2202 (declaratory relief). The current

cause of action arises under the laws of the United States, including the Administrative Procedure

Act, 5 U.S.C. §§ 701 *et seq.*; and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. An

actual, justiciable controversy exists between Plaintiffs and Defendants.

## VENUE

18.     Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the

events or omissions giving rise to the claims herein occurred within this judicial district. The BLM

official who authorized and approved the decision is headquartered in Medford, Oregon, which is

located within this district. Plaintiffs have offices within this district.

19.     This case is properly filed in Medford, Oregon pursuant to Local Rule 3 because the

Medford BLM Resource Area Office is located in Jackson County, Oregon, and the Griffin Half

Moon Timber Sale is located on lands located in Jackson County, Oregon.

## PARTIES

20.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-

profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main

office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10

states, with most members concentrated in southern Oregon and northern California. On behalf of

its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath

Basins and works to protect and restore the extraordinary biological diversity of the Klamath-

Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law,

science, education, and collaboration to help build healthy ecosystems and sustainable communities.

Through its campaign work, KS Wild strives to protect the last wild areas and vital biological

diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands

and forests, and routinely participates in commenting, monitoring, and litigation affecting public

lands in Oregon. KS Wild is a membership organization and has members who would be irreparably

injured by the Griffin Half Moon timber sale.

21.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene,

Oregon. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the

conservation of the Cascadia Bioregion, which extends from northern California to southeastern

Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation,

advocacy, and collaboration to defend wild places and promote sustainable, restoration-based

forestry. Cascadia Wildlands' members use the Griffin Half Moon timber sale area for a variety of

professional and personal pursuits including viewing threatened and endangered species.

Implementation of the Griffin Half Moon timber sale would irreparably harm the interests of

Cascadia Wildlands and its members.

22.     Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members

and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its

members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an

enduring legacy. Oregon Wild members use the Griffin Half Moon timber sale area for hiking,

recreation, bird watching, nature appreciation, and other recreational and professional pursuits.

Implementation of the Griffin Half Moon timber sale would irreparably harm the interests of

Oregon Wild and its members.

23.     Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("SMWC") is a non-profit organization incorporated in Oregon with an office near Ashland, Oregon. SMWC has approximately 325 members and mails to about ten times that many addresses, with most members and addressees concentrated in southern Oregon and some in northwestern California and elsewhere in the United States. SMWC is dedicated to protecting and restoring wildlands and the outstanding biodiversity and important biological connectivity where the botanically significant Siskiyou Mountains join the southern Cascade Range in southwest Oregon and northwest California. SMWC monitors federal public land activities to ensure that management complies with relevant federal laws, including environmental laws. SMWC also proposes designations that would better protect the area. SMWC has a specific interest in the O&C lands managed by the BLM in southwest Oregon. SMWC monitors Medford and Klamath Falls Resource Area BLM projects on O&C lands in the Cascade-Siskiyou connectivity area, and SMWC educated the public and elected officials, wrote comments, and otherwise advocated for the designation of the Cascade-Siskiyou National Monument, which is directly adjacent to the Griffin Half Moon timber sale area.

<b>LEGAL AND FACTUAL BACKGROUND</b>

**The Administrative Procedure Act**

24.     The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions … found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

///    ///    ///

///    ///    ///

///    ///    ///

**National Environmental Policy Act**

25.     Congress enacted the National Environmental Policy Act ("NEPA") in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

26.     NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action.

27.     The Council on Environmental Quality ("CEQ") has promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq.*

28.     If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment ("EA") to determine if a more detailed Environmental Impact Statement ("EIS") is required. 40 C.F.R. § 1501.4.

29.     For an agency's decision to be considered reasonable, a decision record and finding of no significant impact ("DR/FONSI") must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in its EA, its decision is arbitrary and capricious.

30.     The CEQ regulations require that action agencies prepare a supplemental NEPA analysis when "major federal action" remains to occur and the initial NEPA document does not adequately discuss "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

31.     To support a determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.8. Direct

effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." 40 C.F.R. § 1508. Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7.

32.        NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

**Federal Land Policy and Management Act**

33.        Congress enacted the Federal Land Policy and Management Act ("FLPMA") in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

34.        FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

35.     The BLM revised the southern Oregon RMP for the Ashland Resource Area of the Medford District in 2016. The southern Oregon RMP applies to the Griffin Half Moon timber sale.

