SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
 (541) 778-6626 | Phone
sangyeij@westernlaw.org

BRODIA NARDI MINTER (OSB #164414)
Klamath Siskiyou Wildlands Center
P.O. Box 102
Ashland, Oregon 97520
(541) 488-5789 | Phone
Brodia@kswild.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL,<br><br>*Plaintiffs,*<br><br>vs.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>*Defendant.* | Civ. Case No. 1:19-cv-02069-CL<br><br>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPENING MEMORANDUM IN SUPPORT OF MOTION<br><br>ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

MOTION. ................................................................................................................. 1

ARGUMENT. .......................................................................................................... 1

I.     INTRODUCTION. .......................................................................................... 1

II.    JURISDICTION. ............................................................................................. 3

III.   STANDARD OF REVIEW. ........................................................................... 3

IV.    FACTUAL BACKGROUND. ........................................................................ 5

       A.    The Griffin Half Moon Timber Sale. ................................................... 5

       B.    Great Gray Owl (*Strix nebulosa*). ....................................................... 6

       C.    Pacific Fisher (*Pekania pennant*). .................................................... 11

V.     LEGAL BACKGROUND. ............................................................................ 13

       A.    The Federal Land Policy and Management Act. ............................... 13

       B.    The National Environmental Policy Act. ........................................... 14

VI.    THE GRIFFIN HALF MOON TIMBER SALE VIOLATES THE NATIONAL
       ENVIRONMENTAL POLICY ACT BECAUSE THE BLM FAILED TO
       CONSIDER THE PROJECT'S DIRECT, INDIRECT, AND CUMULATIVE
       EFFECTS. ..................................................................................................... 16

       A.    Direct, Indirect, and Cumulative Effects on Great Gray Owls. ..................... 17

       B.    Direct, Indirect, and Cumulative Effects on Pacific Fisher. ........................ 24

VII.   CONCLUSION. ............................................................................................. 29

# TABLE OF AUTHORITIES

**Federal Cases**

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997) ................................... 4

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) .......... 4

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ...................................... 14, 20, 24

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ........... passim

*Center for Biological Diversity et al. v. Fish and Wildlife Serv. et al.*, No. 3:16-cv-06040-WHA (N.D. Cal., Nov. 29, 2019) ......................................................... 11, 12

*Churchill Cty. v. Norton*, 276 F.3d 1060 (9th Cir. 2001) ........................................... 5

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................... 4

*Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009) ............................. 19, 22, 23

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157 (9th Cir. 2003) ...................... 5

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) ..... 15

*Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922 (9th Cir. 1999) ........................................ 16

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................... 22

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) ........................................ 16

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) ...................................... 25

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ............................... 4

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ............................... 25

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006) ............................... 16

*Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380 (9th Cir. 1953) ............................. 18

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) ...................................... 4

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................................................... 25

*Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 2014 WL 525116 (D. Or. 2014).... 15

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) .. 22, 27

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2010)..................................................... 4, 24, 25

*Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279 (9th Cir. 1986)............................................. 18

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999)............................ 21

*Mullis v. U.S. Bank. Ct.*, 828 F.2d 1385 (9th Cir. 1987)................................................................ 18

*N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886 (9th Cir. 1992) ........................................................ 16

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372 (9th Cir. 1998) .................. 28

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009)......... 18

*Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175 (W.D. Wash. 2005) ........................................ 23

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ....................... 14

*Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007)....................................... 17

*Or. Nat. Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997) ........................................................ 4

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010).................... 2

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015)...................... 22, 23

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248
    (W.D. Wash. 2007) ................................................................................................................. 23

*Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012 (9th Cir. 2012), *vacated*, 570 U.S. 901
    (2013) ...................................................................................................................................... 29

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) .............................................. 16

*Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) ......................................................... 16

*Steamboaters v. FERC*, 759 F.2d 1382 (9th Cir. 1985).............................................................. 28

*Ursack, Inc. v. Sierra Interagency Black Bear Group*, 2009 WL 2422784 ( N.D. Cal. 2009) .... 18

**Federal Statutes**

5 U.S.C. § 706 ................................................................................................................ passim

5 U.S.C. §§ 701 et seq. ............................................................................................................. 3

16 U.S.C. §§ 1531 et seq. .......................................................................................................... 2

28 U.S.C. § 1331 ....................................................................................................................... 3

28 U.S.C. § 1346 ....................................................................................................................... 3

28 U.S.C. § 1391 ....................................................................................................................... 3

28 U.S.C. § 2201 ....................................................................................................................... 3

28 U.S.C. § 2202 ....................................................................................................................... 3

42 U.S.C. § 4332(2)(C) ........................................................................................................... 14

42 U.S.C. § 4342 ..................................................................................................................... 14

42 U.S.C. §§ 4321 et seq. .......................................................................................................... 3

43 C.F.R. § 1610.5-3(a) .......................................................................................................... 13

43 U.S.C. § 1701 et seq. .......................................................................................................... 13

43 U.S.C. § 1701(a)(2) ............................................................................................................ 13

43 U.S.C. § 1701(a)(8) ....................................................................................................... 2, 13

43 U.S.C. § 1712 ..................................................................................................................... 13

43 U.S.C. § 1732 ..................................................................................................................... 13

**Federal Regulations**

40 C.F.R. § 1500.1(b) ............................................................................................................. 15

40 C.F.R. § 1501.4 .................................................................................................................. 14

40 C.F.R. § 1502.18 ................................................................................................................ 24

40 C.F.R. § 1508.28 ................................................................................................................ 15

40 C.F.R. § 1508.7 .................................................................................................. 15

40 C.F.R. § 1508.8 .............................................................................................. 15, 21

40 C.F.R. § 1508.8(a) ............................................................................................. 15

40 C.F.R. § 1508.8(b) ............................................................................................ 15

40 C.F.R. § 1508.9 .............................................................................................. 25, 26

40 C.F.R. §§ 1500 et seq .......................................................................................... 14

## Miscellaneous

FED R. CIV. P. 56(c) .................................................................................................. 3

FED R. CIV. P. 56(a) .................................................................................................. 1

*Threatened Species Status for West Coast Distinct Population Segment of Fisher With Section
      4(d) Rule*, 84 Fed. Reg. 6,0278 (Nov. 7, 2019)....................................................... 11, 28

U.S. Department of the Interior, Bureau of Land Management, Oregon, and U.S. Department of
      Agriculture, Forest Service Regions 5 and 6, *Survey protocol for great gray owl (Strix
      nebulosa) within the range of the Northwest Forest Plan, Version 4.0* (April 20, 2020),
      https://www.fs.fed.us/r6/sfpnw/issssp/documents4/sp-bi-strix-nebulosa-20171017.pdf . 18

Pub. L. 94-579.......................................................................................................... 13

## MOTION

Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and Soda Mountain Wilderness Council (KS Wild) respectfully move the Court pursuant to Fed. R. Civ. P. Rule 56(a) for summary judgment on all claims against Federal Defendants U.S. Bureau of Land Management (BLM) as set forth in Plaintiffs' Complaint filed December 20, 2019. This Motion is supported by the following Memorandum and the First Declarations of Melvin N. Clements, Harry Fuller, Jeanne Moy, Shannon Rio, George Sexton, Peter J. Thiemann, Pepper W. Trail, and Dave Willis, filed herewith.

