Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

THE HONORABLE MARK D. CLARKE

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT,**<br><br>Defendant,<br><br>**and**<br><br>**MURPHY COMPANY,**<br><br>Defendant-Intervenor. | Case No.:  1:19-cv-02069-CL<br><br>**DEFENDANT-INTERVENOR'S MOTION AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**DEFENDANT-INTERVENOR'S SJ MEM.**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARDS GOVERNING JUDICIAL REVIEW ...........................................4

    A.  Summary Judgment Standard ...............................................................4

    B.  The APA Arbitrary and Capricious Standard of Review .........................5

    C.  Tiering Under NEPA ............................................................................5

    D.  Deference to Agency Expertise and Management Direction ..................6

III.  OVERVIEW OF THE GRIFFIN HALF MOON VEGETATION MANAGEMENT
PROJECT AND ITS GRIFFIN HALF MOON TIMBER SALE PURCHASED BY
MURPHY COMPANY ...........................................................................................7

IV.  ARGUMENT ......................................................................................................11

    A.  The Ninth Circuit Affirmed That BLM Fully Explained Its Decision to Replace
the Northwest Forest Plan's Survey and Manage Measures with a Different
Land Management Approach Involving a Larger Network of Late-Successional
Reserve Habitat When Adopting the 2016 RMP .....................................11

        1.  A Look Back at the Northwest Forest Plan, Which No Longer Applies
to BLM Lands in Western Oregon...............................................12

        2.  Because BLM Provided a Well-Reasoned Explanation for Its New, Non-
Northwest Forest Plan Approach to Land Management When Adopting
the 2016 RMP, It Was Not Required to Justify the Absence of Survey
and Manage Measures for the Project.........................................13

    B.  NEPA is Satisfied in this Case Because the Potential Impacts on the Fisher and
Great Gray Owl from the Project's Planned Vegetation Management Were Fully
Considered in the Environmental Analyses for the 2016 RMP, to Which the
Project Properly Tiers .........................................................................17

        1.  The Project's potential environmental impacts on the fisher, a Bureau
Sensitive Species, were fully anticipated in the environmental analyses
for the 2016 RMP.....................................................................18

        2.  The Project's potential environmental impacts on the great gray owl,
which is not a protected species, were fully anticipated in the
environmental analyses for the 2016 RMP................................25

**V.**    CONCLUSION.................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Forest Res. Council v. Hammond*,
 No. CV 16-1599 (RJL), 2019 WL 6311896 (D.D.C. Nov. 22, 2019) ........................................2

*Blue Mountains Biodiversity Project v. Blackwood*,
 161 F.3d 1208 (9th Cir. 1998) ...............................................................18

*Conservation Northwest v. Rey*,
 674 F. Supp. 2d 1232 (W.D. Wash. 2009), *rev'd*, 715 F.3d 1181 (9th Cir.
 2013) ..........................................................................................12

*Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*,
 No. 1:12-cv-1596-CL, 2014 WL 458288 (Feb. 4, 2014 D. Or.) (unpublished
 opinion) ........................................................................................7

*Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*,
 451 F.3d 1005 (9th Cir. 2006) ...............................................................18

*F.C.C. v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009).................................................................13, 14, 15, 16

*Gifford Pinchot Task Force v. U.S. FWS*,
 378 F.3d 1059, *amended by* 387 F.3d 968 (9th Cir. 2004)...................................12

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
 914 F.2d 1174 (9th Cir. 1990) ..................................................... *passim*

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
 468 F.3d 549 (9th Cir. 2006) ...................................................................5

*Lands Council v. McNair*,
 537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.
 Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .................5, 6, 7

*Marsh v. Oregon Natural Res. Council*,
 490 U.S. 360 (1989)...........................................................................7

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
 551 U.S. 644 (2007).........................................................................5

*Native Ecosystems v. Weldon*,
 697 F.3d 1043 (9th Cir. 2012) ...............................................................7

*Native Village of Nuiqsut v. BLM*,
  Case No. 3:19-cv-00056-SLG, 2020 WL 113495 (D. Alaska Jan. 9, 2020) ................................17

*Nw. Envtl. Advocates v. NMFS*,
  460 F.3d 1125 (9th Cir. 2006) ........................................................................................10

*Oregon Wild v. U.S.*,
  107 F. Supp. 3d 1102, 1111 (D. Or. 2015) ........................................................................18

*Organized Village of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ....................................................................................14, 15

*Pacific Rivers v. U.S. Bureau of Land Management*,
  Case No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018),
  *adopted in full*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, No. 19-
  35384, 2020 WL 2510759 (9th Cir. May 15, 2020) ....................................................... *passim*

*Seattle Audubon Soc'y v. Lyons*,
  871 F. Supp. 1291 (W.D. Wash. 1994), *aff'd, Seattle Audubon Soc'y v.
  Moseley*, 80 F.3d 1401 (9th Cir. 1996) ........................................................................12, 13

*T.W. Elec. Serv. v. Pac. Elec. Contractors*,
  809 F.2d 626 (9th Cir. 1987) ..........................................................................................4


**STATUTES**

5 U.S.C. § 706(2)(A)............................................................................................................5

42 U.S.C. §§ 4321 et seq......................................................................................................1

43 U.S.C. § 1701 et seq.......................................................................................................15

43 U.S.C. § 1712...............................................................................................................15

43 U.S.C. § 2601 et seq........................................................................................................2


**OTHER AUTHORITIES**

40 C.F.R. § 1502.20.............................................................................................................6

40 C.F.R. § 1508.28.............................................................................................................6

43 C.F.R. § 46.140(c)...........................................................................................................6

43 C.F.R. § 46.315(a)................................................................................................18

43 C.F.R. § 1601.0-1 to 1601.0-8 ...........................................................................15

43 C.F.R. § 1610.5-3(a) ...........................................................................................14

85 Fed. Reg. C.F.R. § 29,532 (May 15, 2020)........................................................22

Federal Rules of Civil Procedure Rule 56 .............................................................1, 4

**MOTION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (FRCP) and this Court's order of March 18, 2020, defendant-intervenor Murphy Company moves the Court for summary judgment against plaintiffs' two National Environmental Policy Act (NEPA) claims and in favor of the Griffin Half Moon Vegetation Management Project on the grounds that defendant the Bureau of Land Management (BLM) and Murphy Company are entitled to judgment as a matter of law.  In support of this motion, Murphy Company relies on the following Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, the pleadings on file, including the Administrative Record (AR), and the filings of BLM, all of which support granting summary judgment in favor of BLM and Murphy Company and against plaintiffs.

**MEMORANDUM**

**I.    INTRODUCTION.**

Before the Court is another challenge to BLM's management of the Harvest Land Base in southern Oregon brought by plaintiffs Klamath Siskiyou Wildlands Center et al. (collectively KSWild).  The land management action challenged in this case is the Griffin Half Moon Vegetation Management Project (the Project) and its Griffin Half Moon Timber Sale (the Timber Sale).  Murphy Company purchased the Timber Sale in 2018 with a goal of supplying its White City veneer plant with white fir timber volume.  Although much in the world has changed since 2018, at least one thing has not – the Project was then and remains today compliant with NEPA, 42 U.S.C. §§ 4321 et seq.

