**BILLY J. WILLIAMS, OSB # 901366**
United States Attorney
District of Oregon
**SEAN E. MARTIN, OSB # 054338**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone:  (503) 727-1010
        Attorneys for Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER; OREGON WILD; CASCADIA WILDLANDS; SODA MOUNTAIN WILDERNESS COUNCIL,** | **Case No. 1:19-cv-02069-CL** |
| Plaintiffs, | **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT/IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **U.S. BUREAU OF LAND MANAGEMENT**, | **Request for Oral Argument** |
| Defendant, | |
| and | |
| **MURPHY COMPANY,** | |
| Defendant-Intervenor. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY OF ACRONYMS ........................................................ vii

MOTION ............................................................................................1

MEMORANDUM .............................................................................1

INTRODUCTION .............................................................................1

FACTUAL BACKGROUND .............................................................2

    I.     BLM's underlying 2016 Resource Management Plan ("RMP")...........2

    II.    Overview of the Griffin Half Moon Vegetation Management Project ................................................................................................4

    III.   BLM's administrative review process for the Griffin Half Moon project ...................................................................................5

        A.    BLM considered effects to great gray owls ....................................6

        B.    BLM considered effects to the Pacific fisher .................................9

        C.    BLM's decision authorizing the project ...................................... 11

        D.    Subsequent developments regarding the fisher........................... 13

THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA") ................... 13

STANDARD OF REVIEW ............................................................... 15

    I.     Judicial Review under the Administrative Procedure Act ("APA")..................................................................................... 15

ARGUMENT .................................................................................... 17

    I.     BLM complied with NEPA in assessing effects on great gray owls.......................................................................................... 17

A.  BLM appropriately tiered its NEPA effects analysis to its
    NEPA analysis for the 2016 RMP.................................................. 17

B.  Plaintiffs fail to establish that BLM's use of tiering was improper
    ............................................................................................................ 21

C.  Plaintiffs' NEPA claim fails in asserting violations of
    substantive duties and a supposed failure to explain a
    change in policy........................................................................................ 25

    1.  Plaintiffs lack a viable NEPA claim in asserting
        violations of supposed substantive duties .............................. 25

    2.  Plaintiffs' assertion that BLM failed to explain a
        change in policy has already been rejected by this court
        and the Ninth Circuit ................................................................ 28

D.  Plaintiffs inappropriately seek summary judgment based
    on post-decisional, extra-record evidence ...................................... 29

E.  Plaintiffs' other arguments fail to establish that BLM was
    arbitrary and capricious under the APA ...................................... 30

II.  BLM complied with NEPA in assessing effects on the Pacific fisher
    ............................................................................................................ 32

    A.  BLM appropriately tiered its NEPA effects analysis to the
        analysis for its 2016 RMP ...................................................... 32

    B.  Plaintiffs' lead argument is foreclosed by Ninth Circuit
        precedent and by their own representations................................ 34

    C.  Plaintiffs misrepresent the status of the fisher at the
        time BLM made its challenged decision...................................... 36

    D.  Plaintiffs' other arguments fail to establish BLM was
        arbitrary and capricious under the APA ...................................... 38

CONCLUSION................................................................................ 41

# TABLE OF AUTHORITIES

## CASES

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) .......................................................... 24

*Blue Mountain Biodiversity Proj. v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ........................................................................................ 24

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................................................................ 16

*California by and through Becerra v. Azar*, __ F.3d __, 2020 WL 878528 (9th Cir. Feb. 24, 2020) (en banc) ........................................................ 16

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ............................. 15

*Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2017 WL 5957811 (D. Or. Jan. 18, 2017) ................... 30

*Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009).............. 25

*Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) ........................................................ 15

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ........................................................ 17

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012) ..... 34-35

*Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125 (9th Cir. 2010) ................................................................................. 17, 27

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)............................. 37

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir. 2003)................................................................................... 15-16

*Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143 (9th Cir. 2010) ........... 13-14

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015
(9th Cir.2011) ............................................................................ 37

*Headwaters, Inc. v. BLM*, 914 F.2d 1174 (9th Cir. 1990) ...................... 5, 9, 22

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) .................. 35

*'Ilio'ulaokalani Coalition v. Rumsfeld, 464 F.3d 1*083 (9th Cir. 2006) .......... 18

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ................. 15

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989
(9th Cir. 2004)............................................................................ 24

*Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230 (D. Or. 2013) ................................................ 1

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ................................ 27

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................... 16

*Native Ecosystem Council v. Judice*, 2019 WL 1131231
(D. Mont. March 12, 2019) ....................................................... 19-20

*Native Ecosystems Council v. Weldon*, 697 F.3d. 1043 (9th Cir. 2012)........... 15

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372
(9th Cir. 1998)............................................................................ 40

*O'Neal v. United States*, 814 F.2d 1285 (9th Cir. 1987)................................... 5

*Pacific Rivers v. BLM*, No. 16-cv-1598-JR, 2018 WL 6735090
(D. Or. Oct. 12, 2018)....................................................... 3, 4, 5, 14, 26, 28

*Pacific Rivers v. BLM*, No. 16-cv-1598-JR, 2019 WL 1232835 (D. Or. March
15, 2019) ................................................................................... 3

*Pacific Rivers v. BLM*, 2020 WL 2510759, __ Fed. App'x __ (9th Cir. 2020)
............................................................................ 3, 4, 25, 28, 40

*Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173 (D. Or. 2002) ........................... 26

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989) ........................................................... 13, 14, 26

*Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025
 (9th Cir. 2012) ..................................................................... 23-24

*Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168
 (D. Nev. 2004) ......................................................................... 26

*Steamboaters v. FERC*, 759 F.2d  (9th Cir. 1985) ........................................... 41

*Swanson Group Mfg., LLC v. Bernhardt*, 417 F. Supp. 3d 22
 (D.D.C. 2019) ........................................................................... 12

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113
 (9th Cir. 2012) ................................................................... 14, 30

## STATUTES

5 U.S.C. § 706(2)(A) ...................................................................... 1, 15

42 U.S.C. § 4332(C) .......................................................................... 14

43 U.S.C. § 2601 ..................................................................... 2, 5, 12

## REGULATIONS

40 C.F.R. § 1500.4(c) ................................................................... 20, 23

40 C.F.R. § 1501.4(e) ........................................................................ 14

40 C.F.R. § 1502.18 ........................................................................... 34

40 C.F.R. § 1502.20 ........................................................................... 18

40 C.F.R. § 1508.9 ............................................................................ 14

40 C.F.R. § 1508.13 ........................................................................... 14

40 C.F.R. § 1508.28 ................................................................ 18

43 C.F.R. § 46.120 ................................................................. 18

43 C.F.R. § 46.120(b) ............................................................ 17

43 C.F.R. § 46.140(c) ............................................................ 18

43 C.F.R. § 46.315(a) ............................................................ 35

43 C.F.R. § 46.315(b) ............................................................ 35

43 C.F.R. § 300 .................................................................... 14

43 C.F.R. § 310 .................................................................... 14

43 C.F.R. § 310(a) ................................................................ 14

## FEDERAL REGISTER

84 Fed. Reg. 60,278 (Nov. 7, 2019) ...................................... 36

85 Fed. Reg. 29,532 (May 15, 2020) ................................ 13, 37

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | (Revised) Administrative Record |
| BLM | U.S. Bureau of Land Management |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NWFP | Northwest Forest Plan |
| O&C Act | Oregon and California Lands Act |
| RMP | Resource Management Plan |

**MOTION**

Defendant U.S. Bureau of Land Management ("BLM") files this cross-motion for summary judgment as supported by the following memorandum and the agency's court-filed revised administrative record ("AR"); ECF 30). The following memorandum also responds to Plaintiffs' motion for summary judgment. Pursuant to LR 7-1(a), the parties conferred but were not able to resolve the need for this cross-motion.