**The Griffin Half Moon Timber Sale**

36.     On June 8, 2018, the Ashland Resource Area of the Medford District of the Bureau of Land Management published for public comment the Griffin Half Moon timber sale Environmental Assessment.

37.     The BLM prepared a Revised Environmental Assessment ("Griffin Half Moon REA" or "REA") for the timber sale, and released it simultaneously with the Decision Record on August 15, 2018.

38.     The Griffin Half Moon timber sale is located in southwest Oregon, directly adjacent to the Cascade-Siskiyou National Monument. The Cascade-Siskiyou National Monument is the only National Monument designated to protect outstanding biological diversity.

39.     The Griffin Half Moon timber sale is located on O&C Lands that are heavily "checkerboarded:" every other square mile of land owned and managed by the BLM alternates with lands managed by other landowners, primarily industry timberland companies:

**Map 1-1: Griffin Half Moon Vegetation Management Project Area**



Griffin Half Moon Vegetation Management Project            4            **Revised** Environmental Assessment

40.    The Griffin Half Moon REA authorizes logging 933 acres of forest, entirely through ground-based harvest methods. These 933 acres of forest will produce approximately 9 million board feet ("MMbf") of timber.

41.    Timber harvest techniques employed for the Griffin Half Moon timber sale include commercial thinning and "regeneration harvest," known colloquially as "clear cutting" because all or nearly all of the trees are cleared from the harvested area.

42.    The BLM proposes to use timber harvest techniques that will reduce the "basal area," or the area of a timber stand occupied by trees, of the harvested stands to 5–15% of their pre-harvest condition, equating to 10-20% canopy cover retention.

PAGE 10 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

43.     The Griffin Half Moon REA analyzed five issues "in detail:" 1) how efficiently the proposed project would meet the Ashland Resource Area's Annual Sale Quantity (ASQ); 2) how erosion, sedimentation, and turbidity from proposed logging operations would affect fisheries, aquatic habitat, and water quality; 3) how the large scale removal of canopy cover would affect water quantity or peak flows; 4) how the proposed project would affect the Threatened northern spotted owl and its designated critical habitat; and 5) how geographic and ecological conditions of the Project Area would affect the ability to reforest the Project Area after regeneration harvest.

44.     The Griffin Half Moon REA does not address the direct, indirect, or cumulative effects of the project on any other issues or resources, including those raised by Plaintiffs during the public comment and administrative review process.

45.     The Griffin Half Moon REA does not address the environmental consequences of the project on great gray owls.

46.     The Griffin Half Moon REA does not address the environmental consequences of the project on Pacific fisher, a candidate species for listing under the Endangered Species Act.

47.     Plaintiffs submitted timely comments on the Griffin Half Moon EA.

48.     Plaintiffs have exhausted their administrative remedies with respect to the Griffin Half Moon timber sale.

**BLM Special Status Species Policy**

49.     The Department of Interior 6840-Handbook for Special Status Species Management establishes policy for the management of species listed or proposed for listing pursuant to the Endangered Species Act and Bureau Sensitive Species that are found on BLM-administered lands.

50.     In compliance with this policy and other laws, including the BLM multiple use mission as specified in FLPMA, the BLM is required to designate Bureau Sensitive Species and implement

measures to conserve these species and their habitats to promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.

51.     In project-level planning, the BLM's Special Status Species Policy requires the BLM to consider all site-specific methods and procedures needed to bring species and their habitats to the condition under which management under the Bureau Sensitive Species Policy would no longer be necessary. These measures include but are not limited to: 1) determining the distribution, abundance, population condition, current threats, and habitat needs for sensitive species, and evaluating the significance of BLM-administered lands and actions undertaken by the BLM in conserving those species; 2) monitoring the populations and habitats of Bureau sensitive species to determine whether species management objectives are being met; 3) prioritizing Bureau sensitive species and their habitats for conservation action; and 4) incorporating best management practices, standard operating procedures, conservation measures, and design criteria to mitigate specific threats to Bureau sensitive species during the planning of activities and projects.