Plaintiffs seek a declaration that the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact violate the National Environmental Policy Act, the Administrative Procedure Act, and their implementing regulations. To remedy these violations of law, KS Wild asks the Court to vacate the Griffin Half Moon Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact and remand the decision to the BLM. KS Wild further asks the Court to award KS Wild their costs of suit and attorneys' fees, and grant KS Wild such other and further relief as the Court deems just and equitable.

## ARGUMENT

## I.     INTRODUCTION.

The Federal Land Policy and Management Act, which provides congressional direction to the Department of Interior regarding management of the public lands, states that it is the policy of the United States that

> The public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife

1

and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). Acting according to this congressional mandate, as well as that provided by the Endangered Species Act (ESA), 16 U.S.C. 1531 et seq., the Bureau of Land Management (BLM) must manage its lands so as to conserve and recover already ESA-listed species and to prevent the listing of at-risk wildlife. *Id.* When BLM takes management actions affecting the public lands, it also must analyze and disclose the environmental consequences of its actions. *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010).

The Griffin Half Moon timber sale planning area is located in an area of southwest Oregon that is biologically rich and diverse, despite the heavily "checkerboarded" nature of the landownership. Two wildlife species, the Pacific fisher and great gray owl, make their home in the region, drawing countless residents and visitors from around the region and world in an effort to experience these species in their natural habitat. The viability of both species are at-risk: the Pacific fisher is a Candidate species under the ESA and has been proposed for listing as Threatened, and the great gray owl's elusive nature has left researchers unsure of its true population status. Both species depend on late-successional and old growth forests for survival.

Given the importance ecologically and socially of both species, Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and Soda Mountain Wilderness Council (collectively, KS Wild) repeatedly asked the BLM to assess the environmental consequences of aggressive commercial logging on Pacific fisher and great gray owls. The BLM refused. Instead, the BLM elevated timber harvest above a basic legal obligation: to disclose and discuss the direct, indirect, and cumulative effects of its land management decisions on the environment, including the wildlife that exist within it. 40 C.F.R. §§ 1508.7-1508.8. Consequently, the BLM's decision to implement the Griffin Half Moon timber sale is arbitrary,

2

capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A). This Court should grant KS Wild's motion for summary judgment and permanently enjoin implementation of the Griffin Half Moon timber sale.

## II.    JURISDICTION.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 2201 (injunctive relief), and 2202 (declaratory relief). The current cause of action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and their implementing regulations. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. § 706. An actual, justiciable controversy exists between Plaintiffs and Defendants.

Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The BLM official who authorized and approved the decision is headquartered in Medford, Oregon, which is located within this district. Plaintiffs have offices within this district. This case is properly filed in Medford, Oregon pursuant to Local Rule 3 because the Medford BLM Resource Area Office is located in Jackson County, Oregon, and the Griffin Half Moon Timber Sale is located on lands located in Jackson County, Oregon.

## III.    STANDARD OF REVIEW.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). Judicial review of agency actions under the Federal Land Policy and Management Act (FLPMA) and NEPA and their implementing regulations is governed by the APA. 5 U.S.C. § 706; *Karuk Tribe*

*of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012). Under the APA, "[t]he reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (internal citation omitted). The arbitrary and capricious standard is deferential, but it does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). The BLM must articulate "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). It is not entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

An agency's decision can be upheld only on the basis of the reasoning found in that decision; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Rationales for agency decision-making appearing for the first time in litigation are post hoc explanations that cannot be used to justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (internal citation omitted). Review for compliance with NEPA consists of "ensuring that the agency has taken a 'hard look' at the environmental effects of the proposed

action." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (*citing Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)).

## IV.  FACTUAL BACKGROUND.

### A.  The Griffin Half Moon Timber Sale.

On June 8, 2018, the Ashland Resource Area of the Medford District of the Bureau of Land Management published for public comment the Griffin Half Moon timber sale (Griffin Half Moon or timber sale) environmental assessment. Administrative Record (AR), 004452-004636. The BLM prepared a revised environmental assessment (Griffin Half Moon REA or REA) for the timber sale, and released it simultaneously with the Decision Record on August 15, 2018. AR 003208-003396. The Griffin Half Moon timber sale is located in southwest Oregon, directly adjacent to the Cascade-Siskiyou National Monument. The timber sale is also located on O&C Lands that are heavily "checkerboarded:" every other square mile of public land managed by the BLM alternates with lands managed by other landowners, primarily industrial timberland companies. AR 003221 (project area map).

The Griffin Half Moon REA authorizes logging 933 acres of forest, entirely through ground-based harvest methods. AR 003271. These 933 acres of forest will produce approximately 9 million board feet of timber. *Id*. Timber harvest techniques employed for the Griffin Half Moon timber sale include commercial thinning and "regeneration harvest," known colloquially as "clear cutting" because all or nearly all of the trees are cleared from the harvested area. AR 003321. The BLM proposes to use timber harvest techniques that will reduce the canopy cover retention to 30% on average, meaning that some units will have a higher retention of overstory trees, and some less. AR 003325.

Plaintiffs submitted timely comments on the Griffin Half Moon EA, AR 004011-004030, and exhausted their administrative remedies, AR 003128-003151.