KSWild's two NEPA claims, one focused on the disclosure of potential environmental impacts on the great gray owl, the other on the fisher, rest on KSWild's refusal to acknowledge

that BLM properly tiered its NEPA analysis for the Project to the extensive environmental

analyses conducted by BLM for the 2016 Southwestern Oregon Resource Management Plan

(2016 RMP).  *See also* AR_006280-81 (2016 RMP 2-3) (explaining that the 2016 RMP is

"nearly identical" to the Proposed RMP evaluated in the 2016 RMP NEPA process).  The 2016

RMP "provides a system of land use allocations that together provide a strategy for forest

management and a sustainable supply of timber while contributing to the conservation and

recovery of threatened and endangered species within the planning area . . . ."  AR_003218

(REA 1).  The 2016 RMP, which currently governs land management actions in the Project area,

has withstood all legal challenges brought by three of the plaintiffs in this case (Klamath

Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands).[1]  Those plaintiffs (joined by

others) challenged the 2016 RMP under NEPA, the Endangered Species Act (ESA) and the O&C

Sustained Yield Act,[2] but their claims were rejected resoundingly first by Magistrate Russo and

then by Judge McShane.  *See generally Pacific Rivers v. U.S. Bureau of Land Management*, Case

No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018), *adopted in full*, 2019 WL

---

[1]  In two cases challenging the 2016 RMP on different grounds (D.C. District Court Case Nos. 16-1599 and 16-1602), the D.C. District Court on November 22, 2019 ruled that the 2016 RMP violates the O&C Sustained Yield Act by excluding certain O&C Act timberlands from timber harvest.  *See Am. Forest Res. Council v. Hammond*, No. CV 16-1599 (RJL), 2019 WL 6311896, at *3 (D.D.C. Nov. 22, 2019).  The parties' remedy briefing in the D.C. District Court is complete, and no party has asked for wholesale invalidation of the 2016 RMP, which continues to govern the lands at issue in this case and will do so for the foreseeable future.

[2]  The O&C Sustained Yield Act is the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 2601 et seq.  Contrary to established law, the plaintiffs' challenge to the 2016 RMP alleged that the O&C Sustained Yield Act is a multiple-use management statute.  It is not, as the Oregon District Court rightly recognized in *Pacific Rivers*.  *See also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1183-84 (9th Cir. 1990) (holding in no uncertain terms that the O&C Sustained Yield Act is a "timber production" dominant use statute which disallows conflicting uses, and rejecting the "untenable" notion that the Act was a multiple-use management statute).

1232835 (D. Or. Mar. 15, 2019). The Ninth Circuit recently agreed with the Oregon District Court.

On May 15, 2020, only 10 days after oral argument, the Ninth Circuit readily upheld the Oregon District Court's decision. *Pacific Rivers*, No. 19-35384, 2020 WL 2510759 (9th Cir. May 15, 2020). In doing so, the Ninth Circuit confirmed that BLM's analyses for the 2016 RMP complied with NEPA. The Ninth Circuit also rejected the assertion, raised again without merit in this case, that BLM had not "provided a 'reasoned explanation' for any change in its management approach." *Id.* at *2. The change in BLM's land management approach effected by the 2016 RMP and upheld by the Ninth Circuit includes BLM's reasoned decision to replace the Northwest Forest Plan's survey and manage measures with a larger network of late-successional reserve habitat designed to benefit numerous species like the great gray owl and the fisher. Thus, no survey and manage measures apply to the BLM lands at issue in this case – again, the 2016 RMP employs a different approach to land management that has withstood legal challenge and been upheld by the Ninth Circuit. *Cf.* Plaintiffs' Opening Summary Judgment Memorandum (Docket No. 31, Pls.' Mem.) at 22-23 (alleging erroneously that BLM's Griffin Half Moon Project eliminated survey and manage measures related to the great gray owl, when in fact the 2016 RMP governing the Project replaced those survey and manage measures with a different management approach).

The briefing in this case demonstrates that BLM properly tiered the Project's NEPA analysis to the extensive NEPA analyses conducted in connection with promulgation of the 2016 RMP and its forest management program for the Harvest Land Base in southwestern Oregon. The Project is almost entirely within the 2016 RMP's Harvest Land Base, AR_003218 (REA 1), and comprised 100% of O&C Sustained Yield Act acres. AR_003220 (REA 3). The Harvest

Land Base is the land allocation use designated for continual timber production – that is the purpose of these lands, the total acreage of which is dwarfed by the acreage set aside in the 2016 RMP for wildlife conservation purposes.  *See, e.g.*, AR_006321 (2016 RMP 43) (showing that under the 2016 RMP, 31% of the acreage in the planning area is allocated to late-successional reserves and 15% is allocated to riparian reserves (not to mention the 18% of the acreage that is allocated to District-Designated Reserves), whereas only 20% of the acreage is in the Harvest Land Base.  The 2016 RMP provides the land management direction for the Harvest Land Base acres at issue in this case, all of which again are O&C Sustained Yield Act acres where the dominant use established by Congress is sustained-yield timber production, not the creation of reserves for wildlife.  *See supra* note 2 (discussing *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174 (9th Cir. 1990)).  KSWild may wish it were otherwise, but that is the reality of the Harvest Land Base and O&C Sustained Yield Act acreage in the Project area.  And contrary to KSWild's myopic view of the record, the potential environmental impacts of the proposed timber harvest on great gray owls and fishers were fully-considered and disclosed during development of the 2016 RMP to which this Project tiers.  NEPA thus is satisfied, and summary judgment should be granted in favor of Project implementation.

## II.    LEGAL STANDARDS GOVERNING JUDICIAL REVIEW.

### A.    Summary Judgment Standard.

Summary judgment is proper when the evidence and reasonable inferences show there are no genuine issues of fact such that the moving party is entitled to judgment as a matter of law.  FRCP 56(c); *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987).  Where review is based on an administrative record, the Court's task is not to judge whether there are disputed issues of material fact but rather to ensure the record supports the agency action.

Here, the record supports BLM's decision to authorize the Griffin Half Moon Project pursuant to a Finding of No Significant Impact and Decision Record after preparation of a Revised Environmental Assessment (REA), as a result of which the Project should be upheld.

**B.      The APA Arbitrary and Capricious Standard of Review.**

NEPA challenges to agency land management decisions are reviewed under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review.  5 U.S.C. § 706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 554 (9th Cir. 2006) (agency decisions challenged under NEPA are reviewed under the APA).

The APA's arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency.  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009).  Under this standard, an agency's decision should be upheld unless the agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' . . . offered an explanation 'that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *McNair*, 537 F.3d at 987 (citation omitted). Applying this legal standard, the Griffin Half Moon Project should be upheld by the Court.

**C.      Tiering Under NEPA.**

Tiering under NEPA is a process whereby an agency evaluates the potential environmental impacts of a proposed action based on prior NEPA environmental analysis.  *See*

40 C.F.R. § 1508.28 ("Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement [or environmental assessment] subsequently prepared").  The Council on Environmental Quality, the agency that promulgates NEPA regulations, encourages agencies to employ tiering "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28)."  *Id.* § 1502.20.  Thus, when a broad, programmatic EIS like that for the 2016 RMP already has been prepared and the agency is preparing a subsequent EA for an action "included within the entire program . . . (such as a site specific action) the subsequent [EA] need only summarize the issues discussed in the broader statement and incorporate discussion from the broader statement by reference . . . ."  *Id.*

Department of Interior regulations similarly encourage tiering.  43 C.F.R. § 46.140(c) (explaining that "[a]n environmental assessment prepared in support of an individual proposed action can be tiered to a programmatic or other broader-scope environmental impact statement").  For the Griffin Half Moon Project, BLM properly tiered its environmental analysis to that for the 2016 RMP.  *See, e.g.*, AR_003179 (Finding of No Significant Impact 1) (stating that the Griffin Half Moon REA "tiered to and incorporated by reference as appropriate broader scale analyses documenting the environmental and human effects of a forest management program analyzed in the Proposed Resource Management Plan and Final Environmental Impact Statement for Western Oregon (2016 PRMP/FEIS)").