This case is appropriate for final resolution on the parties' cross-motions for summary judgment, because this Court is to review the administrative record and determine on that record whether BLM's challenged project decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act. *See Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013); 5 U.S.C. § 706(2)(A).

**MEMORANDUM**

## INTRODUCTION

In August 2018, BLM authorized the Griffin Half Moon Vegetation Management Project ("Griffin Half Moon" or "the project"), which allows 932 acres of commercial timber harvest on lands that BLM formally designated in its 2016 Resource Management Plan for timber harvest. The project will

Page 1    Defendant's Cross-Motion for Summary Judgment and
         Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
         No. 1:19-cv-02069-CL

occur on lands Congress designated for timber production in the Oregon and California Lands Act ("O&C Act"), 43 U.S.C. § 2601, *et seq*.

In deciding to authorize Griffin Half Moon, BLM met its obligations under the National Environmental Policy Act ("NEPA") to consider information regarding potential significant environmental effects and to provide relevant information to the public. BLM followed express NEPA provisions that encourage tiering to an already existing 2016 NEPA analysis of the effects of timber harvest on great gray owls and the Pacific fisher.

Plaintiffs disagree with the management framework BLM selected in 2016 for management of the O&C lands. But they have already litigated and lost their legal challenge to that new framework, and they fail to establish that BLM was arbitrary and capricious in implementing that framework in Griffin Half Moon.

## FACTUAL BACKGROUND

### I.    BLM's underlying 2016 Resource Management Plan ("RMP").

All of the lands at issue are managed by BLM's Medford District. In 2016, after a multi-year revision process involving numerous stakeholders, BLM adopted a new Resource Management Plan governing its management of approximately 1.2 million acres of lands, including lands in its Medford District. *See* AR 6271. This plan is known as BLM's 2016 Southwestern

Oregon Record of Decision and Resource Management Plan ("2016 RMP").

Before deciding to adopt this RMP, BLM prepared a Final Environmental

Impact Statement ("2016 FEIS") that analyzed in detail the environmental

effects of various RMP alternatives.  The 2016 RMP is "nearly identical" to

the "Proposed RMP" alternative that BLM examined in the 2016 FEIS.  AR

6279-80.

The 2016 RMP revised BLM's 1995 Medford RMP in its entirety,

thereby discontinuing BLM's use of the Northwest Forest Plan ("NWFP")

framework, including the NWFP's "Survey and Manage" program, in favor of

an updated management framework with an expanded network of reserves

where timber harvest is restricted.  AR 6305-06.  Under the 2016 RMP, BLM

designated about 20% of the lands it administers as "harvest land base" to be

managed for timber production.  AR 6321.  The 2016 RMP also designated

31% of BLM-managed acreage as late-successional reserves, and another 15%

as riparian reserves.  *Id.*

This Court and the Ninth Circuit rejected a NEPA challenge to the

2016 RMP from most of the same plaintiffs here.  *Pacific Rivers v. BLM*, No.

16-cv-1598-JR, 2018 WL 6735090 (D. Or. March 15, 2019), *adopted by* 2019

WL 1232835 (D. Or. March 15, 2019), *aff'd*, __ Fed. App'x ___, 2020 WL

2510759 (9th Cir. May 15, 2020) (memorandum disposition).  This Court

Page 3      Defendant's Cross-Motion for Summary Judgment and
            Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
            No. 1:19-cv-02069-CL

found that in developing the 2016 RMP, BLM appropriately considered "new information and changed conditions" in departing from the NWFP framework.  2018 WL 6735090 at *2, *7-*8.  The Ninth Circuit affirmed, concluding that BLM provided a "reasoned explanation" for any change from its prior management approach.  2020 WL 2510759 at *2.

## II.  Overview of the Griffin Half Moon Vegetation Management Project.

The Griffin Half Moon project is located in southwest Oregon, east of Ashland and near Howard Prairie Lake.  AR 3220.  The area is characterized by a "checkerboard" pattern of land ownership, with blocks of BLM-administered lands intermingled with privately owned lands.  AR 3279, 3234-36.  The edges of several units abut—but do not extend into—the Cascade Siskiyou National Monument.  *See* AR 3234-36 (maps of project units).

BLM designed the project under the 2016 RMP and the project's purpose is to implement specific management direction in the 2016 RMP.  AR 3210, 3219-20.  The project's aim is to harvest timber on acres designated as harvest land base in the 2016 RMP, to contribute to BLM Medford District's annual timber production target.  AR 3222-23.  About 96% of the project's activities occur within BLM's designated harvest land base.  AR 3218.

All project activities would occur on "O&C lands" designated by

Congress under the O&C Act, 43 U.S.C. § 2601 *et seq.*  AR 3220.  The O&C

Act's plain language and legislative history "clearly reflect that the O&C Act

is not a multiple use mandate for public federal forestland management."

*Pacific Rivers*, 2018 WL 6735090 at *17.  "[T]he O&C Act is a 'primary' or

'dominant' use statute for sustained-yield timber production."  *Id.*  O&C lands

are intended primarily "for timber production to be managed in conformity

with the provision of sustained yield."  *O'Neal v. United States*, 814 F.2d

1285, 1287 (9th Cir. 1987) (per curiam).  "[T]he O & C Act envisions timber

production as a dominant use."  *Headwaters, Inc. v. BLM*, 914 F.2d 1174,

1184 (9th Cir. 1990).  "[W]ildlife habitat conservation . . . is [not] a goal of the

O&C Act at all."  *Id.*, *quoted in Pacific Rivers*, 2018 WL 6735090, at *17.

## III.   BLM's administrative review process for the Griffin Half Moon project.

BLM began public outreach for Griffin Half Moon in late 2017, after the

2016 RMP was in effect, and hosted a field trip in the project area in

December 2017.  AR 3165.  Then, in early June 2018, BLM published an

Environmental Assessment ("EA") with appendices for public review.  AR

3165-66.  BLM reviewed public input, and in August 2018 BLM published a

revised EA with appendices, along with a response to comments.  AR 3208-

396.  The revised EA examined in detail a "no-action" alternative and three

action alternatives:  a proposed action, AR 3232-45; an action alternative with less regeneration harvest, AR 3246-51; and another action alternative with no regeneration harvest, AR 3252-55.

BLM found in the revised EA that certain issues did not need to be analyzed in detail.  AR 3228-29.  These are issues already analyzed in BLM's 2016 FEIS.  AR 3228.  BLM identified these issues, and provided the public with "rationale for their being considered but not analyzed in detail."  AR 3229.   These issues included effects to great gray owls and the Pacific fisher. *See* AR 3274, 3341, 3359-60.