**Pacific fisher**

52.     A resident of coniferous and mixed coniferous forests, the Pacific fisher (*Pekania pennant*) once occurred throughout much of the western and northern United States and Canada.

53.     The Pacific fisher is light brown to dark blackish-brown, with the face, neck, and shoulders sometimes being slightly gray. Pacific fisher's chest and underside often has irregular white patches.

54.     Pacific fisher populations declined historically primarily due to loss of habitat from timber harvesting and trapping. The West Coast Distinct Population Segment includes the states of Washington, Oregon, and California.

55.     In the southern Oregon Cascade mountains, the home range of a non-breeding male Pacific fisher averages 24 mi$^2$ (15,320 acres), while home range of a female Pacific fisher averages 9.6 mi$^2$ (6,177 acres).

56.     Pacific fishers use forest habitats with dense canopy closure, large diameter live trees (conifers and hardwoods) and snags (dead trees) with cavities and other deformities, large diameter down wood, and multiple canopy layers. Mature and late-successional coniferous or mixed forests that contain key habitat and structural components provide the most suitable Pacific fisher habitat because they provide abundant potential den sites and preferred prey species. The physical structure of the forest (abundant structures for den and rest sites, complexity and diversity of trees and shrubs) and prey associated with these forest conditions are thought to be the critical features that explain Pacific fisher habitat use, rather than specific forest types.

57.     Based on the overall size of the Griffin Half Moon planning area, the planning area has the potential to support at least seven female home ranges and three or more male home ranges.

58.     The Griffin Half Moon timber sale area supports two known resident female Pacific fishers and two known resident male Pacific fishers. The Griffin Half Moon timber sale proposes to conduct timber harvest, including regeneration harvest, in habitat with known fisher presence.

59.     Proposed commercial treatments under all action alternatives would detrimentally impact suitable Pacific fisher habitat, and the habitat of its prey species.

60.     Under all action alternatives, timber harvest would reduce canopy cover on 410 acres to the point where the remaining habitat, if any, would no longer support use by Pacific fisher for its life history activities.

61.     On November 7, 2019, the U.S. Fish and Wildlife Service proposed to list the West Coast DPS of Pacific fisher as threatened under the Endangered Species Act (ESA).  84 Fed. Reg. 6,0278.

62.     This proposed listing is based on the best scientific and commercial data available for the species.

63.     The proposed listing specifically identifies habitat loss and fragmentation caused by vegetation management as threats to the Pacific fisher.

64.     The proposed listing also identifies with the Pacific fisher's small population size as a threat to the continued existence of the species.

65.     The West Coast Distinct Population Segment (DPS) of Pacific fisher is both a Bureau Sensitive Species as well as a Bureau Special Status Species. For the Griffin Half Moon Project, Bureau Special Status Species receive no mandatory protections. This is inconsistent with BLM policy direction stated in the Department of Interior's 6840-Handbook for Special Status Species Management.

66.     BLM did not take a hard look at excluding timber harvest from occupied Pacific fisher habitat. BLM did not monitor Pacific fisher presence in the planning area to determine if species management objectives are being met. BLM did not incorporates best management practices, standard operating procedures, conservation measures, and design criteria to mitigate specific threats to Pacific fisher as required by BLM policy.

**Great Gray Owl (*Strix nebulosa*)**

67.     The great gray owl (*Strix nebulosa*) is a very large owl distinguished by its gray plumage; large, circular facial discs surrounding bright yellow eyes; and lack of ear tuffs.

68.     Considered rare, the great gray owl occurs at low densities within its range, which includes the Griffin Half Moon planning area.

69.     Breeding great gray owls require preexisting nest structures in forest stands that are adjacent to open foraging habitat, preferentially with hunting perches. The availability of nest sites and suitable foraging habitat are considered the most important factors limiting great gray owl populations. Great gray owls often nest in stick nests built by large corvids and diurnal raptors. These sites occur more frequently in older forest stands with larger trees.

70.     Shorter timber harvest rotation periods and selective removal of large-diameter trees has reduced nest-site availability. Great gray owls most frequently nest in late-successional stands dominated by Douglas fir located near natural forest edges.