**B.    Great Gray Owl (*Strix nebulosa*).**

The great gray owl (*Strix nebulosa*) is a very large owl distinguished by its gray plumage; large, circular facial discs surrounding bright yellow eyes; and lack of ear tuffs. AR 018293, 013961, 021675. Considered rare, the great gray owl occurs at low densities within its range, which includes the Griffin Half Moon planning area. AR 014023-014030, 018293, 009359, 013158, 013168, 021675, 021907 ("populations of great gray owls are in peril (declining or experiencing some demographic trauma) or are likely to be in peril in the future given current land management practices"), 021910 ("researchers most aware of the owl's ecology in eastern and central Oregon and in California suggest that persistence of the species is less certain in these areas"), 021911 ("the loss of nesting habitat in central and eastern Oregon has been identified as the most immediate threat to great gray owl persistence in that region...determined management of nesting habitat should be a priority, without which local persistence of the species will be in jeopardy"). Scientific research on the species explains that, "The overall North American Great Gray Owl long-term (>10 yr) population trend is unknown. There are no long-term, rigorous or standardized Great Gray Owl breeding population trend data on a range-wide, regional or local scale. There is circumstantial evidence that some local and/or regional populations have either remained stable, increased or decreased over periods of <10 yr." AR 018294; *see also*, 009366, 013158, 021675 ("the great gray owl remains poorly understood...we have found no studies that examine great gray owl population characteristics"), 021676, 021863 ("the Committee on the Status of Endangered Wildlife in Canada considers great gray owls

vulnerable or a species at risk because of low or declining numbers") (internal quotations omitted).

Great gray owls require preexisting nest structures in forest stands that are adjacent to open foraging habitat, preferentially with hunting perches. AR 014029, 014023, 018295-018296, 021681. The availability of nest sites and suitable foraging habitat are considered the most important factors limiting great gray owl populations. AR 018294, 021686. Great gray owls often nest in stick nests built by large corvids and diurnal raptors. AR 014023, 014026, 018295, 018297, 021909. These sites occur more frequently in older forest stands with larger trees. AR 014026, 018297, 009366, 021686, 021908-021909. Great gray owls also make frequent use of nest boxes and artificial nests. AR 014029, 018295, 021681. Shorter timber harvest rotation periods, overstory removal, and selective removal of large-diameter trees has reduced natural nest-site availability. AR 014026, 018292 ("Intensive timber management typically removes large diameter and deformed nest trees, leaning trees used by juveniles for roosting before they can fly and stands with dense canopy closure used by juveniles and adults for cover and protection"), 018295 ("forest management activities that reduce the number of nest sites (e.g., fire suppression, disease control, and shorter rotation periods) have the potential to reduce Great Gray Owl breeding densities"), 018297, 009366, 021686. Great gray owls most frequently nest in late-successional stands dominated by mature and old growth Douglas fir or ponderosa pine located near natural forest edges. AR 014023, 014026, 021681, 021897-021898, 021908-021909.

The southwestern Oregon great gray owl population is important to support the California population of great gray owls that are listed under the California Endangered Species Act. AR 009358, 013168, 013158, 012155 (explaining that the Oregon/California border is a natural bottleneck between the species' population in both states), 005771-005772, 021911. The Oregon

population is a crucial link between the primary great gray owl range further north and the otherwise isolated population of California great gray owls, and is thus critical to the species long-term survival. AR 018296 ("Great Gray Owl population declines from ancestral levels have been reported in California (Winter 1986). These were attributed to habitat changes, e g., fire suppression and overharvesting of forests"), 012155 ("The Sierra Nevada population of great gray owls may be at high risk of population decline or extinction due to a number of threats," making owls dispersing from Oregon important to the metapopulation); AR 005771-005772, 021898 ("The similarities are so great between northeastern California's forest vegetation (Klamath N.F.) and that which occurs in Oregon's southcentral Cascades that Miller (1991) undertook a detailed habitat analysis to assess the great gray owl's status in the northern California extension of the Cascade Range but he found no owls occupying his California study site"), 021911.

The scientific literature on great gray owls has also examined the types of habitat manipulation that adversely affect the species and provides management recommendations. Regeneration timber harvest removes suitable habitat for great gray owls, and the species does not use harvested areas for most of their life functions. AR 014028-014029. Other "forestry practices that reduce the number of potential nest sites include the removal of diseased trees, removal of large trees, and forest stand alteration not compatible with the habitat requirements for nest-building species." AR 021686, 012159-012160. The federal government's survey protocol for the great gray owl explains:

> The following activities are generally expected to result in significant negative effects on habitat, life cycle, microclimate or life support systems or persistence of Great Gray Owls at the project location.
>
> 1.  Activities that modify suitable nesting habitat or fall potential nest trees....

Examples include but are not limited to:
- Timber harvest
  - Regeneration harvest
  - Commercial thinning
- Post and pole thinning
- Road construction/reconstruction
- Guy line or tail hold trees
- Logging landings/expansion
- Trail construction/reconstruction using any motorized equipment

AR 013960- 013961. "In summarizing what we know about the character of forest and meadow types used by the great gray owl in western U.S.,"

A two-part theme repeats itself: great gray owls use old-growth forests near openings. The old-growth forests provide large-diameter (over 50 cm dbh) trees or snags having abandoned raptor nests, and the openings provide huntable populations of rodents. During the past century, human activities, including widespread harvesting of mature and old-growth forests, have reduced the abundance of potential nest trees. Furthermore, the altering of natural (pre-settlement) fire regimes have disrupted the generation and maintenance of a distinctive fire mosaic covering the western North American landscape.

Timber harvesting, whether clearcuts or even selective removal of large-diameter trees, has reduced nesting opportunities for all forest raptors, including great gray owls. Studies show that logging can and does generate "temporary meadows" capable of supporting rodent populations used by breeding great gray owls. But unlike naturally occurring mountain meadows, forest clearings created by logging undergo rapid forest re-establishment; successional development makes the usefulness of such openings short-lived. Some montane grasslands have experienced gradual conifer invasions, attributable to reduced fire occurrence and fostered by shifting climatic cycles. This means shrinking great gray owl foraging habitat throughout western North America. Sustaining populations of great gray owls is possible, but only as a product of innovative ecosystem forest management.

AR 021900-021901.

In order to "sustain populations of great gray owls," scientists recommend surveys to identify great gray owl sites; protection of key habitat features such as perches, large diameter live and dead (snags) trees, and sufficient canopy cover; restoration and maintenance of natural meadows with prescribed and managed fire; and application of no-disturbance buffers of at least

250-300 meters around meadows and known sites. AR 018296-018297, 009358, 009366-009367, 021910. Some researchers have observed that

> The causes of the recent population bottlenecks detected in the microsatellite data for western great gray owls are unknown, but by extension of logic, habitat degradation, and fragmentation of western forests and landscapes driven by the influence of increasing human development and management activities may be associated with population declines in great gray owl populations across their western range in the Sierra Nevada and Pacific Northwest. Similar reductions in population size have been attributed to recent anthropogenic modifications of the natural landscape (e.g., Trzcinski et al., 1999; Butler et al., 2004). Regardless of cause, population bottlenecks and reductions in genetic diversity are important considerations to address for future management approaches for the great gray owl.