### D.    <u>Deference to Agency Expertise and Management Direction.</u>

Federal agencies are owed substantial deference by bodies reviewing agency action, particularly agency action involving scientific matters.  *McNair*, 537 F.3d at 988.  *See also*

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (deference to an agency's decision is particularly appropriate where questions of scientific methodology or technical expertise are involved).  Review should be at its *most* deferential where an agency is addressing difficult issues within its area of special expertise.  *McNair*, 537 F.3d at 993.  An "agency's interpretation and application of its own management direction" also is entitled to "'substantial deference.'"  *Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*, No. 1:12-cv-1596-CL, 2014 WL 458288 (Feb. 4, 2014 D. Or.) (unpublished opinion) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1055-56 (9th Cir. 2012)).  BLM's decision-making in this natural resources management case is entitled to substantial deference.

## III.    OVERVIEW OF THE GRIFFIN HALF MOON VEGETATION MANAGEMENT PROJECT AND ITS GRIFFIN HALF MOON TIMBER SALE.

The Griffin Half Moon Project and Timber Sale are located "in southwest Oregon, east of the city of Ashland and near Howard Prairie Lake . . . ."  AR_003220 (REA 3).  Murphy Company, the Timber Sale purchaser, operates a veneer plant nearby in White City.  Declaration of John Murphy (Murphy Decl.) ¶ 2.  Murphy Company purchased the Timber Sale because it has a heavy white fir component that will supply Murphy Company's White City veneer plant with raw materials needed to sustain operations.  Murphy Decl. ¶¶ 8-9.  *See also* Declaration of Lawrence Knox Marshall ¶ 3 (explaining that the resulting white fir veneer will be "used as high grade veneer in the softwood plywood manufactured in Rogue River and the hardwood plywood that [Murphy Company] make[s] in Eugene").

All of the approximately 933 acres undergoing vegetation management in the Project Area are O&C Sustained Yield Act timberlands.  AR_003220 (REA 3).  *See also* AR_003162 (Decision Record 6) (displaying in Table 1 the acreage and harvest prescription for each Timber Sale unit).  O&C Act timberlands are subject to the congressional mandate that they be managed

for the dominant use of permanent forest production under the principles of sustained-yield

timber management.  *See, e.g.*, *Pacific Rivers*, 2018 WL 6735090, at *17 ("[C]ourts have

repeatedly held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber

production.").  This means Congress dedicated the timberlands at issue to the dominant use of

"timber production."  *Headwaters*, 914 F.2d at 1184.  Consistent with that dominant use, almost

all of the timberlands at issue (96%) are located in the 2016 RMP's Harvest Land Base,

AR_003218 (REA 1), the land use allocation dedicated to long-term sustained yield timber

management under the 2016 RMP.  AR_006284 (2016 RMP 6).

Not all Harvest Land Base acres are managed the same way.  Rather, under the 2016

RMP, the Harvest Land Base has "sub-allocations to guide forest management based on large-

scale forest conditions . . . ."  AR_003219 (REA 2).  Here, all of the Harvest Land Base acres are

in the Low Intensity Timber Area (LITA) sub-allocation.  AR_003219 (REA 2).  For LITA, the

2016 RMP directs BLM to use "regeneration harvest . . . to produce complex early-successional

ecosystems and adjust the age-class distribution while contributing toward meeting the" 2016

RMP's timber production targets. *See generally* AR_6342-43 (2016 RMP 64-65) (describing

management objectives for LITA in the 2016 RMP).

In addition to the 2016 RMP directing that the lands in the Project area be managed via

regeneration harvest, the stands selected for timber harvest are in need of active management as

they are declining in vigor.  As BLM explained in the REA, the timberlands that will be treated

"are overstocked and are experiencing declining vigor and growth rates due to high levels of

density-related competition that has primarily occurred from lack of disturbance (i.e., fire.)."

AR_003219 (REA 2).  As a result of historical fire suppression, the stands selected for timber

harvest "have developed understories of shade tolerant white fir . . . which are often very dense."

**PAGE 8 --      DEFENDANT-INTERVENOR'S SJ MEM.**

AR_003233 (REA 16).  Again, Murphy Company purchased the Timber Sale because of its heavy white fir component.  Murphy Decl. ¶ 8 (explaining that "[h]arvesting the white fir volume not only will benefit stand conditions but it also will provide an important supply of raw materials for Murphy Company's operations in White City, Rogue River, and Eugene, which collectively employ nearly 600 people").

After BLM originally proposed the Project (illustrated by Alternative 2 in the REA, see AR_003232-45 (REA 15-28)), the agency remained responsive to stakeholder input.  In response to public comment, the Decision Record approved an evolved version of the Project that authorizes less timber harvest than originally proposed on these lands set aside for the very purpose of timber production.  *See generally* AR_003157-69 (Decision Record).  *See also* AR-003163 (Decision Record 7) (acknowledgment by BLM that the Selected Alternative will produce less timber than originally proposed).

BLM's original proposed action would have treated most stands via regeneration harvest that left 40-60 square feet of tree basal area per acre and "10-20 percent canopy cover retention." AR_003233 (REA 16).  But after considering comments on the Project, BLM authorized less timber harvest through a mix of regeneration harvest (two units), high retention regeneration harvest (seven units), white fir regeneration harvest (two units) and commercial thinning (three units).  AR_003163 (Decision Record 7).  Unlike standard regeneration harvest, high retention regeneration harvest leaves basal areas of 60-100 square feet per acre with an associated canopy cover retention of 30-40 percent.  AR_003246 (REA 29).  White fir regeneration harvest retains basal areas of 60-80 square feet per acre with a retained canopy cover of 30-40 percent. AR_003250 (REA 33).  And commercial thinning results in retained basal areas of 100-140 square feet per acre with a retained canopy cover of 35-50 percent.  AR_003251 (REA 34).

**PAGE 9 --    DEFENDANT-INTERVENOR'S SJ MEM.**

Regardless of whether Murphy Company agrees (or does not) with BLM's decision to retain

additional trees in the Project area, BLM's conduct reflects the agency's commitment to a robust

NEPA process within the sideboards of the Project's purpose and need.  *See Nw. Envtl.*

*Advocates v. NMFS*, 460 F.3d 1125, 1138 (9th Cir. 2006) (stating approvingly in the context of

NEPA that an agency "remained open to input from stakeholders" during the NEPA process as

evidenced by its conduct).