## A.    BLM considered effects to great gray owls.

The great gray owl is not common, but "enjoys a wide distribution" in Oregon, breeding in the Blue, Cascade, and Siskiyou Mountains.  AR 13148. In North America, there are an estimated 20,000 to 70,000 breeding pairs. AR 18293.   The species "thrives in a variety of habitats," and "can likely persist with some amount of forest cutting."  AR 18296.  The species is most often seen in winter, *id*., is largely nocturnal, and the owl calls "most often at a time of year when snow makes access into much of their range difficult." AR 13149.  There is little available information about the species' population or habitat trends.  AR 21863.

The great gray owl is not listed under the Endangered Species Act

("ESA"). AR 3172. Nor is the great gray owl a BLM Sensitive Species. *See* 8922-30, 8931-36; Pls.' Mot. 21 n.4.

The great gray owl was a Survey and Manage species under the NWFP, but BLM discontinued that management framework when the 2016 RMP became effective. AR 6305-06. Therefore, as Plaintiffs acknowledge, BLM is longer required to survey for and protect great gray owls. Pls.' Mot. 19; AR 3274. Under the 2016 RMP, however, BLM predicts there will be an increase in great gray owl habitat in fifty years through management of both harvest land base and reserve areas. AR 1537, 8066, 8938.

In the revised EA for Griffin Half Moon, BLM specifically considered a project alternative to avoid heavy thinning or regeneration harvest in units that were previously deferred from harvest—under the former 1995 RMP—to protect known great gray owl sites. AR 3274, 3341.[1] As BLM explained, it decided not to analyze this alternative in further detail, because that Survey and Manage approach was already examined (and not selected for continuation) through BLM's public process for its 2016 RMP. AR 1528.

In the revised EA, BLM tiered to and incorporated by reference its 2016 NEPA analysis regarding great gray owls. AR 3228-29, 1528. That 2016

---

[1] Plaintiffs' statement is incorrect that BLM "did not conduct any environmental analysis of the Griffin Half Moon timber sale on great gray owls." Pls.' Mot. 20.

Page 7    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

NEPA analysis found that implementing the RMP would result in an increase in great gray owl habitat over time with the discontinuation of Survey and Manage for species including great gray owls.  *See* AR 1529. Griffin Half Moon is not "an exercise in policy creation" but is "simply implementing" the management direction "established" in the 2016 RMP.  AR 1528; *see also* AR 3172.  Therefore, BLM found that gathering and publishing information such as the number of great gray owl sites in Griffin Half Moon would not serve a meaningful NEPA purpose.  AR 1529, 3172, 1537.

As BLM disclosed in the revised EA, the project protects raptor species including great gray owls.  AR 3265, 1540.  Griffin Half Moon will protect great gray owl nest trees and will seasonally restrict project activities within a quarter mile of known sites.  AR 3265.  With its revised EA, BLM acknowledged that timber harvest can be a threat to great gray owl habitat, but noted the 2016 RMP allocates a large reserve network "that accomplishes the goal of protecting older and more structurally-complex forests, and provides management for species such as the [great gray owl]."  AR 3341. BLM found that the proposed RMP would increase great gray owl habitat longer term.  AR 8065-66, 3172.  As the revised EA noted, the 2016 RMP "allocates a larger Late-Successional Reserve network than the previous plan," protecting the species.  AR 3274.

BLM therefore found that further detailed analysis regarding effects to great gray owls was unnecessary in the revised EA.

## B.    BLM considered effects to the Pacific fisher.

The Pacific fisher ("fisher") is a medium-sized forest mammal with a long body, short legs, and a long, bushy tail.  AR 6754, 6761.  The fisher is a BLM Sensitive Species and the revised EA specified several measures that would reduce impacts to the species in this project.  AR 3264-65, 3359.

The administrative record shows that under BLM policy, management of sensitive species on O&C lands "must be consistent with timber production as the dominant use of those lands."  AR 12520.  "Nowhere does the legislative history [of the O&C Act] suggest that wildlife habitat conservation . . . is a goal on a par with timber production, or indeed that it is a goal of the O&C Act at all."  *Headwaters*, 914 F.2d at 1184.

As part of the revised EA, BLM looked to its fisher analysis from the 2016 RMP and incorporated it by reference.  *See* AR 3359, 1526.  The 2016 FEIS described the fisher's range and its habitat and provided a detailed, quantified analysis of the effects of timber harvesting under the proposed RMP.  *See* AR 3359, 8088-99, 8956-68.  The 2016 FEIS specifically predicted that for harvest land base acreage, fisher denning habitat would decline but that in reserve lands, denning habitat would increase.  AR 8964.  The 2016

Page 9    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

FEIS also predicted that 52,202 acres of fisher habitat would be harvested

through 2023 under the RMP.  AR 8966.  BLM also predicted the RMP would

initially result in a slight fisher population decline that would be offset by

later growth in the fisher population.  AR 8098, 8968.  Land management

under the proposed RMP is expected initially to bring a loss of fisher habitat

but is expected longer term to surpass current conditions as additional

habitat develops.  *Id*.

BLM determined under NEPA that Griffin Half Moon would not exceed

the fisher-effects predictions in the 2016 RMP or trend the fisher towards

further protective listing. AR 3360, 1529, 3173.  About 410 acres of fisher

habitat would no longer be suitable for fisher denning and resting, but BLM

in 2016 predicted a small decrease in fisher habitat in the harvest land base,

AR 8964, and 410 acres is well within the 52,202 acres of removed habitat

BLM forecast through 2023.  Using northern spotted owl habitat as a proxy

for fisher habitat, AR 3359, BLM in Griffin Half Moon informed the public

that 97% of fisher habitat in the project's analysis area would remain, AR

3360, and that project elements would minimize long-term effects to fishers

by retaining large down wood and snags to maintain denning habitat and

retaining 80% canopy cover within 50 feet of den sites if any become known.

AR 3265, 3360.  The fisher analysis area shows the "potential" for at least

seven female fisher home ranges and three male fisher home ranges, AR

3312, 3359, but there are no known dens.   Telemetry data also show that

openings on the landscape do not impede fisher movement.  AR 3362.  The

species is highly mobile, AR 6758-59, and in southwest Oregon, features such

as smaller rivers and paved county roads "did not appear to influence home

range establishment or daily movements."  AR 11718.

Throughout the NEPA process for Griffin Half Moon, the fisher was not

proposed for ESA listing.  *See infra* Factual Background III.D and Argument

II.C

## C.    BLM's decision authorizing the project.

In August 2018, BLM published its response to public comments and

issued a Decision Record that selected an action alternative for Griffin Half

Moon.  AR 3157-78.  BLM selected the alternative with less regeneration

harvest, as modified with certain prescriptions from its proposed action

alternative.  AR 3157.

Under the Decision Record, BLM authorized timber harvest on 932

acres of O&C lands and construction of up to 0.39 miles of temporary roads.