71.     The southwestern Oregon great gray owl population is important to support the California population of great gray owls that are listed under the Endangered Species Act in California. The Oregon population is a crucial link between the primary great gray owl range further north and the otherwise isolated population of California great gray owls, and is thus critical to the species long-term survival.

72.     The project planning area is home to perhaps the best known population of great gray owls in Oregon. Sighting a great gray owl in the wild is one of the most sought-after accomplishments for Oregon and California birders.

73.     The local Rogue Valley Audubon Society has an ongoing project to increase great gray owl nesting habitat by providing nesting platforms. Nine of the platforms are located in the project planning area, three of which are in timber sale areas that will be logged under the Griffin Half Moon timber sale.

74.     As documented by Rogue Valley Audubon Society members and others, there have been at least 16 active great gray owl nests with owlets (young of the year) in recent years in the Project Area, both in broken tree stumps and on the man-made platforms. Five of these sixteen nests are located in the proposed sale areas.

75.     The great gray owl is a Bureau Special Status Species because it is a Bureau Sensitive Species. For the Griffin Half Moon Project, Bureau Sensitive Species receive no mandatory protections. This is inconsistent with BLM policy direction stated in the Department of Interior's 6840-Handbook for Special Status Species Management.

76.    The Griffin Half Moon timber sale includes logging units that were previously deferred as non-harvest wildlife buffers for great gray owl pursuant to the NWFP's Survey and Manage program. BLM did not take a hard look at excluding timber harvest in those previously deferred units. BLM did not monitor great gray owls and owlet presence in the planning area to determine if species management objectives are being met. BLM did not incorporate best management practices, standard operating procedures, conservation measures, and design criteria to mitigate specific threats to great gray owls as required by BLM policy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Failure to Consider Direct, Indirect, and Cumulative Effects on Great Gray Owls Violates the National Environmental Policy Act

77.    Plaintiffs incorporate by reference all preceding paragraphs.

78.    NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508.

79.    An EA must provide sufficient information for determining whether to prepare an EIS or issue a Finding of No Significant Impact. 40 C.F.R. § 1508.9(a). The information presented in the EA must be of "high quality," and include "accurate scientific analysis." 40 C.F.R. 1500.1(b). The agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant.

80.    NEPA requires that an adequate EA analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects which ... are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

81.     An EA must also assess the cumulative impacts, i.e., those resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. §§ 1508.7–1508.8.

82.     The Griffin Half Moon REA acknowledges that the action would harvest stands previously established as no-harvest wildlife buffers for great gray owls, but fails consider the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on this at-risk wildlife species.

83.     The failure to consider the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on great gray owls is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

84.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to EAJA. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### Failure to Consider Direct, Indirect, and Cumulative Effects on Pacific fisher Violates the National Environmental Policy Act

85.     Plaintiffs incorporate by reference all preceding paragraphs.

86.     The Griffin Half Moon REA acknowledges the presence of Pacific fisher in the planning area, but fails to consider the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on this at-risk wildlife species.

87.     The failure to consider the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on Pacific fisher is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

88.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to EAJA. 28 U.S.C. § 2412.

PAGE 17 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**PLAINTIFFS' PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.      Declare that the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact violate NEPA and its implementing regulations;

2.      Declare that the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact are arbitrary, capricious, an abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the APA;

3.      Vacate and set aside the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact and remand the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact to the BLM until such time as the BLM demonstrates to this Court that it has adequately complied with the law;

4.      Enjoin the BLM and its contractors, assigns, etc. from implementation of the Griffin Half Moon Revised Environmental Assessment, Decision Record, Finding of No Significant Impact, and timber sale;

5.      Award Plaintiffs their costs of suit and attorneys' fees; and

6.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.


Respectfully submitted and dated this 20th day of December, 2019.

> /s/ Susan Jane M. Brown
> Susan Jane M. Brown (OSB #054607)
> Western Environmental Law Center
> 120 Shelton McMurphey Blvd., Ste. 340
> Eugene, Oregon 97401
> (503) 914-1323 | Phone
> brown@westernlaw.org
>
> *Attorney for Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have

no affiliates, parent companies, or subsidiaries issuing shares to the public.


Respectfully submitted and dated this 20th day of December, 2019.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
(503) 914-1323 | Phone
brown@westernlaw.org

*Attorneys for Plaintiffs*