AR 012159-012160. Researchers have thus concluded that "maintaining quality great gray owl foraging habitat should be compatible with forest management for commodity resources if management takes a long term view." AR 021910-021911.

The Griffin Half Moon timber sale planning area is home to perhaps the best known population of great gray owls in Oregon, and because observing a great gray owl in the wild is one of the most sought-after accomplishments for birders, visitors from near and far come to the planning area to view great grays. AR 005771; Clements Decl., ¶¶ 11-19, 21, 35-36; Fuller Decl., ¶¶ 1-133; Moy Decl., ¶¶ 11-12, 15; Rio Decl., ¶¶ 4-5; Thiemann Decl., ¶¶ 2-5, 7-8, 11, 13-15; Trail Decl., ¶¶ 3-6. The local Rogue Valley Audubon Society has an ongoing project to increase great gray owl nesting habitat by providing nesting platforms. AR 005771-005772. Nine of the platforms are located in the project planning area, three of which are in timber sale areas that will be logged under the Griffin Half Moon timber sale. AR 005771-005772. As documented by Rogue Valley Audubon Society members and others, there have been at least 16 active great gray owl nests with owlets (young of the year) in recent years in the Project planning area, both in broken trees and on the man-made platforms. *Id.* Five of these sixteen nests are located in the planning area. *Id.*

10

"In Oregon, great gray owls typically nest in the same home range year after year (Bull et al. 1989a). They will change nest sites but usually move < 5 km. Some birds in Oregon stay in the same area year round if snow is not deep; others move to areas with less snow." AR 021687. The Griffin Half Moon timber sale includes logging units that were previously deferred as non-harvest wildlife buffers for the great gray owl pursuant to the Northwest Forest Plan's Survey and Manage program. AR 000001-001511, 000055, 000248.

### C. Pacific Fisher (*Pekania pennant*).

The Pacific fisher (*Pekania pennant*), a resident of coniferous and mixed coniferous forests, once occurred throughout much of the western and northern United States and Canada. AR 008088. The Pacific fisher is light brown to dark blackish-brown, with the face, neck, and shoulders sometimes being slightly gray. *Threatened Species Status for West Coast Distinct Population Segment of Fisher With Section 4(d) Rule*, 84 Fed. Reg. 6,0278 (Nov. 7, 2019). The primary threats to the viability of Pacific fisher are habitat loss and fragmentation due to wildfire, vegetation management, toxicants (i.e., anti-coagulant rodenticides), and the synergistic effects of these and other factors (e.g., mortality from vehicle collisions) on small populations. *Id*. The United States Fish and Wildlife Service proposed to list the Pacific fisher as a "Threatened" species in 2019, making the species a "Candidate" species. *Id.* The West Coast Distinct Population Segment (DPS) of Pacific fisher includes the states of Washington, Oregon, and California. *Id*.

The Fish and Wildlife Service expected to issue a final listing decision on April 25, 2020. Stipulated Request for 30 Day Extension of Time to Comply with the Court's May 17, 2019 Order, *Center for Biological Diversity et al. v. Fish and Wildlife Serv. et al.*, No. 3:16-cv-06040-WHA (N.D. Cal., Nov. 29, 2019), ECF No. 114 (seeking extension of time to publish a final

11

listing determination by May 25, 2020); Order Denying Stipulated Request for Extension, *Center for Biological Diversity et al. v. Fish and Wildlife Serv. et al.*, No. 3:16-cv-06040-WHA, ECF No. 115 (denying extension and retaining April 25, 2020 deadline for final listing decision). FWS has not yet published a final listing decision, in violation of Judge Alsup's Order.

The West Coast DPS of Pacific fisher is both a Bureau Sensitive Species as well as a Bureau Special Status Species. AR 003265; *but see*, Federal Defendant's Answer ¶ 65 (denying that Pacific fisher are a Bureau Sensitive Species despite its listing as such in the REA). The Department of Interior's 6840-Handbook for Special Status Species Management requires the BLM to determine

> to the extent practicable, the distribution, abundance, population condition, current threats, and habitat needs for sensitive species, and evaluating the significance of BLM-administered lands and actions undertaken by the BLM in conserving those species; Ensuring that BLM activities affecting Bureau sensitive species are carried out in a way that is consistent with its objectives for managing those species and their habitats at the appropriate spatial scale; Monitoring populations and habitats of Bureau sensitive species to determine whether species management objectives are being met.

AR 012518.

In the southern Oregon Cascade mountains, the home range of a non-breeding male Pacific fisher averages 24 mi$^2$ (15,320 acres), while home range of a female Pacific fisher averages 9.6 mi$^2$ (6,177 acres). AR 03359. Mature and late-successional coniferous or mixed forests that contain key habitat and structural components provide the most suitable Pacific fisher habitat because they provide abundant potential den sites and preferred prey species. AR 008088. The physical structure of the forest (abundant structures for den and rest sites, complexity and diversity of trees and shrubs), and prey associated with these forest conditions, are thought to be the critical features that explain Pacific fisher habitat use, rather than specific forest types. *Id*.

Canopy cover is essential to fishers: the most consistent predictor of Pacific fisher occurrence at large spatial scales is moderate to high amounts of contiguous canopy cover. *Id.*

The Griffin Half Moon timber sale area currently supports two known resident female Pacific fishers and two known resident male Pacific fishers, but has the capacity to carry "at least seven female home ranges and three or more male home ranges." AR 003359. The Griffin Half Moon timber sale proposes to conduct timber harvest, including regeneration harvest, in habitat with known Pacific fisher presence. AR 003360. Under all action alternatives, timber harvest would reduce canopy cover on 410 acres to the point where the remaining habitat, if any, would no longer support use by Pacific fisher for its life history activities. *Id.*

## V.    LEGAL BACKGROUND.

### A.    The Federal Land Policy and Management Act.

Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 et seq. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

FLPMA requires the BLM to develop land use plans called "resource management plans" (RMPs) that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a). The BLM revised the southern Oregon

13

RMP for the Ashland Resource Area of the Medford District in 2016. The southern Oregon RMP applies to the Griffin Half Moon timber sale.

**B.      The National Environmental Policy Act.**

Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action. The Council on Environmental Quality (CEQ) has promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 et seq.