　　　　As stated at the outset, the 2016 RMP "provides a system of land use allocations that

together provide a strategy for forest management and a sustainable supply of timber while

contributing to the conservation and recovery of threatened and endangered species within the

planning area . . . ."  AR_003218 (REA 1).  The habitat needs of myriad wildlife species are

provided for in the 2016 RMP by such strategies as maintaining "a network of large blocks of

forest to be managed for late-successional forests" and protecting "older and more structurally-

complex multi-layered conifer forests."  AR_006279 (2016 RMP 1).  The need to generate a

sustainable supply of timber is provided for by timber sales from the Harvest Land Base, like the

Griffin Half Moon Timber Sale currently before the Court.

　　　　KSWild would have the Court relegate these Harvest Land Base and O&C Sustained

Yield Act acres for additional wildlife conservation purposes beyond those provided for

abundantly in the 2016 RMP, but that is not the purpose of these lands.  *Headwaters*, 914 F.2d at

1183 (acknowledgment by the Ninth Circuit that "exempting certain [O&C Sustained Yield Act

timberlands] from harvesting to serve as wildlife habitat . . . is inconsistent with the principle of

sustained yield").  And notwithstanding KSWild's assertions, the habitat needs of species like

the great gray owl and fisher were fully assessed during the NEPA process leading up to BLM's

adoption of the 2016 RMP and its integrated strategy for forest management.  The analysis of

**PAGE 10 --    DEFENDANT-INTERVENOR'S SJ MEM.**

Project effects was "completed within the context of" those prior NEPA analyses, to which the Project tiers. AR_003187 (Finding of No Significant Impact 9). Ultimately, BLM rightly concluded that the Project's "anticipated effects are within the scope, type, and magnitude of effects anticipated and analyzed" during the NEPA process leading to adoption of the 2016 RMP. The Project thus complies with NEPA's "hard look" requirement, as is discussed below.

## IV.    ARGUMENT.

### A.    The Ninth Circuit Affirmed that BLM Fully Explained Its Decision to Replace the Northwest Forest Plan's Survey and Manage Measures with a Different Land Management Approach Involving a Larger Network of Late-Successional Reserve Habitat When Adopting the 2016 RMP.

As stated in the introduction, three of the plaintiffs in this case – Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands – unsuccessfully challenged the 2016 RMP on the grounds that BLM had failed to provide a reasoned explanation for replacing Northwest Forest Plan protections (which include the survey and manage measures) with a different land management approach. Although those plaintiffs focused on the aquatic conservation strategy component of the Northwest Forest Plan, the district court and Ninth Circuit's rejection of the argument applies with equal force to KSWild's oblique challenge in this case to BLM's decision to move away from the Northwest Forest Plan's survey and manage measures in the context of the great gray owl. *See* Pls.' Mem. at 22-24 (erroneously asserting that the Griffin Half Moon Project moved away from the survey and manage measures without explanation, when in reality it was the 2016 RMP that adopted a different, and well-reasoned, land management approach). The Ninth Circuit confirmed that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it promulgated the 2016 RMP. *Pacific Rivers*, 2020 WL 2510759, at *2.

///

**PAGE 11 --    DEFENDANT-INTERVENOR'S SJ MEM.**

1.    **A Look Back at the Northwest Forest Plan, Which No Longer Applies to BLM Lands in Western Oregon.**

As BLM pointed out when promulgating the 2016 RMP, the agency never was eternally wedded to the now-26 year old Northwest Forest Plan.  *See, e.g.*, AR_007213 (2016 RMP EIS 20).  The Northwest Forest Plan was simply a management plan developed by BLM and the Forest Service to provide land management direction with the entire range of the northern spotted owl in response to the ESA listing of the owl and the ensuing paralysis of land management efforts.  *See, e.g., Gifford Pinchot Task Force v. U.S. FWS*, 378 F.3d 1059, 1063, *amended by* 387 F.3d 968 (9th Cir. 2004).

The Northwest Forest Plan classified forest lands into one of three general categories subject to different management direction and adopted survey and manage measures.  *See, e.g., Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1304-05 (W.D. Wash. 1994), *aff'd, Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).  The survey and manage measures were mitigation measures that applied to about 400 species within the range of the northern spotted owl.  *Conservation Northwest v. Rey*, 674 F. Supp. 2d 1232, 1238 (W.D. Wash. 2009) (discussing the history of the survey and manage requirements), *rev'd*, 715 F.3d 1181 (9th Cir. 2013).  Survey and manage species were not organisms listed as threatened or endangered under the ESA, nor were survey and manage measures designed to guarantee species viability.  Rather, survey and manage measures were applied to species that were apparently uncommon, or about which the agencies lacked sufficient information to know whether other Northwest Forest Plan elements provided them with sufficient protection.[3]  *Id.*

---

[3]  To illustrate, the record shows that the great gray owl, a former survey and manage species, is uncommon but "enjoys a wide distribution in Oregon."  AR_013148 (Birds of Oregon 322).  *Cf.* Pls.' Mem. at 22 (stating that the great gray owl's viability in questionable when in fact the administrative record citation says no such thing).

The Northwest Forest Plan was incorporated into land management plans within the range of the spotted owl, a vast geographic area comprising approximately 24 million acres of federal lands. *Seattle Audubon Soc'y*, 871 F. Supp. at 1300. Because of the management plan's expansive breadth, it necessarily provided high-level rather than area-specific land management direction. *See, e.g.*, AR_009095 (2016 RMP EIS 1840) (explaining that the analytical foundation for the Northwest Forest Plan was information in a report addressing "a very large and diverse assessment area"). In contrast, the analysis for the 2016 RMP was based on a foundation of "detailed information on conditions within the much smaller planning area and includes quantified modeling and analysis specific to the alternatives" assessed in the 2016 RMP EIS. *Id.* Also in contrast with the 26 year old Northwest Forest Plan, the analysis for the 2016 RMP was founded on up-to-date, "detailed information that was not available when the Northwest Forest Plan was approved . . . ." *Id.*

> ### 2. Because BLM Provided a Well-Reasoned Explanation for Its New, Non-Northwest Forest Plan Approach to Land Management When Adopting the 2016 RMP, It Was Not Required to Justify the Absence of Survey and Manage Measures for the Project.

KSWild would have the Court believe BLM acted arbitrarily and capriciously by failing to apply survey and manage measures to great gray owls in the Project area without satisfying the so-called *Fox* factor requirements for a lawful change in agency policy. Pls.' Mem. at 22-23. *See generally F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency may lawfully change course so long as the agency is aware of its policy change, which is itself statutorily permissible, coupled with the agency believing the policy change is better and offering "good reasons for the new policy"). That is not so. BLM's policy change, i.e., moving away from the Northwest Forest Plan with its survey and manage component, was effected by the 2016 RMP, not by this Project – and, as the Ninth Circuit concluded, that policy change was

wholly lawful.  *Pacific Rivers*, 2020 WL 2510759, at *2.  Because site-specific projects must be consistent with the governing RMP, 43 C.F.R. § 1610.5-3(a), the Griffin Half Moon Project necessarily did not revisit BLM's prior programmatic decision.  It would have been improper and nonsensical for the Project to have done so.

Still, for the Court's information, the record makes clear that BLM satisfied the four *Fox* factors when it moved away from the Northwest Forest Plan in the 2016 RMP.  The Ninth Circuit has articulated the four *Fox* requirements for an agency's lawful policy change as follows:  "the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy."  *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).