The project will also make 1.85 miles of long-term road closures and certain

road renovations and improvements along haul routes.  AR 3157.  Of the 932

acres of harvest, 757 acres involves regeneration harvest prescriptions that

Page 11    Defendant's Cross-Motion for Summary Judgment and
           Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
           No. 1:19-cv-02069-CL

are not "clearcuts" but would retain between 10% and 40% of canopy cover.
AR 3162, 3182.  The 2016 RMP directs the use of regeneration harvest within
the harvest land base.  AR 3222.  The remaining 175 acres of commercial
harvest in the project involves commercial thinning and selection harvest
that would retain between 35% and 50% of canopy cover.  *Id.*  The project
would retain all trees with at least 40-inch diameter that have a birthdate
prior to 1850.  *See* AR 3237.  As authorized, the project would produce about
9 million board feet of timber.  AR 3163.  This is just under one-quarter of the
annual timber productive capacity for the BLM Medford District.  *See* AR
6283.  Each BLM District under the O&C Act is required to meet its annual
capacity.  *See* AR 3223; 43 U.S.C. § 2601; *Swanson Group Mfg., LLC v.
Bernhardt*, 417 F. Supp. 3d 22 (D.D.C. 2019).

　　With its Decision Record, BLM also issued a Finding of No Significant
Impact ("FONSI") which found that preparation of an Environmental Impact
Statement ("EIS") was not necessary.  AR 3179-87.

　　Plaintiffs and the American Forest Resource Council ("AFRC"), a
timber-industry trade group, each filed an administrative protest of the
Decision Record and FONSI.  AR 3128-51 (Plaintiffs), 3122-25 (AFRC).  In
late October 2019, BLM responded in detail to Plaintiffs' protest points and
denied their protest.  AR 1522-47.  BLM also responded to AFRC's protest

points and denied its protest.  AR 1516-21.

Plaintiffs then filed this action.

### D.  Subsequent developments regarding the fisher.

The fisher is not an ESA candidate or listed species in Oregon.  On May 15, 2020, the U.S. Fish and Wildlife Service ("FWS") published a final rule that found that such listing was unwarranted for fishers in Oregon.  85 Fed. Reg. 29,532, 29,561-62 (May 15, 2020).  FWS found that the Northern California/Southern Oregon distinct population segment of fisher is a "species" under the ESA.  *Id*. at 29,537.  But FWS found there is a "widespread distribution" of this species in actively managed landscapes and found that "fishers continue to persist in actively managed landscapes."  *Id*. at 29553.

### THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

The purpose of the National Environmental Policy Act ("NEPA") is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts in proposing actions, and; (2) to guarantee relevant information is available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

"NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater*

Page 13    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

*Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1150 (9th Cir. 2010). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351. NEPA "simply guarantees a particular procedure," so "the rights and obligations it creates are fundamentally unlike those of substantive land management statutes like the Federal Land and Policy Management Act." *Pacific Rivers v. BLM*, No. 6:16-cv-1598-JR, 2018 WL 6735090, *7 (D. Or. Oct. 12, 2018) (internal quotations omitted).

If an agency determines that a proposed action may significantly affect the quality of the human environment, NEPA generally requires that it prepare an EIS. 42 U.S.C. § 4332(C). BLM may prepare an EA, when it has not determined an EIS is needed. 40 C.F.R. § 1508.9; 43 C.F.R. §§ 300, 310.

An EA is a "workable public document that *briefly* provides evidence and analysis for an agency's finding regarding an environmental impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012) (citing 40 C.F.R. § 1508.9) (emphasis in original). *See also* 43 C.F.R. 310(a). If an agency determines that an EIS is not required, after preparing an EA, then the agency must issue a FONSI, which briefly states the reasons why the proposed agency action will not have a significant impact on the human environment. 40 C.F.R. §§ 1501.4(e), 1508.13.

Courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d. 1043, 1051 (9th Cir. 2012) (internal quotation omitted).

## STANDARD OF REVIEW

### I.    Judicial Review under the Administrative Procedure Act ("APA").

NEPA does not contain provisions for judicial review, so Plaintiffs bring their claims under the Administrative Procedure Act ("APA"). *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004).

Under the APA, a reviewing court will uphold agency action unless it finds the action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011), *quoting* 5 U.S.C. § 706(2)(A). This standard is "'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (internal quotation omitted). "An agency's actions need not be perfect; [courts] may only set aside decisions that have no basis

in fact, and not those with which [courts] disagree." *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1099 (9th Cir. 2003).

Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

An agency action is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

An agency action meets APA standards when the agency "relied on its own predictions" within its area of discretion and expertise and "rejected those [predictions] submitted by commenters." *California by and through Becerra v. Azar*, __ F.3d __, 2020 WL 878528, at *23 (9th Cir. Feb. 24, 2020) (en banc) (internal quotation omitted).  Further, "[c]omplete factual support" for an agency's prediction is not "possible or required," and opposing predictions and assumptions are simply evidence for the agency to consider. *Id.* (internal quotation omitted).

Page 16    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

An agency's factual conclusions in APA review are reviewed for "substantial evidence," a standard more deferential than the "clearly erroneous" standard for appellate review of trial court findings.  *Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999); *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1133-34 (9th Cir. 2010).

## ARGUMENT

### I.   BLM complied with NEPA in assessing effects on great gray owls.

#### A.   BLM appropriately tiered its NEPA effects analysis to its NEPA analysis for the 2016 RMP.

BLM appropriately tiered to its 2016 FEIS in assessing effects to great gray owls in Griffin Half Moon.  *See* AR 3229.  The 2016 FEIS considered effects to great gray owls from the RMP.  Then, in implementing the RMP through Griffin Half Moon, BLM tiered to the 2016 FEIS in finding the project would not bring the potential for significant effects to great gray owls beyond those taken into account in the 2016 NEPA review.

NEPA regulations direct that BLM "should use existing NEPA analyses for assessing" a later project's effects, and BLM's 2016 FEIS included "data and assumptions appropriate for" Griffin Half Moon analysis. 43 C.F.R. § 46.120(b).  In Griffin Half Moon, BLM rationally tiered to the 2016 FEIS and found no basis to overturn the FEIS analysis on the project

scale.  BLM also considered a NEPA alternative to avoid timber harvest near great gray owl sites that were protected under the former RMP.  AR 3274.

BLM's approach to assessing effects on the great gray owl is amply supported under NEPA.  Where an agency is moving from a plan EIS to a site-specific analysis, "tiering is appropriate."  '*Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006).  NEPA regulations specifically allow the revised EA to tier to the 2016 FEIS in reviewing environmental effects, and to incorporate that FEIS by reference.  43 C.F.R. §§ 46.120, 46.140(c); 40 C.F.R. §§ 1502.20, 1508.28.  Tiering to a broader-scale EIS is allowed, "so long as any previously unanalyzed effects are not significant."  43 C.F.R. § 46.140(c).  As here, when an agency has prepared a broad EIS and then prepares an EA on a new action within the EIS's overall ambit, the EA need only "summarize the issues discussed" in the EIS, "incorporate discussions from" the EIS, and "concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20.