If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment (EA) to determine if a more detailed Environmental Impact Statement (EIS) is required. 40 C.F.R. § 1501.4. For an agency's decision to be considered reasonable, a decision record and finding of no significant impact (DR/FONSI) must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. Agency action is valid only if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). If the agency fails to take a "hard look" at the consequences of its action and consider important aspects of the problem in its EA, its decision is arbitrary and capricious. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010).

To support a determination of non-significance in an EA, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40

C.F.R. § 1508.8; *Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 2014 WL 525116,

at *2 (D. Or. 2014); *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000,

1006 (9th Cir. 2011). Direct effects are caused by the action and occur at the same time and place

as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are

later in time or farther removed in distances but are still reasonably foreseeable. 40 C.F.R. §

1508.8(b). Cumulative impact results when the "incremental impact of the action [is] added to

other past, present, and reasonably foreseeable future actions" undertaken by any person or

agency. 40 C.F.R. § 1508.7.

NEPA requires that environmental information be available to public officials and

citizens before agency decisions are made and before any actions occur to implement the

proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and

sufficient to allow the public to question the agency rationale and understand the agency's

decision-making process. *Id.*

CEQ's NEPA regulations permit the "tiering" of site-specific environmental analysis to

programmatic analysis in some cases:

> "Tiering" refers to the coverage of general matters in broader environmental impact
> statements (such as national program or policy statements) with subsequent narrower
> statements or environmental analyses (such as regional or basinwide program statements
> or ultimately site-specific statements) incorporating by reference the general discussions
> and concentrating solely on the issues specific to statement subsequently prepared.

40 C.F.R. § 1508.28. The "broader environmental impact statement" is usually referred to as a

"programmatic" analysis, which occurs for the Resource Management Plan and sometimes also

for other types of decisions. In the context of federal forest management, the Ninth Circuit has

> defined the programmatic stage as the level "at which the [agency] develops alternative
> management scenarios responsive to public concerns, analyzes the costs, benefits and
> consequences of each alternative in an environmental impact statement ('EIS'), and
> adopts an amendable forest plan to guide management of multiple use resources."

15

> *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n. 2 (9th Cir. 1999). Following the programmatic stage is the "implementation site specific stage during which individual site specific projects, consistent with the forest plan, are proposed and assessed." *Id*. A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (*quoting N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992) (quotation marks omitted)).

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). However, once an

agency decides to implement a site-specific project, such as a timber sale, then the agency must

consider the site-specific impacts of the action in that project's environmental analysis. *Id.* at

1095-96; *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006); *Resources Ltd.*

*v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1993). Indeed, "nothing in the tiering regulations

suggests that the existence of a programmatic EIS for a forest plan obviates the need for any

future project-specific [environmental analysis]." *Blue Mountains Biodiversity Project v.*

*Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

## VI.    THE GRIFFIN HALF MOON TIMBER SALE VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT BECAUSE THE BLM FAILED TO CONSIDER THE PROJECT'S DIRECT, INDIRECT, AND CUMULATIVE EFFECTS.

The Griffin Half Moon REA analyzed three issues "in detail:" the effects of the Project

on fish, aquatic habitat, and water quality including peak flow; the effects of the Project on

northern spotted owls; and whether harvested areas on the Dead Indian Plateau could be

successfully reforested. AR 003229. The Griffin Half Moon REA does not address the direct,

indirect, or cumulative effects of the project on any other issues or resources, including those

raised by plaintiffs during the public comment and administrative review process. Specifically,

the Griffin Half Moon REA fails to address the environmental consequences of the project on

great gray owls or Pacific fishers rendering the REA arbitrary, capricious, and not in accordance

with NEPA. *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007)

(requiring a hard look at the direct, indirect, and cumulative effects of an agency's action);

*Blackwood*, 161 F.3d at 1214 (rejecting reliance on forest plan EIS and requiring site-specific

environmental analysis).

### A.    Direct, Indirect, and Cumulative Effects on Great Gray Owls.

The Griffin Half Moon planning area is one of the best known location for great gray

owls in Oregon, and perhaps the Pacific Northwest, and visitors come to the area from around

the country and world to attempt to view these raptors, injecting the local economy with

important recreation-based revenue. AR 005771; Clements Decl., ¶¶ 11-19, 21, 35-36; Fuller

Decl., ¶¶ 1-133; Moy Decl., ¶¶ 11-12, 15; Rio Decl., ¶¶ 4-5; Thiemann Decl., ¶¶ 2-5, 7-8, 11, 13-

15; Trail Decl., ¶¶ 3-6. Great gray owls are rare species, and the prognosis for their long-term

survival and existence is unclear. AR 014023-014030, 018293, 009359, 013158, 013168,

021675, 021907, 021910, 021911, 018294, 009366, 013158, 021675, 021676, 021863.

Given the scientific concern about the species' persistence, in 1994 great gray owls were

listed as a "Survey and Manage" species by the BLM and Forest Service, which required the

federal land management agencies to survey for the species and protect it from disturbance with

no-harvest buffers. The Northwest Forest Plan, of which the Survey and Manage Program is a

part, states that "Specific mitigation measures for the great gray owl, within the range of the

northern spotted owl, include the following: provide a no-harvest buffer of 300 feet around

meadows and natural openings and establish 1/4-mile protection zones around known nest sites,"

and required the development of a survey protocol by 1995. AR 021092. The great gray owl

survey protocol currently states that after an owl site (either a pair or resident single) is located,

> a 30 acre management area is delineated for nests or paired owls [or resident singles],
> covering the best potential habitat for the species. Within these 30 acres, management

17

> treatments are limited to the protection or improvement of nesting habitat. In addition, a ¼ mile protection zone is created around each nest/pair. Within this protection zone, a 300 ft buffer is established around meadows and natural openings greater than [or equal to] 10 acres. Within these buffers, treatments are limited to protection or improvement of nesting habitat.

U.S. Department of the Interior, Bureau of Land Management, Oregon, and U.S. Department of Agriculture, Forest Service Regions 5 and 6, *Survey protocol for great gray owl (Strix nebulosa) within the range of the Northwest Forest Plan, Version 4.0* (April 20, 2020), https://www.fs.fed.us/r6/sfpnw/isssp/documents4/sp-bi-strix-nebulosa-20171017.pdf, at 31 (brackets in original).[1]

Between 1994 and 2016, the BLM prepared and implemented several timber sales in and around the Griffin Half Moon planning area. AR 000001-001511. In conformance with its Survey and Manage obligations at the time, BLM surveyed for, located, and protected with no-harvest buffers at least three great gray owl sites: Indian Highway, Howard 12, and Indian Access. *Id*.; AR 000055 (Howard 12 map), AR 000248 (Indian Access map). These sites completely or partially overlap with Griffin Half Moon timber sale units 12-1, 13-2, 13-3A, 13-3B, 13-4, and 15-1. *Compare id. with* AR 003159-003161 (timber harvest units maps).