First, BLM made a conscious change of course to adopt a different land management strategy.  BLM explicitly stated in the EIS for the 2016 RMP that "this RMP revision would replace the 1995 RMPs and thereby replace the Northwest Forest Plan for the management of BLM-administered lands in western Oregon."[4]  AR_007214 (2016 RMP EIS 21).  BLM specifically addressed its departure from the survey and manage measures, explaining that by adopting the 2016 RMP, BLM no longer needed survey and manage measures "to protect species associated with older and more structurally-complex forests.  This is because the purpose of this RMP revision includes maintaining older and more structurally-complex multi-layered conifer forests . . . ."  AR_007215 (2016 RMP EIS 22).  *See also* AR_006305 (2016 BLM RMP 27)

---

[4]  It is no secret that for well over a decade, BLM had been trying to develop a better land management approach for BLM-administered lands by departing from the Northwest Forest Plan.  AR_007198 (2016 RMP EIS 5) (stating that the RMP "revision process takes place against the backdrop of past planning efforts").  KSWild itself alludes to this history.  Pls.' Mem. at 23.

**PAGE 14 --    DEFENDANT-INTERVENOR'S SJ MEM.**

(acknowledging that its new approach to land management would not include the Northwest Forest Plan's survey and manage measures). Thus, like the FCC in *Fox*, BLM's awareness of its changed position is abundantly clear. *Fox*, 556 U.S. at 517 (observing that FCC "forthrightly acknowledged that its recent actions have broken new ground," thereby demonstrating awareness of the agency's changed position).

Second, it was wholly permissible for BLM to develop a new land management approach. The governing Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. (FLPMA), did not require BLM to manage the public lands in western Oregon under the Northwest Forest Plan. Rather, FLPMA generally directs BLM to "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a), leaving the contents of such RMPs to the discretion of the agency within the sideboards identified in the statute. *Id.* § 1712(c) (listing criteria for RMP development and revision). *See also* 43 C.F.R. § 1601.0-1 to 1601.0-8 (setting forth the process and principles for developing and revising RMPs); AR_007213 (2016 RMP EIS 20) (explicitly stating that the Northwest Forest Plan "did not change the authority of the BLM, provided under the FLPMA and its promulgating regulations, for amending or revising RMPs").

Third, by consciously adopting the 2016 RMP, BLM demonstrated its belief that the new land management approach embodied therein is a better approach to resource management. The Ninth Circuit explained in *Organized Village of Kake* that reviewing courts assume the existence of this factor based on the agency's intentional decision to take the challenged action. 795 F.3d at 967 (citing *Fox*, 556 U.S. at 515). The commonsense basis for this assumption is that the "the conscious change of course adequately indicates" the agency's belief that the new approach is better. *Fox,* 556 U.S. at 515.

**PAGE 15 --    DEFENDANT-INTERVENOR'S SJ MEM.**

Fourth, BLM provided good reasons for the 2016 RMP's new, non-Northwest Forest Plan land management approach.  For example, BLM explained that the "purpose and need for this RMP revision clearly identified new scientific information that the Northwest Forest Plan did not address; the alternatives in the Draft RMP/EIS address this new scientific information." AR_009095 (2016 RMP EIS 1840).  With respect to survey and manage measures, BLM explained it would not need such measures because:

> the purpose of this RMP revision includes maintaining a network of large blocks of forest . . . . All action alternatives and the Proposed RMP therefore allocate a Late-Successional Reserve network, where sustained-yield timber harvest would not occur, that is larger than what is provided in the Northwest Forest Plan and broadly encompasses "old-growth forests."  Each alternative and the Proposed RMP would more than sufficiently address maintenance of older and more structurally-complex forests, without the need for additional mitigation like that provided by Survey and Manage.

AR-007215) (2016 RMP 22).  Other examples of BLM's rational reasons for parting ways with the Northwest Forest Plan abound in the record.  *See, e.g.*, AR_007180 (2016 RMP EIS xxiii) (stating that RMP revision was "needed to address the changed circumstances and new information" that had developed over the years).  BLM thus offered good, "entirely rational," reasons for its new approach to land management.  *Fox*, 556 U.S. at 517.

The Ninth Circuit confirmed that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it departed from the Northwest Forest Plan with its survey and manage measures through adoption of the 2016 RMP.  *Pacific Rivers*, 2020 WL 2510759, at *2.  Despite KSWild's criticism of BLM, Pls.' Mem. at 22-24, the agency was not required to revisit the 2016 RMP's decision to move away from survey and manage measures when analyzing the potential impacts of the Project.  Put simply, it would have made no sense for BLM to talk about survey and manage measures when such measures no longer apply on these BLM lands.

**PAGE 16 --   DEFENDANT-INTERVENOR'S SJ MEM.**

**B.    NEPA is Satisfied in this Case Because the Potential Impacts on the Fisher and Great Gray Owl from the Project's Planned Vegetation Management Were Fully Considered in the Environmental Analyses for the 2016 RMP, to Which the Project Properly Tiers.**

Turning to KSWild's specific NEPA assertions, KSWild's arguments are fundamentally flawed because they ignore the fact that BLM took the requisite "hard look" at potential Project impacts by tiering its environmental analysis to the environmental analyses conducted for promulgation of the 2016 RMP.  The Alaska District Court recently discussed the applicable standard for reviewing an EA that tiers to an EIS, there in the context of BLM's approval pursuant to a Finding of No New Significant Impact of drilling in the National Petroleum Reserve-Alaska.  *Native Village of Nuiqsut v. BLM*, Case No. 3:19-cv-00056-SLG, 2020 WL 113495 (D. Alaska Jan. 9, 2020).  In *Native Village*, the court explained that "[t]iering promotes efficiency; it allows an agency to take the requisite hard look at the potential environmental consequences of [a] proposed action without treading the same ground twice."  *Id.*, at *13 (internal quotation marks and citation to Ninth Circuit case law omitted).  *Native Village* further explained that "when a programmatic EIS *doe*s adequately consider the impacts of subsequent site-specific projects, a subsequent NEPA document need not repeat that analysis 'unless new and significant environmental impacts arise that were not previously considered.'"  *Id.*, at *12 (emphasis in original, citation to Ninth Circuit case law omitted).

In this case, BLM confirmed that Project implementation "will not have significant effects beyond those described in the broader analyses conducted and disclosed in the 2016 PRMP/FEIS and those actions authorized in the associated [2016 RMP], or the effects have been determined to be insignificant."  AR_003179 (Finding of No Significant Impact 1).  Nothing more was required under NEPA.

1.    **The Project's potential environmental impacts on the fisher, a Bureau Sensitive Species, were fully anticipated in the environmental analyses for the 2016 RMP**.

As an initial matter, KSWild's criticism of BLM for including environmental information regarding the fisher in a REA appendix misapprehends the law.  *See* Pls.' Mem. at 24-25.  The law does not prohibit the REA's use of an appendix – in fact, it defies logic to suggest that information could be included in a cumbersome administrative record but could not be included in a far more accessible appendix to, and therefore a part of, the REA.