Here, tiering to its 2016 FEIS, BLM rationally found that Griffin Half Moon would not have significant effects on great gray owls that were not already analyzed in the 2016 FEIS.  *See* AR 1537.  Griffin Half Moon was designed to implement the 2016 RMP, which discontinued Survey and Manage provisions while allocating a larger network of reserve lands for

great gray owls and predicting a long-term increase in species habitat.  AR 3218, 3222, 8066, 8938.  Because Griffin Half Moon is implementing the timber management directed under the 2016 RMP, BLM appropriately tiered its analysis to that in the 2016 FEIS, and rationally chose not to prepare further analysis regarding great gray owls.  The 2016 RMP authorized the management proposed by the project, gauged the effects of such management, and nothing in Griffin Half Moon indicated to BLM that effects to the species would be more significant than what BLM predicted in 2016.

Plaintiffs acknowledge that maintaining quality great gray owl habitat should be compatible with forest management for commodity resources, "if management takes a long term view."  Pls.' Mot. 10.  That is precisely what BLM did in allowing for timber removal within its limited harvest land base, on O&C lands, while predicting an increase in great gray owl habitat given enhanced reserve lands.  *See* AR 1529.

The recent district court ruling in *Native Ecosystem Council v. Judice* ("*Judice*"), is instructive.  2019 WL 1131231, at *4 (D. Mont. March 12, 2019).  In *Judice*, plaintiffs argued that a BLM project's NEPA analysis was inadequate regarding effects on wildlife species, but the court rejected that argument given BLM's tiering to the NEPA analysis in an earlier, broader RMP.  *Id.* at *6.  The project in *Judice* "implement[s] the objectives already

Page 19    Defendant's Cross-Motion for Summary Judgment and
            Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
            No. 1:19-cv-02069-CL

authorized by the RMP." *Id*.  Therefore, tiering was "particularly relevant here because of the relationship of the RMP to the EA in this particular case." *Id*. at *4.

As in *Judice*, tiering here is appropriate because Griffin Half Moon implements the objectives authorized in the 2016 RMP.  In reaching its 2016 RMP, BLM analyzed the effects of its new management on great gray owls. The underlying data BLM relied upon in Griffin Half Moon is in the 2016 FEIS, to which the EA is tiered.  Then, in Griffin Half Moon, BLM implemented the very objective and management actions authorized in the 2016 RMP.

Nothing about the great gray owl's current status required additional NEPA review in Griffin Half Moon.  *See* 40 C.F.R. § 1500.4(c) ("NEPA's purpose is not to generate paperwork").  The species is not a Sensitive Species under BLM policy and is not listed under the ESA.  *See* Pls.' Mot. 21 n.4.  There are BLM policies establishing agency procedures for the management of species designed as BLM Sensitive, AR 3225, but none of those management procedures apply to species that are not Bureau Sensitive, including the great gray owl.

BLM's 2016 RMP provided that maintaining quality great gray owl habitat was compatible with forest management for commodity resources.

Page 20     Defendant's Cross-Motion for Summary Judgment and
            Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
            No. 1:19-cv-02069-CL

BLM implemented this approach in Griffin Half Moon allowing for timber removal within its limited harvest land base, on O&C lands, while predicting a long-term increase in great gray owl habitat given enhanced reserve lands. *See* AR 1529. This was neither arbitrary nor capricious under the APA.

## B.    Plaintiffs fail to establish that BLM's use of tiering was improper.

Plaintiffs argue that it was improper for BLM to tier to the 2016 FEIS, because that earlier analysis did not assess the environmental consequences on great gray owls within the Griffin Half Moon area. Pls.' Mot. 21-22. That is incorrect. The 2016 FEIS addressed effects on the species across the entire FEIS planning area, including the BLM Medford District and its harvest land base acreages. In the 2016 FEIS, BLM examined the effects of timber harvest on great gray owls and Griffin Half Moon implements the 2016 RMP and rests squarely within that effects analysis.

BLM's use of NEPA tiering was appropriate, because BLM already disclosed that the RMP would protect most known sites of the former Survey and Manage species —including the great gray owl—and would provide species protections even within the harvest land base. *See* AR 9103-04. Specifically, for the great gray owl, nearly two-thirds (800) of the total known owl sites (1,228) are within reserves. AR 8944. Most "actual known sites"

would continue to be protected.  AR 9226.  Further, the proposed RMP would

reserve 83% of existing mature or structurally complex forest habitat, an

improvement from the prior NWFP framework.  AR 9226.  Finally, the

proposed RMP would "result in an increase in habitat for the great gray owl

over current conditions in 50 years."  AR 8066.

Additionally, and as mentioned above, the great gray owl does not

have a special status or designation, either as a BLM Sensitive Species or

under the ESA, that would require additional NEPA review.  NEPA does not

require a detailed, stand-alone effects analysis with regard to every species of

wildlife.  For BLM-designated Sensitive Species, BLM policy specifies various

land management procedures, AR 12518, but there are no such measures for

undesignated species.  *See* AR 3325 (revised EA's description of BLM policy

regarding designated sensitive species).  Further, all Griffin Half Moon

activities will occur on Congressionally designated O&C lands.  "Nowhere

does the legislative history [of the O&C Act] suggest that wildlife habitat

conservation . . .  is a goal on a par with timber production, or indeed that it

is a goal of the O& C Act at all."  *Headwaters, Inc. v. BLM*, 914 F.2d 1174,

1184 (9th Cir. 1990).  In Griffin Half Moon, BLM tiered to existing NEPA

analysis, and requiring still further NEPA review for an undesignated

species clashes with both the underlying backdrop of the O&C Act and

NEPA's purpose to avoid unnecessary paperwork.  *See* 40 C.F.R. § 1500.4(c).

Further, Plaintiffs fail to point to any evidence in the administrative record indicating that the great gray owl faces a problem persisting on BLM lands in the Medford District.  Plaintiffs say the great gray owl "depend[s] on late-successional and old growth forests for survival."  Pls.' Mot. 2.  But the revised EA told the public that older, multilayered, structurally-complex forest habitat "does not occur" in the project area in the first place.  AR 3311.  Griffin Half Moon will have no effect on that habitat.  As for forest acreage with high canopy cover, multi-layered structure, and large overstory trees, Griffin Half Moon will reduce that from 40% of the project's analysis area to 39%.  AR 3311, 3319.  This minimal change to such habitat, along with the abundance of large nearby reserve acreages with late-successional habitat (AR 3341), supports BLM's use of tiering and its NEPA finding that additional review was not required.  *See* AR 3274.

Plaintiffs say BLM's defense of its position must be in its EA, Pls.' Mot. 20, but that contradicts their acknowledgment that the information supporting BLM's decision may instead be "in the administrative record and referred to by the EA."  Pls.' Mot 25.  Further, Plaintiffs ignore that courts look to an agency's response to comments in evaluating whether the agency took a hard look under NEPA.  *See Save the Peaks Coal. v. U.S. Forest Serv.*,

669 F.3d 1025, 1037 & n.5 (9th Cir. 2012); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 956 (9th Cir. 2008). Here, in the response to public comments accompanying its NEPA decision, BLM stated why effects to great gray owls were not analyzed in detail in the revised EA. AR 3172.