---

[1] The 2004 version of the survey protocol is available in the administrative record for the Griffin Half Moon project, AR 013952-014003, but it was superseded by version 4.0 in 2016. *See also*, AR 014029 (scientific publication recommending that due to new findings "a reassessment of the current protocol used by the USFS and BLM to monitor Great Gray Owls in the Pacific Northwest...seems appropriate"). The 2016 protocol is a government publication publicly available on a government website, and therefore this Court may take judicial notice of its contents. *See Mack v. S. Bay Beer Distribs., Inc*., 798 F.2d 1279, 1282 (9th Cir. 1986); *Mullis v. U.S. Bank. Ct*., 828 F.2d 1385, 1388 (9th Cir. 1987*); Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (judicial notice of records of administrative bodies); *Ursack, Inc. v. Sierra Interagency Black Bear Group*, 2009 WL 2422784, *6 ( N.D. Cal. 2009) (judicial notice of agency materials posted on agency website); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of information on government websites in APA case).

In 2016, the BLM revised its RMP and jettisoned its participation in the Survey and Manage program. As a result, BLM is no longer required by its RMP to survey for and protect great gray owls. In reaching that decision, the BLM's final environmental impact statement (FEIS) supporting the 2016 RMP states that an earlier agency analysis[2]

> ...identified that the great gray owl would be likely to have sufficient habitat rangewide, but insufficient habitat in a portion of its range, because it would not be included on the BLM or U.S. Forest Service sensitive species lists and protection of known nest sites was uncertain based on 'inconsistent' protections in individual management plans (USDA FS and USDI BLM 2007, pp. 285–286). Although it is not possible to compare directly the effects of the alternatives and the Proposed RMP on great gray owl to the outcomes described in the 2007 SEIS as explained above, it is possible to evaluate where known sites occur and how habitat would change over time under the alternatives and the Proposed RMP. Under all action alternatives and the Proposed RMP, more BLM-administered lands would be allocated to reserves than under the No Action alternative, and therefore more great gray owl observations (and presumably more nest sites) would occur within reserves....

AR 008065-008066.[3] The Griffin Half Moon timber sale is not located within reserve land use allocations: it is located within the Harvest Land Base.

The REA does not discuss the timber sale's direct, indirect, and cumulative effects on the three known great gray owl sites located within the planning area that were buffered by the BLM in previous timber sale planning efforts, despite repeated calls from the public to do so given the high public interest in this wildlife species and its habitat needs that are incompatible with the proposed regeneration harvest and heavy thinning prescriptions. AR 005866-005867, 005771-005772, 005775-005778, 004031-004032, 003129-003131, 003135-003136, 003138-003139, 003144-003147, 004014-004015, 004017-004018, 004023-004025, 005781; Clements Decl., ¶¶ 2-39 (including exhibits); Fuller Decl., ¶¶ 1-133; Moy Decl., ¶¶ 8-16; Rio Decl., ¶¶ 2-12; Sexton

---

[2] This analysis was successfully challenged in federal court as arbitrary, capricious, and not in accordance with law. *Conservation Nw. v. Rey*, 674 F.Supp.2d 1232 (W.D. Wash. 2009).

[3] These two pages represent the totality of the BLM's analysis of the RMP's effect on great gray owls.

Decl., ¶¶ 3-12; Thiemann Decl., ¶¶ 1-17 (including exhibits); Trail Decl., ¶¶ 1-7; Willis Decl., ¶¶ 3-7. Although the federal government's own survey protocol explains that the very type of forest management proposed in the Project – regeneration harvest and heavy commercial thinning – is "generally expected to result in significant negative effects on habitat, life cycle, microclimate or life support systems or persistence of Great Gray Owls at the project location," AR 013960, the BLM did not conduct any environmental analysis of the Griffin Half Moon timber sale on great gray owls.

While the environmental assessment "is where the [agency's] defense of its position must be found," *Blackwood*, 161 F.3d at 1214, the Griffin Half Moon REA contains only two paragraphs about great gray owls, both of which are silent on the effects of the Project on the species and rely on the 2016 RMP for any information about great grays. AR 003274, 003341; *but see also*, AR 003358 (observing that pocket gophers, a prey species of great gray owls, would not be affected by the project). Beyond these three oblique references to the great gray owl in the REA, there are only two additional records in the entire administrative record for the Project, aside from published literature citations, that mention great gray owls: one half-page email that states that a scientific article reporting on the possible genetic isolation of great gray owls just south of the project area in California did not change the "approach" taken to managing the species in the planning area, AR 001872, and a three sentence email that concludes that the Project's effects on great gray owls was a "considered but not addressed in detail" issue, AR 004676. This paucity of information does not suffice as a "hard look" at the Project's direct, indirect, and cumulative effects on great gray owls because there is no deliberative evidence that the BLM can point to demonstrate that it has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington*, 516 F.3d at 1112.

Nor does the REA analyze whether there may be additional but undocumented great gray owl sites in the planning area and how timber harvest may directly, indirectly, and cumulatively affect them, even though the public highlighted the fact that there are numerous sightings of the species in the planning area and in proposed harvest units. Instead, the REA states that "the RMP allocates a larger Late-Successional Reserve network than the previous plan. This accomplishes the goal of protecting older and more structurally-complex forests, and continues to provide management for many of the formerly Survey and Manage species as Bureau Sensitive species."[4] AR 003274. But because the Griffin Half Moon timber sale is not in a Late-Successional Reserve, the known great gray owls in the planning area will not be protected from timber harvest, and extant but undocumented sites will likewise receive no protection. This is a potentially significant environmental effect that should have been disclosed and analyzed in the REA. The BLM's failure to do so violates NEPA. 40 C.F.R. § 1508.8; *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809–11 (9th Cir. 1999) (holding that analysis that "focuses solely on the beneficial impact" and does not analyze the adverse effects of the proposed action violates NEPA).