In support of its mistaken assertion, KSWild cites to *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), for the proposition that information supporting an agency's decision must either be in the environmental document or the administrative record supporting the environmental document.  Pls.' Mem. at 25.  In reality, *Blackwood* criticized a different agency for authorizing certain post-fire salvage timber sales based on an EA where the agency contended the information supporting its analysis of road-related sedimentation impacts was within the accompanying "3,000 page administrative record." 161 F.3d at 1214.  The court concluded the EA was "where the Forest Service's defense of its position must be found," *id.*, but said nothing about whether an appendix is part of an EA. Courts in the Ninth Circuit routinely uphold NEPA decisions based on EAs with appendices. *See, e.g.*, *Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006) (upholding timber sale assessed in an EA where the EA discussed "detailed" applicable Best Management Practices for the Project in an appendix to the EA); *Oregon Wild v. U.S.*, 107 F. Supp. 3d 1102, 1111 (D. Or. 2015) (upholding forest management project assessed in an EA where the EA disclosed anticipated effects to Potential Wilderness Areas in a "33-page appendix" to the EA).  *See also* 43 C.F.R. § 46.315(a) ("An environmental assessment may be

prepared in any format useful to facilitate planning, decision-making, and appropriate public participation.").

Turning to the fisher, a Bureau Sensitive Species,[5] BLM's NEPA analysis passes muster. First, the 2016 RMP EIS, to which the Project tiers, fully evaluated the potential impacts on fishers from implementing BLM's forest management program in BLM's southwestern Oregon Harvest Land Base.  Second, BLM explained in the REA its reasonable conclusion that implementing the Project in the Harvest Land Base would not have significant effects beyond those disclosed in the 2016 RMP EIS for implementing BLM's forest management program.

First, the 2016 RMP EIS, to which the Project tiers, thoroughly evaluated potential impacts on the fisher from implementing BLM's forest management program in the Southwestern Oregon Harvest Land Base, including on the 933 acres at issue in this case. BLM's analysis of potential effects is found at pages 870-80 and 1701-13 of the 2016 RMP EIS. AR_008088-99, 008956-68.

In the EIS's background section, BLM discussed such things as the habitat needs of fishers, threats to the species' existence, and the size of home ranges for both males and females. AR_008088-89 (2016 RMP EIS 870-71).  BLM then discussed its analytical approach to assessing potential impacts on fishers from the agency's forest management program, which included an "analysis of the direct and indirect effects of alternative and Proposed RMP implementation on fisher habitat in the decision area and an analysis of cumulative effects on fisher habitat of past, present, and reasonably foreseeable future actions . . . ."  AR_008092

---

[5]  Management of Bureau Sensitive Species on O&C Sustained Yield Act lands like those in the Project area "'must be consistent with timber production as the dominant use of those lands' (BLM Manual 6840 – Special Status Species Management; USDI BLM 2008)."  AR_007722 (2016 RMP EIS 529).

(2016 RMP EIS 873). This analysis involved BLM using methods employed and/or recommended by other expert federal agencies to estimate the fisher population "to provide the BLM with the relative outcomes of the fisher population under the alternatives and the Proposed RMP" over time.[6] *Id.*

BLM's discussion of the potential environmental impacts on fishers and fisher habitat from implementing BLM's forest management program is found at pages 873-77 in the 2016 RMP EIS, AR_008092-99, as supported by the habitat impact disclosures over time included at pages 1701-13, AR_008956-68. The habitat impact disclosures included a breakdown by decade for each alternative, including the Proposed RMP (i.e., the 2016 RMP), for total fisher habitat, fisher denning habitat, fisher resting habitat, and fisher foraging habitat, both in the decision area and in the larger planning area. AR_008956-58 (2016 RMP EIS 1701-03). The habitat impact disclosures also broke down, by decade, the Harvest Land Base versus reserves land use allocations for fisher habitat under each alternative, including the 2016 RMP. *See generally* AR_008959-64 (2016 RMP EIS 1704-09). The specific impacts of the 2016 RMP on the Harvest Land Base versus reserves land use allocations for fisher habitat are shown at page 1709 of the EIS, AR_008964. An estimate of the fisher population by decade under implementation of the 2016 RMP is disclosed in Table S-69. AR_008968 (2016 RMP EIS 1713).

BLM explained the meaning of these disclosures in the "Affected Environment and Environmental Consequences" section of the EIS. For example, BLM disclosed that

---

[6] Although BLM cautioned that "absolute population numbers" were uncertain due to unpredictable factors "unaffected by BLM land management actions," like fatal run-ins with automobiles, AR_008092 (2016 RMP EIS 873), that uncertainty did not prevent BLM from assessing likely environmental impacts on fishers from implementation of the 2016 RMP's forest management program. *Cf.* Pls.' Mem. at 26 (falsely asserting that the necessary assumptions in BLM's analysis rendered the analysis incapable of informing BLM's decision about impacts of the Project on fishers).

implementation of the 2016 RMP "would result in an increase in total fisher habitat . . . and denning habitat . . . on BLM-administered lands in 50 years." AR_008093 (2016 RMP EIS 874). Regarding the timeframe particularly relevant to the Project, BLM disclosed that in the first decade of implementing its new land management approach under the 2016 RMP (actually under all management options assessed, including continued implementation of the Northwest Forest Plan), the fisher population would decrease slightly, but that the projected "reduction in the fisher population . . . would constitute a loss of < 1 percent of the current estimated population in the decision area (1,292 fishers) and would not reduce the fisher population below any known, critical population thresholds." AR_008098 (2016 RMP EIS 879). In fact, by 2023, implementation of the 2016 RMP would result in only two fewer fishers in the entire planning area, hardly a significant effect. AR_008968 (2016 RMP EIS 1713). During that same time period, BLM projected that timber harvest under the 2016 RMP would result in a decrease of 6,025 acres (6.1%) of total fisher habitat in the Harvest Land Base. AR_008964 (2016 RMP EIS 1709) (displaying in Table S-57 that total fisher habitat within the Harvest Land Base would decrease from 99,214 to 93,189 acres in the first decade of 2016 RMP implementation).

The takeaway message from the analysis was that implementation of the 2016 RMP in the near term would have insignificant impacts on fishers, and that implementation of the 2016 RMP over time "would contribute to population increases" for the fisher. AR_008098 (2016 RMP EIS 879). Regarding habitat connectivity in particular under the 2016 RMP, BLM explained that fisher dispersal was not an issue given fishers' "ability to disperse long distances [and to navigate] across or around various landscape features, including rivers, highways, and rural communities." AR_009229 (2016 RMP EIS 1974). *Cf.* Pls.' Mem. at 27 (alleging that nothing in the record supports the notion that fishers are highly mobile). All of this is consistent

with the U.S. Fish and Wildlife Service's recent observation that fishers "persist in actively managed landscapes." 85 Fed. Reg. 29,532, 29,553 (May 15, 2020).  *See also id.* at 29,561 (fishers in Oregon are "not in danger of extinction . . . nor likely to become so in the foreseeable future").

Second, the REA discusses BLM's reasonable conclusion that Project implementation would not have significant effects beyond those analyzed in the 2016 RMP EIS for implementation of BLM's forest management program in the Harvest Land Base.  The REA disclosed that fishers "use similar habitat to" northern spotted owls.  AR_003312 (REA 95).  In fact, the Project's northern spotted owl analysis area incorporated habitat "generated from radio telemetry locations of male and female fisher known to occur in this area . . . ."  *Id.*  The REA further disclosed that under all action alternatives, including the combination of Alternatives 2 and 3 selected in the Decision Record, AR_003163 (Decision Record 7), "more than 97% of existing suitable" northern spotted owl habitat in the northern spotted owl analysis area would go untreated.  AR_003315 (REA 98).  This means that more than 97% of fisher habitat will remain after Project implementation.  *See also* AR_003359 (REA C-8) (reiterating that northern spotted owl "habitat has been determined to be a reasonable proxy for fisher habitat").