To attack BLM's use of tiering, Plaintiffs cite several cases but none assist them here. Pls.' Mot. 22. In *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004), four EAs for successive timber sales tiered to an earlier RMP analysis but nowhere did the agency reveal the cumulative impacts to watersheds that were expected as the result of each of the four timber sales. Here, by contrast, there is a single 2018 timber project designed to implement BLM's 2016 RMP which removed Survey and Manage provisions but protects the great gray owl through larger reserves and an increase in the species' habitat. Plaintiffs cite *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), but there the court rejected the prospect that a salvage logging project was "exempt" from NEPA analysis when an earlier EIS contemplated that logging could occur. There, the salvage logging project was in response to a catastrophic fire that "dramatically altered" the forest ecosystem years after the earlier EIS was prepared. *Id.* Here, in contrast, BLM did not assert it was exempt from

NEPA review, but incorporated by reference its 2016 NEPA review. Further, Griffin Half Moon directly implements the 2016 RMP and nothing has altered the BLM landscape since the 2016 RMP in a manner that would alter the analysis of the effects on great gray owl.

Plaintiffs also cite *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1247 (W.D. Wash. 2009), but that NWFP case does not apply here. Plaintiffs rely on the case for the prospect that the NWFP's reserves were insufficient to protect rare species, "thus necessitating" Survey and Manage. Pls.' Mot. 22. But the 2016 RMP here enhances reserves beyond those set aside by the NWFP. *See* AR 3181, 6305-06. Further, the courts have rejected Plaintiffs' NEPA challenge to the 2016 RMP's choice to discontinue management under the NWFP. *See Pacific Rivers v. BLM*, __ Fed. App'x ___, 2020 WL 2510759, at *2 (9th Cir. May 15, 2020) (memorandum disposition).

## C. Plaintiffs' NEPA claim fails in asserting violations of substantive duties and a supposed failure to explain a change in policy.

### 1. Plaintiffs lack a viable NEPA claim in asserting violations of supposed substantive duties.

Plaintiffs assert that BLM "failed to implement protective measures" for great gray owls in the project. Pls.' Mot. 22. But Plaintiffs' preferences

for how the owl should be substantively managed do not establish a valid NEPA claim.

"[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA does not impose substantive duties on an agency; rather, NEPA exists to ensure a process, not particular substantive results." *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1190 (D. Or. 2002) (internal quotation omitted). Mere disagreement with an agency's substantive conclusions regarding a project's effects is not a basis for overturning an agency decision under NEPA. *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1186 (D. Nev. 2004), *cited with approval in Pacific Rivers*, 2018 WL 6735090, at *9 n.11.

Further, Plaintiffs' assertion of a lack of owl protections is wrong. The project includes specific protections for raptors including great gray owls. AR 3265. BLM disclosed in the revised EA that Griffin Half Moon protects great gray owl nest trees and seasonally restricts project activities within a quarter mile of known sites. *Id.* Similarly, the 2016 RMP, which Plaintiffs unsuccessfully challenged, contains enhanced reserve lands to protect great gray owls and this is expected to increase the species' habitat over time. *See* AR 1529, 1537, 1540, 8065-66.

Page 26    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

Plaintiffs attempt to rely on an extra-record owl survey protocol, Pls.'
Mot. 17-18 & n.1, but that document is not in the administrative record and
is irrelevant to their NEPA claim.  This is because Plaintiffs acknowledge
BLM is not required by its RMP to survey for great gray owls.  Pls.' Mot. 19.
There is no procedural duty under NEPA for BLM to take on the substantive
duty of surveys, when such surveys are not required in the first place.  Nor is
there a good reason under the APA's "record-review rule" to consider an
extra-record survey protocol that is inapplicable to this project.  *See Lands
Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005); *Fence Creek Cattle
Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

Plaintiffs argue that "regeneration harvest and heavy thinning
prescriptions" are "incompatible" with the great gray owl.  Pls.' Mot. 19.  But
NEPA does not set substantive requirements, and BLM followed appropriate
NEPA process in examining in detail a no-action alternative and an
alternative that would avoid any regeneration harvest near great gray owl
sites.  AR 3232, 3252.

Plaintiffs' substantive disagreements with Griffin Half Moon fail to
establish a NEPA violation.

> **2.    Plaintiffs' assertion that BLM failed to explain a change in policy has already been rejected by this court and the Ninth Circuit.**

Plaintiffs also argue that BLM violated NEPA because Griffin Half Moon eliminated substantive protections for great gray owls without providing an appropriate explanation.  Pls.' Mot. 23-24.  Not so.  The record is clear that the 2016 RMP discontinued Survey and Manage in lieu of other substantive protections for great gray owls.

Before this project, in its 2016 RMP, BLM had already chosen to discontinue Survey and Manage and other NWFP provisions in favor of a different management framework.  Plaintiffs challenged that choice under NEPA for a supposed lack of explanation, but this Court rejected the challenge.  *Pacific Rivers,* 2018 WL 6735090, at *8 n.10.  The Ninth Circuit then affirmed this Court, concluding that BLM provided a "reasoned explanation" for any change from its prior management approach under the NWFP.  *Pacific Rivers,* ___ Fed. App'x ___, 2020 WL 2510759, at *2.

In the 2016 RMP, BLM chose a new substantive policy framework for management of its lands and discontinued use of Survey and Manage. Griffin Half Moon was designed under this new substantive framework. Griffin Half Moon did not make any policy changes; BLM already changed the underlying framework in 2016.

Page 28    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

Further, BLM disclosed in the revised Griffin Half Moon EA that Survey and Manage was no longer part of its land management framework. AR 3274. BLM also explained that "the decision to not include Survey and Manage measures for species . . . has already been analyzed and decided" in the 2016 RMP. AR 1529; *see* AR 6305-06. There was no NEPA duty in Griffin Half Moon for BLM to again analyze the rationale for the 2016 RMP's species management framework. That would be repetitive and unnecessary paperwork, and the issue of BLM's 2016 decision to discontinue the NWFP management framework has already been litigated and decided by the courts.

### D. Plaintiffs inappropriately seek summary judgment based on post-decisional, extra-record evidence.

In seeking summary judgment on their NEPA claim, Plaintiffs rely heavily on a series of post-hoc declarations. *See* Pls.' Mot. 10, 17, 19-20 (citing declarations at ECF 33 through 39). But these post-decisional declarations are outside the administrative record and should not be considered. It is inappropriate in APA review for Plaintiffs to "sandbag" BLM, after the completion of a public NEPA process in 2018, with new declarations that raise points not brought to BLM's attention during its public process in reaching a project decision.

It is well established and familiar to this Court that extra-record, post-

decisional evidence is not a proper basis to attack the agency's decision under the APA and should be stricken. *See, e.g., Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2017 WL 5957811, at *1 (D. Or. Jan. 18, 2017). Here, as in *Concerned Friends*, the declarations were "prepared after completion of the relevant administrative record, and the Ninth Circuit applies a post-decisional bar to extra-record materials." *Id.* (citing *Tri-Valley CARES v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130-31 (9th Cir. 2012)).

This Court should strike the declarations at ECF 33 through 39 in its APA review of the merits of Plaintiffs' claim.