Nor may the BLM rely on or tier to the environmental analysis supporting the 2016 RMP to meet its NEPA obligations for the Griffin Half Moon timber sale. The RMP FEIS does not actually analyze the effect on great gray owls, instead stating that the existence of Late-Successional Reserves will result in more habitat for great grays over time in that land use allocation. AR 008065-008066. But this statement says nothing about the actual environmental consequences from the Griffin Half Moon timber sale on the great gray owls located in that

---

[4] The great gray owl is not a Bureau Sensitive Species. Federal Defendant's Answer, ¶ 70 ("the great gray owl is not a BLM sensitive species in Oregon and is not a BLM special status species in Oregon"). It therefore receives no special "management" protections.

planning area, which is *not* within a Late-Successional Reserve, so "tiering to the RMP EIS cannot save the EA[]." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004); *Blackwood*, 161 F.3d at 1214 ("It does not support the proposition that any scale of logging project is exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur"). Indeed, prior agency analysis concluded that the reserve system was insufficient to protect rare species, thus necessitating the protections of the Survey and Manage program. *Conservation Nw. v. Rey*, 674 F.Supp.2d 1232, 1247 (W.D. Wash. 2009) ("in other words, the Reserves are not enough to ensure that certain rare or little-known species survive; Survey and Manage fills the gap").

The questionable viability of the great gray owl led to its designation as a Survey and Manage species in 1994. AR 021092. There remained concern about the persistence of the species over the next two decades, which continues today. AR 008065-008066. Despite this fact, the BLM failed to implement protective measures for great gray owls in the Griffin Half Moon timber sale or the 2016 RMP. The Ninth Circuit has explained that "the absence of a reasoned explanation for disregarding previous factual findings violates the APA. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc) (*quoting F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring) (internal quotations omitted). When a federal agency issues a final decision that departs from long-standing policy and practice, it must "display[] awareness that it is changing its position" and "if the new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide a "reasoned explanation for disregarding facts and circumstances that underlay or were

engendered by the prior policy." *Organized Vill. of Kake*, 795 F.3d at 966 (internal quotation marks and citations omitted).

    In this case, the BLM eliminated protections for great gray owls without providing a "reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Vill. of Kake*, 795 F.3d at 966. BLM has been in this position before. In 2004, the Forest Service and BLM unsuccessfully attempted to eliminate the Survey and Manage program, which resulted in a successful legal challenge to that decision. The district court there explained:

> The point is not that the Agencies can or cannot chose to eliminate the Survey and Manage standard in an effort to re-balance the Plan's goals (which is an issue beyond the scope of NEPA). Rather, the point under NEPA is that the Agencies' analysis of the environmental impacts of eliminating the standard is premised on an assumption that is inconsistent with their own prior analysis and therefore appears to lack support. Even if including the Survey and Manage standard as a part of the Plan was a policy choice by the Agencies in 1994, just as eliminating the standard is the Agencies' policy choice in 2004, the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now.

*Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175, 1192-93 (W.D. Wash. 2005). The district court reiterated this point when the agencies made a second unsuccessful attempt to eliminate the Survey and Manage program in 2007. *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1247–49 (W.D. Wash. 2009) ("The same question concerns the Court again today. As before, in order to justify eliminating Survey and Manage in compliance with NEPA, the Agencies must "disclose and explain on what basis they deemed the standard necessary before but assume it is not now") (*citing Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175, 1192-93); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248, 1252–53, 1270 (W.D. Wash. 2007) (rejecting attempt to alter another provision of the Northwest Forest Plan based on the same legal theory).

Regarding great gray owls specifically, there is no analysis, justification, or rationale at all anywhere in either the 2016 RMP FEIS or the Griffin Half Moon REA for eliminating protections for the species. And nor is there a discussion in the REA regarding the direct, indirect, and cumulative environmental consequences of the proposed timber sale on great gray owls. Consequently, the BLM "entirely failed to consider an important aspect of the problem," *McNair*, 629 F.3d at 1074, and did not consider "the relevant factors and articulate[] a rational connection between the facts found and the choices made," *Arrington*, 516 F.3d at 1112. These failures are arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

### B.    Direct, Indirect, and Cumulative Effects on Pacific Fisher.

Similar to the REA's lack of analysis of the effects of the Griffin Half Moon timber sale on great gray owls, the REA does not include a discussion of the effects of the timber sale on Pacific fisher. Instead, the only mention of how the timber sale will affect Pacific fisher is in an appendix to the REA. AR 003359-003360. But the use of an "appendix" is only appropriate when an agency has prepared an environmental impact statement, and not an environmental assessment as the BLM prepared here. The CEQ NEPA regulations explain that

> If an agency prepares an appendix *to an environmental impact statement* the appendix shall:
>
> (a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).
> (b) Normally consist of material which substantiates any analysis fundamental to the impact statement.
> (c) Normally be analytic and relevant to the decision to be made.
> (d) Be circulated with the environmental impact statement or be readily available on request.

40 C.F.R. § 1502.18 (emphasis added). Appendix C to the Griffin Half Moon timber sale is captioned "Issues Considered but not Analyzed in Detail" and given its title, does not "consist of

material prepared in connection with an environmental impact statement," and does not "consist of material which substantiates any analysis fundamental to the impact statement" because the REA does not discuss the effect of the timber sale on Pacific fisher in the first instance so there is nothing there to substantiate.

Based on the plain language of the regulation, which is not ambiguous, BLM cannot utilize an appendix to conduct the requisite NEPA analysis required in the body of the revised environmental assessment. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019) (holding that deference to an agency's interpretation of its regulations is not warranted unless the regulation is truly ambiguous). And, because NEPA is binding on all federal agencies and not the BLM alone, BLM is afforded no deference in interpreting the CEQ NEPA regulations. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002) ("the court owes no deference to the FAA's interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the FAA alone").

Instead, the CEQ regulations require that an environmental assessment must contain "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. The Ninth Circuit has held that an appendix is not an acceptable place for environmental analysis: instead, the analysis must be found in the body of the NEPA document itself. The EA (or EIS) must "provide the public with a basis for evaluating the impact" of the proposed action. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), *overruled on other grounds by Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2010). Accordingly, the information supporting the agency's decision must be found either (1) in the EA (or EIS), or (2) in the administrative record and referred to by the EA or EIS. *Blackwood*, 161 F.3d at 1214.