BLM also explained its decision not to provide further detailed consideration of Project impacts on fishers, given the existing information from the 2016 RMP EIS regarding insignificant impacts of timber harvest in the Harvest Land Base on fishers and the fact that Project implementation will affect less than three percent of fisher habitat.  *See generally* AR_003359-60.  BLM reported that it conducted a "preliminary analysis . . . to determine potential effects to fisher and whether or not this issue warranted detailed analysis."  AR_003359 (REA C-8).  BLM summarized the disclosures in the 2016 RMP EIS regarding minimal impacts

of BLM's forest management program on fisher and fisher habitat, *id.*, and pointed out that the

small negative effect to fisher habitat from Project implementation was "anticipated under the

RMP." AR_003360 (REA C-9).    BLM also observed that some Project implementation effects

"would be relatively short-term, as understory vegetation typically returns within five years . . . .

Additionally, treatments would retain key habitat characteristics such as large snags and coarse

woody debris (CWD) to maintain existing and provide for further habitat for fishers." *Id.* (again

noting that about 97% of fisher habitat would remain after Project implementation).  BLM also

noted that the main effect on fishers likely would be "[d]isturbance from treatment activities," an

effect of little consequence given the fact that "fishers are highly mobile" and have "large home

ranges," enabling them to avoid disturbances. *Id.*

BLM further disclosed that Project Design Features (PDFs) "would minimize impacts to

fishers." *Id.*  Indeed, the Project incorporates Project Design Features to "reduce the potential for

adverse impacts to resources." AR_003256 (REA 39).  Protective conservation measures for

fishers are displayed in Table 2-4. AR_003265 (REA 48).  They include the retention of large

down wood and snags, maintaining habitat within stands used for denning, and retaining 80%

canopy cover within 50 feet of known den sites. *Id.*  In addition, because fishers potentially use

debris piles for denning and/or resting, BLM included restrictions on when debris piles

associated with logging activities could be "burned, chipped or made available for firewood

cutting" to ensure their availability for fishers. AR_003266 (REA 49). *See also* AR_003360

(REA C-9) (summarizing Project Design Features); AR_006395-96 (2016 RMP 117-18) (setting

forth protective management direction for fishers).  Finally, BLM pointed out that fishers in the

Project area are located in close proximity to other, abundant, habitat:

> Adjoining the NSO Analysis Area to the northeast is a large Late-Successional
> Reserve (LSR) that is located on USFS-administered land . . . [and] to the south,

east, and west, the Cascade-Siskiyou National Monument and 2016 RMP Late-Successional Reserve provides large areas with habitat suitable for fisher life history purposes.  Because of the retention of these habitat features in and adjacent to the NSO Analysis Area, effects to fishers from implementation of this project are expected to be minor, and would not trend this species towards further listing.

AR_003360 (REA C-9).

Ultimately, BLM reasonably concluded it had taken the requisite "hard look" under NEPA at Project implementation effects on fisher such that further detailed consideration of impacts was not warranted.  The Project's 933 acres of timber harvest had been anticipated by the 2016 RMP, and the 2016 RMP EIS analyzed the minimal effects of such harvest on fisher and fisher habitat.  *Id.*  Project implementation also would result in only a small fraction of the timber harvest anticipated in the 2016 RMP (less than 0.5% of Harvest Land Acres), AR_003182 (Finding of No Significant Impact 4), with at least 97% of fisher habitat remaining in the Project area after Project implementation under all action alternatives.  Further, because all action alternatives would retain at least 97% of fisher habitat, there was "not a foreseeable difference in effects to fisher between the action alternatives," rendering more detailed analysis unnecessary to "a reasoned choice between alternatives."  AR_003360 (REA C-9).  *See also* AR_003228 (REA 11) (explaining that one of the reasons for not evaluating an issue in further detail is the lack of "a measurable difference" in impacts between alternatives such that further detailed analysis is neither helpful nor necessary).  For all of these reasons, additional detailed analysis of Project impacts on fisher "was not carried forward for further analysis."  AR_003360 (REA C-9).  The record fully supports BLM's technical NEPA decision with respect to fishers, which is entitled to substantial deference when reviewed by the Court.

///

**PAGE 24 --    DEFENDANT-INTERVENOR'S SJ MEM.**

2.    **The Project's potential environmental impacts on the great gray owl, which is not a protected species, were fully anticipated in the environmental analyses for the 2016 RMP.**

BLM also took a NEPA "hard look" at Project impacts on great gray owls, again tiering to the environmental analyses for the 2016 RMP and then explaining in the REA the agency's reasonable conclusion that further detailed consideration of potential Project impacts on great gray owls was not warranted.  Unlike the fisher, which is a Bureau Sensitive Species, the great gray owl is not a special status species under the 2016 RMP.  AR_003172 (Decision Record – Attachment 1 at 3).  *See also* AR_006592 (2016 RMP 314) (special status species are those that are listed or proposed for listing under the ESA, candidate species for ESA listing, state-listed species, or Bureau Sensitive Species).  KSWild may wish the law were otherwise, but no law requires BLM to protect individual great gray owls in the Project area, where the dominant use is sustained-yield timber harvest in the 2016 RMP's Harvest Land Base.

KSWild talks at length about the survey and manage measures formerly applying to great gray owls in the Project area.  But as explained earlier, the 2016 RMP does not include the Northwest Forest Plan's survey and manage measures, and for good reason.  Again, BLM's new, non-Northwest Forest Plan approach to land management in southwestern Oregon features "a larger Late-Successional Reserve network than" than provided for under the Northwest Forest Plan (which was the No Action alternative during the NEPA process for the 2016 RMP) and the protection of "older and more structurally-complex forests."  AR_006306 (2016 RMP 28).  Structurally-complex forests comprise "high-quality habitat" for the former survey and manage species.  AR_008066 (2016 RMP EIS 848).  The 2016 RMP protects this habitat from timber harvest, unlike the Northwest Forest Plan, which did not.  *Id.*  In addition, "the acreage of Mature and Structurally-complex forest (which is a broader category than older and more structurally-

PAGE 25 --    DEFENDANT-INTERVENOR'S SJ MEM.

complex multi-layered conifer forests) in the decision area would increase over time," *id.*, more so under the 2016 RMP than under the Northwest Forest Plan as illustrated by Figure 3-150. AR_008067 (2016 RMP EIS 849). This habitat type also supports former survey and manage species. AR_008066 (2016 RMP EIS 848).

During development of the 2016 RMP, BLM disclosed that the great gray owl was a survey and manage species under the Northwest Forest Plan. AR_008064 (2016 RMP EIS 846). BLM also disclosed that an earlier analysis (conducted by the Forest Service and BLM prior to development of the 2016 RMP with its intensive habitat preservation approach to land management) had determined that without the survey and manage measures, the great gray owl "would be likely to have sufficient habitat rangewide [to support stable populations] but insufficient habitat in a portion of [its] range (USDA FS and USDO BLM 20017)." *Id. See also* AR_008065 (2016 RMP EIS 847) (explaining that the determination, which was largely qualitative, necessarily assumed the "land use allocations of the Northwest Forest Plan" since the analysis predated development of the 2016 RMP).