### E.    Plaintiffs' other arguments fail to establish that BLM was arbitrary and capricious under the APA.

Plaintiffs characterize fragments of certain scientific papers in the administrative record, but their characterizations do not aid their procedural NEPA claim. Illustratively, Plaintiffs cite the Hull study to argue the Oregon great gray owl population is important to support the California population of the species. Pls.' Mot. 7-8. But the Hull study says nothing of the sort. Instead, it emphasizes that great gray owls in California are distinct and naturally isolated from great gray owls in Oregon. AR 12159, 12162. Indeed, "many hundreds of kilometers separate" great gray owls in California "from the nearest population in southern Oregon." AR 12155.

Plaintiffs ignore research in the administrative record showing that the great gray owl is adapted to catching prey in open habitats and early forest successional stages and can likely persist within areas where there is timber harvest.  AR 18296.  Plaintiffs also ignore that all Griffin Half Moon activities will occur on O&C lands.  Further, they ignore that the governing 2016 RMP, along with BLM's 2016 Resource Management Plan for Northwestern and Coastal Oregon, sets aside 83% of existing mature or structurally complex forest habitat to better provide for great gray owl and other species.  AR 9226.  For BLM-administered lands, 75% are reserves under the 2016 RMP, whereas only 66% were reserves under the NWFP.  AR 8068.  Plaintiffs cite the old Survey and Manage protocol, Pls.' Mot. 8-9, but that protocol is defunct for these lands.

Plaintiffs argue that "extant but undocumented" great gray owl sites will "receive no protection," Pls.' Mot. 21, but that substantive claim does not relate to NEPA procedures.  Further, Plaintiffs ignore that the project protects known sites and nest trees, and nearly two-thirds of the great gray owls are located in reserve lands entirely unaffected by this project.  NEPA does not require that BLM search for undocumented owl sites.  The record shows that "[s]urvey and species data on Survey and Manage species are incomplete and insufficient to provide for any meaningful analysis of

Page 31    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

population trends."  AR 9105.

Plaintiffs acknowledge that maintaining quality great gray owl habitat should be compatible with forest management for commodity resources, "if management takes a long term view."  Pls.' Mot. 10.  That is precisely what BLM did in allowing for timber removal within its limited harvest land base, on O&C lands, while predicting an increase in great gray owl habitat given enhanced reserve lands.  See AR 1529.

For all these reasons, this Court should grant Defendant summary judgment against Plaintiffs' NEPA claim regarding the great gray owl.

## II.   BLM complied with NEPA in assessing effects on the Pacific fisher.

### A.   BLM appropriately tiered its NEPA effects analysis to the analysis for its 2016 RMP.

In the Griffin Half Moon revised EA, BLM tiered to its fisher effects analysis from the 2016 FEIS and incorporated it by reference.  *See* AR 3228-29, 3359-60, 1526.  This is appropriate under NEPA.  *See supra* Argument I.A.  Nor was BLM arbitrary and capricious in accounting for fisher effects, because BLM provided project-specific information supporting its finding that further NEPA study was not required.

In its 2016 FEIS, BLM described the fisher's range and its habitat and provided a detailed, quantified analysis of the effects of timber harvesting on

Page 32     Defendant's Cross-Motion for Summary Judgment and
            Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
            No. 1:19-cv-02069-CL

the species, specifically within the harvest land base.  AR 3359-60, 8088-99, 8956-68.  Then, for Griffin Half Moon, a harvest land base project, BLM disclosed that the project would affect fisher habitat, as "anticipated under the RMP."  AR 3360.  In the harvest land base, the 2016 FEIS already disclosed that fisher denning habitat would decline under the RMP.  In reserve lands, however, denning habitat would increase.  AR 8964.  The 2016 FEIS predicted that 52,202 acres of fisher habitat would be harvested through 2023 under the RMP.  AR 8966.  The fisher population would initially decline but later increase beyond current levels.  AR 8098, 8968.

BLM rationally determined that Griffin Half Moon would not exceed the fisher-effects predictions under the 2016 RMP or trend the fisher towards further protective listing. AR 3360, 1529, 3173 (BLM's discussion of fisher effects in its response to comments accompanying its August 2018 Decision Record).  Under the revised EA, approximately 410 acres of fisher habitat would no longer be suitable for fisher denning and resting, but BLM in 2016 predicted a small decrease in fisher habitat in the harvest land base, and 410 acres is well within the 52,202 acres of removed habitat BLM forecast through 2023.  Further, using northern spotted owl habitat as a proxy for fisher habitat, AR 3359, BLM in Griffin Half Moon informed the public that 97% of fisher habitat in the project's analysis area would remain, AR 3360,

and that project elements would minimize long-term effects to fishers by retaining large down wood and snags to maintain denning habitat and retaining 80% canopy cover within 50 feet of den sites if any become known. AR 3265, 3360.

For these reasons this Court should grant BLM's cross-motion against Plaintiffs' NEPA claim regarding the fisher.

### B. Plaintiffs' lead argument is foreclosed by Ninth Circuit precedent and by their own representations.

Plaintiffs' lead argument is that it was technically illegal for the revised EA to use an EA appendix to discuss the fisher even though the revised EA specifically referenced that appendix and the appendix was provided to the public with the revised EA. Pls.' Mot. 24-26. Further, BLM's original EA included the same appendix and Plaintiffs commented on its contents. AR 4592-619, 4013-15.

Plaintiffs' argument misrepresents the applicable law, by relying on a NEPA regulation, 40 C.F.R. § 1502.18, that by its plain terms applies only in the context of an EIS. Under Ninth Circuit precedent, a NEPA regulation specific to an EIS does not apply to an EA. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012) (holding that a NEPA regulation did not apply to an EA, when the regulation "by its own terms only

applies" to an EIS).  The regulation that is the centerpiece of Plaintiffs'

argument by its plain terms applies only to an EIS, not an EA.

Plaintiffs fail to acknowledge that a federal NEPA regulation provides

that BLM may prepare an EA "in any format useful to facilitate planning,

decision-making, and appropriate public participation."  43 C.F.R. §

46.315(a).  Further, that NEPA regulation states that an EA may be

"accompanied by any other planning or decision-making document."  *Id*. §

46.315(b).  Here, BLM followed section 46.315 and published its revised EA

in a rational format with clear accompanying documents.  Plaintiffs were not

prejudiced by BLM's publication of an appendix attached to the EA, as their

EA comments discussed and critiqued the appendix itself.  *See* AR 4013-15.

Plaintiffs' argument is also undermined by their own representations.

As Plaintiffs acknowledge, the information supporting an agency decision

may be in the administrative record and referred to by the EA.  Pls.' Mot. 25.

Here, BLM meets this standard.  The administrative record includes BLM's

2016 FEIS, the 2016 RMP, and the revised EA appendices, and these

documents are expressly referenced in the revised EA.  *See*, *e.g.*, AR 3218,

3225, 3228-29.[2]

---

[2] Plaintiffs cite *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th
    Cir. 1998), but that case nowhere concluded that an appendix attached to
    an EA is an unacceptable place for environmental analysis.