25

In the present case, however, the Griffin Half Moon REA does not contain any analysis or discussion about the timber sale's effects on Pacific fisher, and thus does not contain "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. Nor does the administrative record contain this information. The failure to consider the direct, indirect, and cumulative effects of Griffin Half Moon timber sale is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

The only place where the Pacific fisher is discussed at all is on a page and a half of the 28-page Appendix C. Indeed, given the appendix's title – Issues *Considered but not Discussed in Detail* – it is plain that the direct, indirect, and cumulative effects of the timber sale were not disclosed there. Instead, the BLM states that the 2016 RMP FEIS is where the requisite analysis can be found. AR 003360. While tiering is permissible in some circumstances, *Blackwood*, 161 F.3d at 1214, the RMP FEIS specifically cautions managers against relying on the analysis contained therein for future site-specific action:

> The BLM *assumed* full occupancy of habitat by the species and male home ranges overlapping female home ranges. Other factors influence fisher populations, which are not predictable and are unaffected by BLM land management actions (e.g., mortality from toxicants and vehicle collisions) and were not included in estimating fisher populations. *Therefore, these estimates of the fisher population are approximate and the absolute population numbers should be interpreted with great caution. The BLM estimated population numbers only to provide the BLM with the relative outcomes of the fisher population under the alternatives and the Proposed RMP*.

AR 008092 (emphasis added). Because the RMP FEIS was based on a number of assumptions, site-specific analysis at the project level is required to determine effects to the species that exist in a project area. But BLM did not conduct this site-specific analysis in the Griffin Half Moon REA, and did not acknowledge the population assumptions in the RMP FEIS. Forgoing site-

specific analysis in the REA and solely relying on the RMP FEIS does not satisfy NEPA's "hard

look" requirement. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997.

      In response to public comments asking BLM to conduct a direct, indirect, and cumulative

effects analysis of the timber sale on Pacific fisher, the BLM responded that "[T]he Griffin Half

Moon Project is designed consistent with the RMP decision. Furthermore, since there is not a

foreseeable difference in effects to fisher between the action alternatives, additional analysis of

this issue is not expected to help make a reasoned choice between alternatives, and it was not

carried forward for further analysis." AR 003360. Simply stating that the action alternatives do

not differ in their effects to Pacific fisher does not mean that BLM has disclosed and discussed

those effects. Indeed, without a direct, indirect, and cumulative effects analysis in the

environmental assessment the first instance, it is impossible for the public and decisionmaker to

determine whether there exists a reasoned choice between alternatives.

      Rather than discussing how the Griffin Half Moon timber sale will affect Pacific fisher,

the BLM expects Pacific fishers to leave the planning area and find other habitat in which to live

while timber harvest takes place. Appendix C states that "[d]isturbance from treatment activities

would likely be the principal effect to fishers...However, fishers are highly mobile and, with

large home ranges, they would likely move to another part of their home range while the activity

is taking place." AR 003360. But neither the REA nor any other information in the

administrative record supports the contention that Pacific fisher will simply "move out of the

way" of oncoming and ongoing timber harvest; the quality of adjacent habitat and whether the

species will persist there or for how long;[5] or any past, present, or reasonably foreseeable federal

_____

[5] For example, only 21.68% of available habitat across all ownerships within the analysis area
contains sufficient canopy cover for Pacific fisher. AR 003311. Because canopy cover "is
critical" for the species, AR 008088, BLM should have analyzed whether the Pacific fisher will

27

or nonfederal land management actions that may affect the species while in the adjacent habitat. The BLM merely concludes that the timber sale's effects to Pacific fishers will be minimal or minor, AR 003360, without analysis to substantiate its conclusions. These vague and unsubstantiated conclusions do not comport with NEPA's disclosure and analysis requirements. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1380 (9th Cir. 1998) ("to 'consider' cumulative effects, some quantified or detailed information is required. General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided"); *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985) ("An agency cannot...avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment").

      BLM's eschewing analysis of how the Griffin Half Moon timber sale may affect Pacific fisher is especially egregious given the perilous status of the species. A final decision by the Fish and Wildlife Service to list the Pacific fisher as a Threatened species is past-due, and given that two of the primary reasons for listing are the loss of suitable habitat due to timber harvest and the small population size of the species, 84 Fed. Reg. 6,0278, how the Griffin Half Moon timber sale will affect the four known – and possibly as many as ten – individuals of this imperiled species is especially relevant to the species continued persistence. Instead, the BLM punted this analysis back to the RMP FEIS, which explained that additional site-specific project analysis would be required in order to address local population, habitat, and effects questions. AR 008092. BLM should not be permitted to play this shell game. *Pac. Rivers Council v. U.S. Forest Serv*., 689

---

find adequate habitat in the adjacent areas the agency expects the species to retreat to in response to the Griffin Half Moon timber sale.

F.3d 1012, 1029 (9th Cir. 2012), *vacated*, 570 U.S. 901 (2013) ("Reliance on programmatic NEPA documents has resulted in public and regulatory agency concern that programmatic NEPA documents often play a 'shell game' of when and where deferred issues will be addressed, undermining agency credibility and trust") (internal references omitted).

In sum, like its inadequate analysis pertaining to great gray owls, the BLM failed to consider the direct, indirect, and cumulative effects on Pacific fisher from the Griffin Half Moon timber sale, and improperly relied on speculative conclusions from the 2016 Resource Management Plan and Final Environmental Impact Statement to provide that analysis. Because neither the REA nor the RMP and FEIS contain the requisite site-specific analysis, the project is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

## VII.    CONCLUSION.

For the forgoing reasons, the court should GRANT Plaintiffs' motion for summary judgment.

Date:   May 1, 2020.                    Respectfully submitted,

                                        /s/ Susan Jane M. Brown         
SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing **PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT and DECLARATIONS OF MELVIN N. CLEMENTS, HARRY FULLER, JEANINE MOY, SHANNON RIO, GEORGE SEXTON, PETER J. THIEMANN, PEPPER W. TRAIL, and DAVE WILLIS** were served on the following parties by this court's electronic court filing (ECF) system:

BILLY J. WILLIAMS, OSB # 901366
United States Attorney, District of Oregon
SEAN E. MARTIN, OSB # 054338
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone: (503) 727-1010

       Attorneys for Defendant

Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

       Attorneys for Defendant-Intervenor Murphy Company

Date:   May 1, 2020.       Respectfully submitted,

                _/s/ Susan Jane M. Brown_     .
                SUSAN JANE BROWN (OSB #054607)
                Western Environmental Law Center
                4107 NE Couch Street
                Portland, Oregon 97232
                (503) 914-1323 | Phone
                brown@westernlaw.org

*Counsel for Plaintiffs*