But the impetus for investigating whether there was sufficient habitat to support stable populations derived from a Forest Service requirement that did not apply to BLM. Specifically, the impetus for investigating habitat sufficiency for maintenance of viable populations derived from the Forest Service's species viability requirement, *id.*, a requirement that in turn derived from the National Forest Management Act, a statute inapplicable to BLM. AR_007214-15 (2016 RMP EIS 21-22). BLM plainly informed the public in the EIS that the maintenance of species viability was "not a part of the purpose for this RMP revision. There is no comparable regulation for maintaining 'viable populations' in the BLM's regulations implementing the FLPMA or O&C Act." AR_007215 (2016 RMP EIS 22).

**PAGE 26 --    DEFENDANT-INTERVENOR'S SJ MEM.**

Still, BLM explained that it was "possible to evaluate where known [great gray owl] sites occur and how habitat would change over time under the alternatives and the Proposed RMP." AR_008065 (2016 RMP EIS 847). In fact, BLM's NEPA analysis for the 2016 RMP revealed that under the agency's new land management approach, far more of the known great gray owl sites[7] on BLM lands would fall within protected habitat reserves compared with the Northwest Forest Plan. AR_008065-66 (2016 RMP EIS 847-48). In other words, more of the habitat used by great gray owls based on known observations would be protected under the new 2016 RMP then under the old Northwest Forest Plan. In fact, the difference was striking – Table S-36 indicated that out of 1,228 known sites (observations), 800 of those sites would be in protected reserves under the 2016 RMP, whereas only 247 of the sites would have been in reserves under the Northwest Forest Plan, represented by the No Action alternative. AR_008944 (2016 RMP EIS 1689). Further, by 2063, great gray owl habitat is projected to increase to 64,255 acres compared with the 45,157 acres of existing habitat in 2013, an increase of 142%. AR_008938 (2016 RMP EIS 1683). In short, the 2016 RMP "would protect most of the existing habitat for Survey and Manage species and would result in an increase in the total amount of habitat [for such species] over time." AR_008068 (2016 RMP EIS 850).

BLM's REA for the Project explained the agency's reasonable conclusion that further detailed consideration of potential Project impacts on great gray owls was not warranted. In the REA's discussion of alternatives and actions considered but not analyzed in further detail, BLM

---

[7] BLM explained that for great gray owls, the number of known owl sites was "the number of fauna observations in GeoBOB [BLM's Geographic Biologic Observations regional database, *see* AR_007716 (2016 RMP EIS 523)], and the actual number of known great gray owl 'sites' is substantially less than these values." AR_008945 (2016 RMP EIS 1590). Regardless, the number of fauna observations was "an indicator of relative differences among the alternatives and the Proposed RMP." *Id.*

disclosed that it had considered avoiding "heavy thinning or regeneration harvest in treatment units that were previously deferred [under Northwest Forest Plan survey and manage measures] to protect known great gray (GGO) owl sites." AR_003274 (REA 57). But BLM explained that survey and manage measures are not part of the 2016 RMP, which instead "allocates a larger Late-Successional Reserve" for the benefit of species like the great gray owl. *Id.* BLM candidly acknowledged that "timber harvest can threaten GGO habitat." AR_003341 (REA B-4). But it pointed out that the 2016 RMP "allocates a large LSR Network that accomplishes the goal of protecting older and more structurally-complex forests, and provides management for species such as the GGO (USDO BLM 2016b, pp. 27-28)." *Id.* Indeed, the 2016 RMP includes 75% of BLM lands in reserve allocations. AR_008068 (2016 RMP EIS 850). In addition, "a seasonal restriction is in place [for the Project] that restricts project activities within 0.25 miles of raptor nests between March 1 and July 15, and a PDF is in place that retains raptor nest trees; both measures would help to protect GGOs (REA, p. 48)." AR_003172 (Decision record – Attachment 1 at 3).

Despite all this, if KSWild were to have its way, BLM would have to manage the Project's 933 acres – all of them O&C Sustained Yield Act acres and nearly all of them Harvest Land Base acres – to serve as yet additional wildlife conservation habitat, contrary to the governing 2016 RMP and in direct contravention of the O&C Sustained Yield Act and Ninth Circuit case law. *See, e.g.*, *Headwaters*, 914 F.2d at 1183.

Ultimately, as with fishers, BLM reasonably concluded that Project impacts on great gray owls did not need to undergo further detailed consideration. The management of great gray owl sites "previously protected as no harvest buffers under [survey and manage measures] has been decided under" the 2016 RMP. AR_003172 (Decision Record – Attachment 1 at 3). The

analysis of potential effects on great gray owls was "completed within the context of the 2016 ROD/RMP and tiers to the 2016 PRMP/FEIS.  [The Finding of No Significant Impact] is consistent with the 2016 ROD/RMP and the anticipated effects are within the scope, type, and magnitude of effects anticipated and analyzed int eh 2016 ROD/RMP."  AR_003187 (Finding of No Significant Impact 9).  *See also* AR_003184 (Finding of No Significant Impact 6) (BLM's analysis identified no "significant cumulative effects outside of those already disclosed in the 2016 PRMP/FEIS to which this REA tiers").

Because the land management direction for the Project's Harvest Land Base and O&C Sustained Yield Act acres was decided in the 2016 RMP, analyzing potential impacts on great gray owl sites previously excluded from harvest by survey and manage measures "would not have provided the Authorized Officer an opportunity to make a better-informed decision." AR_003172 (Decision Record – Attachment 1 at 3).  Again, BLM concluded in its NEPA analysis for the 2016 RMP that implementing the agency's forest management program as a whole still would protect "most of the existing habitat for Survey and Manage species and would result in an increase in the total amount of habitat [for such species] over time."  AR_008068 (2016 RMP EIS 850).  And implementing the Project will effect less than 0.5% of the timber harvest assessed in the 2016 RMP EIS.  AR_008068 (2016 RMP EIS 850).  For all of these reasons, BLM took the necessary NEPA hard look at the Project's potential impacts on great gray owls, which are not a special status species under the governing RMP.  The Court should afford BLM's decision substantial deference upon review.

///

///

///

**V.**     **CONCLUSION**.

For the foregoing reasons, and for the reasons set forth in the summary judgment filings of federal defendant, BLM's analysis satisfies NEPA's "hard look" requirement for fishers and great gray owls.  Because there is no merit to KSWild's two NEPA claims, the Court should grant summary judgment in favor of BLM and Murphy Company and deny KSWild's motion for summary judgment.

Dated this 5th day of June, 2020.

HAGLUND KELLEY LLP

By: /s/ Julie A. Weis
    Julie A. Weis, OSB No. 974320
    Michael E. Haglund, OSB No. 770230
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor Murphy Company

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the page limitation under LR 7-2(b) because it does not exceed 35 pages in length, excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

/s/ Julie A. Weis
Julie A. Weis, OSB No. 974320

**PAGE 31 --    DEFENDANT-INTERVENOR'S SJ MEM.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of June 2020, I served a true and accurate copy of the foregoing **DEFENDANT-INTERVENOR'S MOTION AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

/s/ Julie A. Weis
Julie A. Weis

**PAGE 32 --    DEFENDANT-INTERVENOR'S SJ MEM.**