Page 35    Defendant's Cross-Motion for Summary Judgment and
           Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case
           No. 1:19-cv-02069-CL

### C.    Plaintiffs misrepresent the status of the fisher at the time BLM made its challenged decision.

Plaintiffs also argue that BLM violated NEPA, because the fisher is proposed for ESA listing. Pls.' Mot. 28-29.  *See also id.* at 2, 11-2.  According to Plaintiffs' argument, BLM's analysis was "especially egregious" because of the "perilous status" of the species.  Pls.' Mot. 28.

Plaintiffs are wrong.  At no time during the Griffin Half Moon NEPA process was the fisher proposed for ESA listing. The administrative record shows that FWS in April 2016 formally withdrew its proposed rule to list the fisher under the ESA, prior to the start of Griffin Half Moon NEPA process. AR 6316, 6317.

BLM signed the Decision Record for Griffin Half Moon on August 15, 2018.  More than a year later, on November 7, 2019, FWS published a proposed rule to list the West Coast Distinct Population Segment of fisher as threatened.

Plaintiffs rely on this post-decisional development outside the administrative record in support of their claim BLM violated NEPA.  Pls.' Mot. 28 (citing 84 Fed. Reg. 60,278) (Nov. 7, 2019); *see also* Pls.' Mot. 11-12 (relying on November 2019 notice).  But this development has no bearing on Plaintiffs' NEPA claim.  Under the APA, the scope of judicial review is

limited to the administrative record available to the agency at the time of the challenged decision. *See Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1024 n.2 (9th Cir.2011) ("Under the APA, we may consider only the record that was before the agency at the time the challenged decision was made."); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

BLM did not violate NEPA in Griffin Half Moon's August 2018 Decision Record and FONSI; during the entire project administrative process the fisher was withdrawn from proposed ESA listing. The post-decisional information Plaintiffs rely on was simply not before BLM when it reached its Griffin Half Moon decision.

Further, FWS has found that the fisher in Oregon does not merit ESA protections. On May 15, 2020, FWS issued a final rule that determined that the fisher in Oregon does not warrant ESA protections as it is not in danger of extinction and unlikely to become so in the foreseeable future. 85 Fed. Reg. 29,532, 29,561-62 (May 15, 2020). FWS recognized that the species is able to become established and persist in landscapes that are managed for timber production. *Id.* at 29553. FWS's final rule buttresses BLM's effects findings regarding the fisher.

**D.    Plaintiffs' other arguments fail to establish BLM was arbitrary and capricious under the APA.**

Plaintiffs acknowledge that NEPA allows tiering, but argue it was illegal here by relying on part of a single paragraph in the 2016 FEIS.  Pls.' Mot. 26 (citing AR 8092).  Plaintiffs mischaracterize the statements in AR 8092; the statements address only BLM's 2016 estimates of fisher population size, providing that these estimates do not account for other factors "unaffected by BLM land management actions."  AR 8092.  BLM stated it used its population size estimates only to provide "relative outcomes" of the fisher population under the various RMP alternatives, and cautioned against using its estimates as an "absolute."  *Id*.

The statements in the 2016 FEIS at AR 8092 do not bar tiering in later projects that implement the 2016 RMP.  In Griffin Half Moon, further, BLM did not use the 2016 population estimates as an absolute.  Instead, BLM looked to the entirety of the 2016 FEIS analysis regarding the fisher, and rationally found that a project to specifically implement the management direction of the 2016 RMP did not present effects to fishers beyond those studied in 2016.  AR 3359-60, 8088-99, 8956-68.  BLM, moreover, made its finding using project-specific data and a variety of habitat considerations, rather than merely 2016 population estimates.  *See id*.

Page 38    Defendant's Cross-Motion for Summary Judgment and Memorandum; *Klamath Siskiyou Wildlands Center v. BLM*, Case No. 1:19-cv-02069-CL

Plaintiffs say the "only place" BLM discussed the fisher was "a page and half." Pls.' Mot. 26. Not so. Plaintiffs ignore the detailed effects review of the fisher and its habitat in BLM's 2016 FEIS. AR 8088-99, 8956-68. Plaintiffs also ignore the detailed analysis that underlaid BLM's 2016 conclusions regarding fishers, such as BLM's vegetation modeling to address the habitat effects of timber harvest and other land management. *See* AR 7317-22, 8400-464.

In in 2016 NEPA review, BLM already addressed the effects of timber harvest activities within the harvest land base on the fisher. In 2018, BLM then incorporated the 2016 review into the Griffin Half Moon revised EA, and provided further specifics for the project that supported its finding that further NEPA review was not warranted. For example, BLM looked to northern spotted owl habitat in the area, a proxy for fisher habitat, and found that 97% of habitat would remain. AR 3359-60. That spotted owl analysis included further detailed analysis regarding habitat. *See* AR 3311-12, 3319. Plaintiffs also ignore the other fisher-specific documents that BLM took into account, including FWS's final species report for the fisher, AR 6747-7095, and a study of fisher habitat in Oregon. AR 11676-803.

Plaintiffs argue that BLM "expects" the fisher "to leave the planning area and find other habitat in which to live." Pls.' Mot. 27. Again, not so. As

BLM disclosed to the public, 97% of fisher habitat will remain after the project, and BLM looked across a 46,600+ acre analysis area.  *See* AR 3312, 3359-60.  Plaintiffs also ignore that the fisher is highly mobile, is able to establish populations in areas managed for timber harvest, and that studies show that daily fisher movements are unimpeded by man-made features such as paved county roads.  *See* AR 3362, 6758-59, 11718.

Plaintiffs cite *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998), but that case did not involve NEPA tiering. Instead, *Neighbors of Cuddy Mountain* involved a failure by an agency to account in one timber project for the cumulative effects on old-growth from three other proposed timber projects.  *Id.* at 1378-79.  Here, by contrast, Griffin Half Moon directly implements the management direction established in the 2016 RMP, Plaintiffs identify no other projects with alleged cumulative effects, and BLM explained why fisher effects were within the scope of the 2016 NEPA review.  Notably also, the Ninth Circuit recently rejected Plaintiffs' argument that BLM under NEPA was required to assess the effects of unspecified future actions by private landowners in reaching the 2016 RMP.  *Pacific Rivers v. BLM*, ___ Fed. App'x ___, 2020 WL 2510759, *2 (9th Cir. May 15, 2020) (memorandum disposition).  NEPA did not require BLM to speculate about the effects of unspecified future actions on the fisher.

Plaintiffs also cite *Steamboaters v. FERC*, 759 F.2d 1282 (9th Cir. 1985), but that case did not involve NEPA tiering and instead involved an agency's failure to adequately explain why it chose not to prepare an EIS.  *Id.* at 1392-93.  Here, by contrast, Plaintiffs do not challenge BLM's choice to prepare an EA.  Nor did BLM baldly assert that effects to fishers would be minor.  Instead, BLM explained why it tiered its effects review to the 2016 FEIS and provided project-specific data to buttress its finding.

For all these reasons, this Court should grant Defendant summary judgment against Plaintiffs' NEPA claim regarding the fisher.

## CONCLUSION

This Court should grant Defendant's cross-motion for summary judgment and dismiss Plaintiffs' NEPA action.

Dated this 5th day of June, 2020.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limitation under LR 7-2(b), because it contains 8,789 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, glossary, signature block, and any certificates of counsel.

Dated this 5th day of June, 2020.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant U.S. Attorney