SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
 (541) 778-6626 | Phone
sangyeij@westernlaw.org

BRODIA NARDI MINTER (OSB #164414)
Klamath Siskiyou Wildlands Center
P.O. Box 102
Ashland, Oregon 97520
(541) 488-5789 | Phone
Brodia@kswild.org

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### MEDFORD DIVISION

|  |  |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, <br><br> *Plaintiffs,* <br><br> vs. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> *Defendant.* | Civ. Case No. 1:19-cv-02069-CL <br><br> PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <br><br> ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

I.      INTRODUCTION.......................................................................................... 1

II.     THE GRIFFIN HALF MOON TIMBER SALE REVISED ENVIRONMENTAL
        ASSESSMENT VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT
        BECAUSE THE BLM FAILED TO CONSIDER THE PROJECT'S DIRECT,
        INDIRECT, AND CUMULATIVE EFFECTS. ............................................... 4

        A.      Tiering to the Environmental Analysis for the BLM's Resource Management
                Plan is Unlawful and Inadequate. ......................................................... 4

        B.      Direct, Indirect, and Cumulative Effects on Great Gray Owls. ...................... 9

                1.      Reliance on the Late-Successional Reserve Land Use Allocation for
                        NEPA Compliance is Inadequate and Unlawful. ................................ 14

                2.      BLM Has Not Provided a Rational Explanation for Removing Great
                        Gray Owl Protections. ........................................................... 16

        C.      Direct, Indirect, and Cumulative Effects on Pacific Fisher. ........................ 18

                1.      Reliance on an Appendix to the REA for NEPA Compliance is
                        Unsupported and Unlawful. ...................................................... 18

                2.      Tiering to the RMP FEIS is Inadequate. ............................................ 20

III.    THE GOVERNMENT'S UNPERFECTED MOTION TO STRIKE SHOULD BE
        DENIED. ........................................................................................... 23

IV.     CONCLUSION. .................................................................................... 24

# TABLE OF AUTHORITIES

**Federal Cases**

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ................................................................ 4, 18

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983).................................. 4

*Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ...................... 7

*California v. Azar,* 950 F.3d 1067 (9th Cir. 2020) ........................................................................ 3

*Cent. Or. Hosp. Dist. v. Sullivan*, 757 F. Supp. 1134 (D. Or. 1991) ........................................... 12

*Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009) ................................... 15, 16

*Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ...................................................... 3

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................................................... 16

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)...................................................... 19

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ....................................... 3

*Harley-Davidson Credit Corp. v. Turudic*, 2012 WL 5411771 (D. Or. 2012) ............................. 23

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010).......................................... 12

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006).............................................. 1

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................................................ 4, 5

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019) ...................................................................... 18

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004)............................... passim

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010)....................................................... 4, 23

*Native Ecosystem Council v. Judice* 2019 WL 1131231 (D. Mont. 2019)................................. 6, 7

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003 (D. Alaska 2020) ...... 5, 6

*Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175 (W.D. Wash. 2005) ...................................... 16

*Or. Envtl. Council v. Kunzman*, 817 F.2d 484 (9th Cir. 1987) ................................................... 10

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ................... 3, 12

*Oregon Wild v. United States*, 107 F. Supp. 3d 1102 (D. Or. 2015) ........................... 24

*Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015)................................... 16

*Pac. Rivers v. Bureau of Land Mgmt.*, 2020 WL 2510759 (9th Cir. 2020)............................ 1, 17

*Portland Audubon Soc. v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992), *modified* 1992 WL 176353

(D. Or. July 16, 1992), *and aff'd sub nom. Portland Audubon Soc. v. Babbitt*, 998 F.2d 705,

709 (9th Cir. 1993) ................................................................................................ 2, 5

*Steamboaters v. FERC*, 759 F.2d 1282 (9th Cir. 1985)............................................... 7, 8

**Federal Statutes**

5 U.S.C. § 706(2)(A)...................................................................................... passim

16 U.S.C. § 1536(a)(2)........................................................................................ 16

43 U.S.C. § 1701(a)(8).......................................................................................... 2

43 U.S.C. § 2601 .................................................................................................. 1

**Federal Regulations**

40 C.F.R. § 1502.18 ...................................................................................... 19, 20

40 C.F.R. § 1502.8 ............................................................................................ 10

40 C.F.R. § 1508.28 ............................................................................................ 5

40 C.F.R. § 1508.8 ............................................................................................. 9

43 C.F.R. § 46.315(a).......................................................................................... 20

43 C.F.R. § 46.315(b).......................................................................................... 20

43 C.F.R. § 46.430(a)..................................................................................... 19, 20

**Miscellaneous**

Order Granting Motion for Summary Judgment, *Am. Forest Res. Council v. Pendley*, No. 16-cv-
01599-RJL (D.D.C. Nov. 22, 2019), ECF No. 55 ................................................................ 2, 15

Plaintiffs' Consolidated Remedy Brief and Proposed Order, *Am. Forest Res. Council v. Pendley*,
No. 16-cv-01599-RJL (D.D.C. Jan. 27, 2020), ECF No. 59-4 .......................................... 3, 16

85 Fed. Reg. 29,532 (May 15, 2020) ........................................................................... 18

LR 7-1(a) ..................................................................................................................... 24

LR 7-1(a)(3) ................................................................................................................. 24

LR 7-1(b) ..................................................................................................................... 23

LR 26-3(c) .................................................................................................................... 24

LR 56-1(b) ............................................................................................................... 23, 24

## I.      INTRODUCTION.

The Bureau of Land Management (BLM) believes its adoption of its 2016 Resource

Management Plan (RMP) relieves the agency of conducting site-specific project-level analysis of

the environmental consequences of the Griffin Half Moon timber sale project (Griffin Half Moon

or the Project) as required by the National Environmental Policy Act (NEPA). The BLM and

intervenors Murphy Company (Murphy) maintain that because the Project is located on revested

Oregon and California 1937 Act Lands (O&C lands), that NEPA does not apply to site-specific

projects and that no consideration is due to project-level effects on wildlife. Both opposing

parties point out that plaintiff Klamath-Siskiyou Wildlands Center (KS Wild) recently lost a

challenge to the 2016 RMP in the Ninth Circuit Court of Appeals. *Pac. Rivers v. Bureau of Land*

*Mgmt.*, 2020 WL 2510759 (9th Cir. 2020).

None of these proffered theories withstand scrutiny.

Unfortunately for BLM and Murphy, NEPA case law is clear that tiering – the

incorporation of a broad programmatic analysis into a subsequent site-specific analysis – is only

permissible when that programmatic analysis actually conducts a site-specific analysis.

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094–96 (9th Cir. 2006). Because the 2016

RMP final environmental impact statement (FEIS) expressly did not conduct a site-specific

analysis of the Griffin Half Moon timber sale's effects on two important wildlife species, tiering

is not appropriate in this case. And because the Revised Environmental Assessment (REA) for

the Project likewise does not contain this analysis, the Project is arbitrary, capricious, and not in

accordance with law. 5 U.S.C. § 706(2)(A).

Moreover, while the Griffin Half Moon timber sale is located on O&C lands, nothing in

the Oregon and California Lands Act (O&C Act), 43 U.S.C. § 2601, absolves BLM of its duties

under NEPA: in fact, the opposite is true. *Portland Audubon Soc. v. Lujan*, 795 F. Supp. 1489, 1506 (D. Or. 1992), *modified* 1992 WL 176353 (D. Or. July 16, 1992), *and aff'd sub nom.* *Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993). Similarly, the Federal Land Policy and Management Act (FLPMA) – which requires the development and implementation of resource management plans – commands BLM to ensure that the "public lands be managed in a manner that will ... provide food and habitat for fish and wildlife... ." 43 U.S.C. § 1701(a)(8).

Taken together, these laws require BLM to carefully consider, disclose, and discuss the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on great gray owls and Pacific fisher, two at-risk wildlife species located within the planning area. Because BLM failed to undertake the requisite analysis, the Project is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

And, the fact that KS Wild did not prevail in its challenge to BLM's 2016 RMP in a separate case involving separate legal issues is irrelevant to whether BLM complied with NEPA in the present case now before this Court. Indeed, BLM and Murphy's heavy reliance on the 2016 RMP to meet BLM's NEPA obligations is undermined by the fact that the trade association to which Murphy belongs has *prevailed* in a challenge to the 2016 RMP on the grounds that the RMP unlawfully created wildlife reserves – the same reserves Murphy relies on in the present case as a supposed surrogate for the required NEPA analysis – on the O&C lands. Order Granting Motion for Summary Judgment, *Am. Forest Res. Council v. Pendley*, No. 16-cv-01599-RJL (D.D.C. Nov. 22, 2019), ECF No. 55. Murphy's allies have asked the D.C. District Court to invalidate the wildlife management provisions in the 2016 RMP, casting further serious doubt on the allegation that the RMP will provide adequate habitat for at-risk species. Plaintiffs'

Consolidated Remedy Brief and Proposed Order, *Am. Forest Res. Council v. Pendley*, No. 16-cv-01599-RJL (D.D.C. Jan. 27, 2020), ECF No. 59-4.

There can be little doubt that the Griffin Half Moon REA and the administrative record for this case contain an inadequate NEPA analysis of the Project's effects on great gray owls and Pacific fisher: there is next to nothing (and in some cases, nothing at all) to support BLM's Finding of No Significant Impact. Indeed the BLM refuses to even disclose the number of great gray owl nesting sites that it intends to log though this project, likely because it does not know the answer. Despite this, BLM and Murphy urge this Court to defer to the agency's analysis, particularly because the agency is "addressing difficult issues within its area of special expertise," Murphy Response Brief (Murphy), 6–7, suggesting that BLM complied with the Administrative Procedure Act (APA) when it "relied on its own predictions within its area of discretion and expertise and rejected those [predictions] submitted by commenters." BLM Response Brief (BLM), 16 (citing *California v. Azar,* 950 F.3d 1067, 1100 (9th Cir. 2020).

However, there is no analysis or data concerning the Project's effects on great gray owls and Pacific fisher in the REA or administrative record, so there is nothing to which this Court can defer. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer to a void."). Similarly, as the D.C. District Court has held, "Although the court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997). BLM's expertise was never engaged – there is zero evidence in the administrative record of any BLM "expert" analyzing effects on these two species – leaving only a void to which this Court cannot defer. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

In its Griffin Half Moon REA, Decision Notice, and Finding of No Significant Impact, BLM "entirely failed to consider" effects on great gray owls or Pacific fisher – "an important aspect of the problem" – rendering the Project and its decision arbitrary, capricious, and not in accordance with NEPA. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010); 5 U.S.C. § 706(2)(A). Because BLM failed to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made," its decision is arbitrary and capricious and Griffin Half Moon should be vacated. *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations and internal quotation marks omitted).

II.    **THE GRIFFIN HALF MOON TIMBER SALE REVISED ENVIRONMENTAL ASSESSMENT VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT BECAUSE THE BLM FAILED TO CONSIDER THE PROJECT'S DIRECT, INDIRECT, AND CUMULATIVE EFFECTS.**

A.    **Tiering to the Environmental Analysis for the BLM's Resource Management Plan is Unlawful and Inadequate.**

It is black letter law that "the National Environmental Policy Act has twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. Bureau of Land Mgmt*., 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)) (internal quotation marks omitted). Thus, the "purpose" of NEPA is to apprise the public, not just agency decision makers, of the environmental consequences of a federal action. *Id*.

Federal defendants and intervenors disagree, arguing that in this case, the disclosure and discussion of the effects of the Griffin Half Moon timber sale on great gray owls and Pacific fishers is not required because it "would not have provided the Authorized Officer an

4

opportunity to make a better-informed decision." Murphy, 29 (quoting AR 003172); BLM, 8. But the "authorized officer" (i.e., the BLM) is not the only target for an informed environmental analysis: NEPA <u>also</u> requires the BLM to "*inform the public* that it has indeed considered environmental concerns in its decisionmaking process." *Kern*, 284 F.3d at 1066 (emphasis added). In this case, the BLM has failed to meet this obligation, instead relying on the environmental analysis allegedly contained in the agency's 2016 final environmental impact statement (FEIS) supporting its revised Resource Management Plan (RMP).[1] But as discussed *infra* in Sections II.B. and II.C., neither the RMP nor its FEIS contain any site-specific analysis of the localized effects of the Griffin Half Moon project on either great gray owls or Pacific Fisher, even though the public raised significant concerns about the Project's effects on these species.

Implicitly agreeing with KS Wild that the Griffin Half Moon REA does not contain site-specific analysis of how the timber sale will affect great gray owls and Pacific fisher, Murphy argues that "tiering" – relying on the general environmental analysis in a broad environmental impact statement in a subsequent site-specific environmental document, 40 C.F.R. § 1508.28 – is appropriate in this case, citing a recent District of Alaska case for support. Murphy, 17 (citing *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003 (D. Alaska 2020)). However, this authority does not support intervenor's position. In that case, the court held that

---

[1] Intervenors argue that because the Griffin Half Moon project is located in the Harvest Land Base (HLB) on Oregon & California (O&C) lands, that the requisite NEPA analysis is not required. Murphy, 29. Intervenors are wrong: the Ninth Circuit has concluded that "No language in [the O&C Act] empowers this court to exempt O&C lands from the requirements of NEPA so as to permit the BLM to avoid the preparation of an Environmental Impact Statement." *Portland Audubon Soc. v. Lujan*, 795 F. Supp. 1489, 1506 (D. Or. 1992), *modified* 1992 WL 176353 (D. Or. July 16, 1992), *and aff'd sub nom. Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993).

"when a programmatic EIS *does* adequately consider the impacts of subsequent site-specific projects, a subsequent NEPA document need not repeat that analysis unless new and significant environmental impacts arise that were not previously considered." *Native Vill.*, 432 F. Supp. 3d at 1025 (emphasis in original, footnoted citations omitted). Here, the RMP FEIS does not "consider the impacts of subsequent site-specific projects:" it only considers the general consequences of adopting a land management plan that covers 2.6 million acres without any kind of site-specific analysis. AR 007197–98.[2] Murphy provides no citations to the RMP FEIS where this document allegedly conducted the requisite site-specific analysis of the effects of the Griffin Half Moon timber sale on wildlife species of concern in the area, as indeed it could not, because the RMP expressly does not contain this analysis. *Id.*

BLM similarly argues that a Montana district court case supports the agency's reliance on tiering, but this case also does not support the government's argument. BLM, 19. In *Native Ecosystem Council v. Judice*, Judge Watters held that tiering was appropriate because "the RMP authorized the vegetation and riparian treatments at issue ... and also authorized grazing in the Planning Area in the EIS." 2019 WL 1131231 at *4 (D. Mont. 2019). Because the programmatic NEPA analysis resulted in a decision to authorize future grazing in a site-specific location, and because that analysis considered the site-specific effects of the decision to authorize grazing in that location, future analysis (which plaintiffs challenged in *Judice*) could rely on "the

---

[2] The RMP FEIS explains that "The Proposed RMP does not include any implementation decisions to be included in the eventual Records of Decision/RMPs. That is, the BLM anticipates that all of the decisions in the Records of Decision/RMPs will be land use plan decisions ... . Implementation decisions authorize implementation of on-the-ground projects. Land use plan decisions (land use allocations, management objectives, and management direction) do not directly authorize implementation of on-the-ground projects. Land use plan decisions guide and control future implementation decisions, which can be carried out only after completion of further appropriate NEPA analysis or documentation, consultation, and decision-making processes."

underlying data and analysis" in the RMP. *Judice*, 2019 WL 1131231 at *4. Coupled with "the EA's extensive analysis," tiering in *Judice* was therefore appropriate. *Id*. at *5.

But those are not the facts in the present case. Here, the opposing parties have failed to point to anything in the RMP FEIS documenting the effects of the Griffin Half Moon timber sale on great gray owls and Pacific fisher.[3] Nor do the parties point to anything in the REA that conducts this analysis. Thus, in contrast to the RMP's "underlying data and analysis" and "the EA's extensive analysis" in *Judice*, no such robust analysis – at any level – is present in this case.

BLM's attempts to distinguish the on-point tiering case law cited by KS Wild in its opening brief fair no better than its reliance on *Judice*. *See* BLM, 20, 24, 41. For example, the facts of *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004) and *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) are on all fours with the facts of the present case: there, the Ninth Circuit held that tiering to the EIS for the applicable land management plan "cannot save the [project-specific] EA" because the programmatic EIS did not contain any site-specific, project-level analysis in the first instance. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d at 997. BLM also criticizes KS Wild's citation of *Steamboaters v. FERC*, 759 F.2d 1282 (9th Cir. 1985), BLM, 41; but KS Wild did not

---

[3] BLM states that "because the Griffin Half Moon implements the objectives authorized in the 2016 RMP," *Judice* supports its tiering argument. BLM, 20. BLM seems to be suggesting that simply because the timber sale "implements" the RMP, and because the RMP contemplated timber harvest generally, further site-specific analysis is not required. But this is not the holding of *Judice*, which instead concluded that *when an RMP authorizes <u>and</u> analyzes future site-specific action*, then tiering may be appropriate. Moreover, the government's argument proves too much: taken to its logical conclusion, it would mean that no site-specific environmental analysis is ever required, provided that the RMP simply contemplated the general effects of multiple use management. This is neither the intent of the RMP FEIS, AR 007197–98, nor is it the law.

cite that case for tiering purposes, rather for the premise that NEPA requires federal agencies to conduct a direct, indirect, and cumulative effects analysis. KS Wild, 33 (citing *Steamboaters*, 759 F.2d at 1393 ("an agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment"). Beyond these anemic attempts, the opposing parties fail to distinguish the body of case law leading to the conclusion that BLM failed to comply with NEPA in this case.

The opposing parties claim that the *Griffin Half Moon* timber sale "will not have significant effects beyond those described in the broader analyses conducted and disclosed in the 2016 PRMP/FEIS and those actions authorized in the associated [2016 RMP], or the effects have been determined to be insignificant." Murphy, 17 (quoting the Project's finding of no significant impact); BLM, 10, 19, 33. This statement is inadequate to demonstrate NEPA compliance for two reasons. One, there is *no* deliberative evidence in the administrative record of how BLM came to its supposed "determination." There are no meeting notes, memos, reports, or other documentation showing that BLM looked at the effects analysis for the two wildlife species allegedly in the RMP FEIS, undertook an intentional and purposeful examination of the site-specific environmental consequences of the timber sale on great gray owls and Pacific fisher, compared the findings of effect from the RMP to this site-specific inquiry, and arrived at a rational conclusion that was supported by evidence in the administrative record. Instead, BLM's conclusion appears out of thin air in the Finding of No Significant Impact.

And two, the 2016 RMP FEIS allegedly addresses the environmental consequences of implementing a land management plan over the course of at least the next decade on almost 3 million acres of land: the observation that the environmental effects of 933 acres of timber harvest "will not have significant effects beyond those described in the" RMP FEIS, states the

obvious. Shifting the scale of impact analysis "cannot save the EA." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d at 997.

### B.  Direct, Indirect, and Cumulative Effects on Great Gray Owls.

BLM and Murphy fail to demonstrate that the agency considered the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on great gray owls, and instead continue to rely heavily on the 2016 RMP FEIS while pointedly ignoring the fact that there is no analysis – anywhere – of how the timber sale will affect this iconic species. For example, BLM alleges that "nothing about the great gray owls' current status required additional NEPA review" in the REA, BLM, 20, while Murphy claims that "no law requires BLM to protect individual great gray owls in the Project area," Murphy, 25. The opposing parties are only partially correct: while it is true that great gray owls formerly received protection under BLM's prior RMP and still receive that protection on national forestlands,[4] KS Wild is not asking this court to "protect" these owls. Instead, KS Wild has pointed out that as a procedural law, NEPA requires BLM to assess the direct, indirect, and cumulative effects of its actions on the environment, particularly given the very high public interest in the great gray owls in the Project area and the best available science indicating that BLM's timber harvest methods would likely harm these birds and the habitat upon which they depend (and which the BLM had previously retained as wildlife buffers). 40 C.F.R. § 1508.8. These are potentially significant effects that should have been disclosed and discussed in the Griffin Half Moon REA.

---

[4] BLM urges this court to disregard the government's current survey protocol for great gray owls, BLM, 27, but does not respond in any way to the legal authority KS Wild provided in its opening brief explaining why judicial notice of this government' publication is warranted, KS Wild, 21 FN1.

9

BLM and Murphy next argue that the "protections" for raptors listed in the REA may be sufficient protect great gray owls, BLM, 26, Murphy, 28, but this retort is inadequate for three reasons. First, these "protections" are found in Table 2-4 of the REA, which is captioned "Conservation Measures for Known Bureau Special Status Terrestrial Wildlife Species in the Project Area," AR 003265, but great gray owls – as BLM averred in its Answer, ECF No. 20, ¶ 70, and points out in its brief, BLM, 22 – are not Bureau Special Status Species. So, the proffered protections do not apply to great gray owls.[5]

Second, the relevant measures apply to "Other Raptor Species" which presumably would include great gray owls. While KS Wild's declarants certainly know that great gray owls are raptors, it is presumptuous at best to assume that the general public would intuit that a "raptor" includes "great gray owls," particularly because there is no analysis in the REA that discusses great gray owls or their species classification as a raptor. NEPA requires BLM to *inform* the public, not expect the public to read the agency's mind. NEPA documents must be "be written in plain language … so that decisionmakers and the public can readily understand them." 40 C.F.R. § 1502.8; *see also Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 493 (9th Cir. 1987) (EISs "must be organized and written so as to be readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected"); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) (applying 40 C.F.R. § 1502.8 to EAs; EAs are unacceptable "if they are indecipherable to the public").

Third, the measures prescribed are two-fold: BLM must 1) retain the nest tree of known raptors; and 2) impose a seasonal operating restriction of .25 mile around known nest trees

---

[5] Alternatively, the REA is in error. If so, this is further evidence of the arbitrary and capricious nature of the REA. 5 U.S.C. § 706(2)(A).

between March 1 and July 15. AR 003265. However, as KS Wild pointed out in its opening brief and the opposing parties do not dispute, great gray owls have a number of specific habitat needs such as "leaners" – smaller trees that lean against the nest tree and other perching trees that allow recently fledged owlets to climb back into the nest tree before they are fully able to fly – in addition to the essential nest tree. KS Wild, 6–11. Thus, it is highly unlikely that just protecting the nest tree is adequate for the life needs of great gray owls, but the public (and decision maker) cannot know because the REA conducts no analysis regarding the adequacy of these measures. Similarly, there is no analysis in the REA or administrative record regarding the seasonal restrictions and whether they are relevant to the life needs of the species (i.e., why these dates were chosen), what life function (nesting, breeding, feeding, etc.) they address, or whether they are adequate to safeguard these life functions. That there is no discussion anywhere in the REA or record about these measures belies the agency's claim that it took a hard look at this issue.

BLM attempts to muddy the waters by claiming that KS Wild has alleged, but not pleaded, a substantive claim regarding great gray owl surveys and the application of no-harvest buffers. BLM, 31. KS Wild's point in its opening brief was that in the past, BLM found (and protected) numerous great gray owls in and around the Griffin Half Moon planning area, and that given the occurrence of these individuals, it was possible that there were additional, but unknown, owls located in unsurveyed harvest units. KS Wild, 6–11, 17–18. And, because the locations of these owls are unknown, they will not receive the "other raptor species" protection measures, thus adding to the possible adverse effects of the Project on great grays. *Id.* at 17–18. Thus, while KS Wild agrees with BLM that "NEPA does not require that BLM search for undocumented owl sites," BLM, 31, NEPA *does* require the agency to assess the environmental

11

consequences of its actions, including the likely direct, indirect, and cumulative effects on wildlife located within the planning area. This BLM has failed to do.

BLM next claims it can demonstrate that it has taken the requisite hard look at an issue by pointing to its responses to public comments. BLM, 23. However, the response to comments cited by BLM contains no analysis of any kind: instead, it simply reiterates BLM's oft-stated position that the RMP FEIS assessed the effects to great gray owls and a larger LSR system than the prior RMP would adequately protect owls located in reserves (which is not where the Griffin Half Moon timber sale is located). AR 003172. This is not analysis. And, while this passage does also state that "In the REA, Appendix B, Scientific Literature Submitted During Scoping, BLM considered the science submitted regarding the management of GGOs and their habitat," there is *no* deliberative information in the record showing that BLM "considered" this information in any way: there are no reports, analysis, emails, or any other evidence that BLM deliberated about the Project's effects on great gray owls. *Or. Nat. Desert Ass'n*, 625 F.3d at 1121 ("We cannot defer to a void.").

Finally, BLM and Murphy take issue with KS Wild's citation of scientific literature regarding the threats to, and habitat needs, behavior, ecology, and distribution of, great gray owls. BLM, 7, 23, 30, 31; Murphy, 12 FN3. Notably, all of these criticisms are post-hoc rationalizations by litigation counsel, are due no deference, and should be rejected by this Court. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010); *Cent. Or. Hosp. Dist. v. Sullivan*, 757 F. Supp. 1134 (D. Or. 1991) ("The court must look at the agency's own contemporary action and may not rely upon the post hoc rationalizations of counsel.").

Regardless, the opposing parties' post hoc criticisms are not well-taken. For example, BLM and Murphy point out that great gray owls are "uncommon" but also "enjoy a wide

distribution in Oregon,"[6] thus suggesting that there is no scientific concern about the species'

persistence. BLM, 7, 23; Murphy, 12 FN3. BLM similarly alleges that KS Wild has cited no

evidence that "the great gray owl faces a problem persisting on BLM lands in the Medford

District." BLM, 23. On the contrary, BLM itself in its RMP FEIS has acknowledged that prior

BLM analyses "identified that the great gray owl would be likely to have sufficient habitat

rangewide, but insufficient habitat in a portion of its range, because it would not be included on

BLM or U.S. Forest Service sensitive species lists and protection of known nest sites was

uncertain based on 'inconsistent' protections in individual management plans (USDA FS and

USDI BLM 2007, pp. 285–286)." AR 008065. These factors have not changed since that 2007

analysis, and BLM cites nothing for its inferred proposition that great gray owl populations are

stable or increasing.

Instead, copious scientific literature identifies concerns with the continued persistence of

great gray owls located in southwest Oregon and on BLM lands. *See* KS Wild, 6–11. But the

only study cited by KS Wild that BLM specifically discusses in its brief is *Range-wide genetic*

*differentiation among North American great gray owls (Strix nebulosa) reveals a distinct lineage*

*restricted to the Sierra Nevada, California* by Hull et al. BLM, 30. There, the agency alleges that

the study does not support KS Wild's contention that the Oregon population of great grays is

important to the disjunct California population. Not only is this a post hoc rationalization by

counsel and thus unpersuasive, but moreover the study does in fact conclude that the Oregon

population of great gray owls is important to California's population. Due to population

---

[6] As the literature cited by KS Wild explains, simply because a species is widely distributed does
not mean that its conservation status is secure. *See* AR 021675 ("the great gray owl remains
poorly understood...we have found no studies that examine great gray owl population
characteristics"); AR 012159–60 (discussing "population declines in great gray owl populations
across their western range in the Sierra Nevada *and Pacific Northwest*") (emphasis added).

bottlenecks between Oregon and California (which are likely due to naturally low numbers of individuals and habitat loss), the researchers concluded that "either the overall population of great gray owls in the Pacific Northwest and Sierra Nevada has not recently expanded, or that the signal of expansion has been degraded by recent bottlenecks." AR 012158. Hull et al. go on to explain that because there is so little gene flow between the Oregon and California populations, it is possible that the California population is evolving into a distinct subspecies, much like Northern and California spotted owls have evolved into separate subspecies. AR 012154–62. That BLM's management of its lands may be contributing to this genetic isolation is troubling and should have been analyzed by the agency in the Project REA.

Beyond this single example, BLM does not address the extensive literature cited by KS Wild clearly stating that persistence of great gray owls is of serious concern to wildlife biologists. *See, e.g.*, AR 021907 ("populations of great gray owls are in peril (declining or experiencing some demographic trauma) or are likely to be in peril in the future given current land management practices"). Given these concerns about the continued viability of the great gray owl, BLM should have taken a hard look at the consequences of the Griffin Half Moon timber sale on the species. Failing to do so renders the agency's decision arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

### 1. Reliance on the Late-Successional Reserve Land Use Allocation for NEPA Compliance is Inadequate and Unlawful.

Much like its argument that the Griffin Half Moon REA lawfully tiers to the 2016 RMP FEIS, BLM claims that it may rely on the Late-Successional Reserve (LSR) land use allocation to protect great gray owls. BLM, 8, 21, 22; Murphy, 16, 25, 27. As KS Wild explained in its opening brief, the Griffin Half Moon timber sale is not located in the LSR land use allocation, but rather in the Harvest Land Base (HLB). KS Wild, 19. Therefore, even assuming for the sake

of argument that great gray owls in LSRs would be "protected,"[7] that fact is irrelevant to how the Project affects great grays in the planning area, which is in the HLB. The opposing parties did not respond to this point in their briefs.

BLM argues that the RMP FEIS concluded that there will be benefits to wildlife located in the Harvest Land Base, but this rebuttal is unpersuasive. BLM points to the only occurrence of the phrase "great gray owl" in that FEIS as evidence that it considered the environmental effects of the Project, BLM, 21, but as KS Wild explained in its opening brief, KS Wild, 19, this narrative only refers to a prior, legally invalidated analysis[8] that concluded that there would be "insufficient habitat in a portion of [the great gray owl's] range," and that persistence of the species was at-risk because of "'inconsistent' protections in individual management plans." AR 008065–66. This passage does not demonstrate that the Griffin Half Moon REA complies with NEPA.

Moreover, BLM and Murphy neglect to inform this Court that while the Ninth Circuit has upheld the validity of the 2016 RMP and its land use allocations, the D.C. District Court recently ruled in favor of timber interests, including a timber industry trade association of which Murphy is a member, which successfully argued that BLM's creation of wildlife reserves on O&C lands violated the Oregon and California Lands Act (O&C Act). Order Granting Motion for Summary Judgment, *Am. Forest Res. Council v. Pendley*, No. 16-cv-01599-RJL (D.D.C. Nov. 22, 2019), ECF No. 55. As part of its requested relief in that case, timber plaintiffs have asked the district court to vacate "the RMP Management Direction captioned 'Wildlife' as stated on ... pages 115-

---

[7] Again, this case is not about "protecting" wildlife (a substantive question) but rather whether BLM disclosed and discussed the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on great gray owls (a procedural question).
[8] *See Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009).

121 of the Southwestern Oregon Record of Decision/RMP;" and to effectuate the required RMP amendments to make this possible, timber plaintiffs have requested a court order that "BLM shall not engage in consultation pursuant to section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), with regard to the RMP amendments." Plaintiffs' Consolidated Remedy Brief and Proposed Order, *Am. Forest Res. Council v. Pendley*, No. 16-cv-01599-RJL at *2–3 (D.D.C. Jan. 27, 2020), ECF No. 59-4. While Judge Leon has not yet ruled on this astonishing request for relief, it is far from certain, contrary to BLM and Murphy's suggestion, that the 2016 RMP – including the LSRs – will continue to provide *any* protections for *any* wildlife species, including the great gray owl. Indeed, it is Murphy's position that it would be unlawful for the BLM to implement *any* wildlife protections whatsoever on O&C lands.

> ### 2. BLM Has Not Provided a Rational Explanation for Removing Great Gray Owl Protections.

In KS Wild's opening brief, plaintiffs explained that under BLM's prior RMP, the Northwest Forest Plan, the agency was required to survey for great gray owls and protect them with no harvest buffers. KS Wild, 22–23 (*citing Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc); *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 537 (2009); *Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175, 1192–93 (W.D. Wash. 2005) ("the point under NEPA is that the Agencies' analysis of the environmental impacts of eliminating the standard is premised on an assumption that is inconsistent with their own prior analysis and therefore appears to lack support. Even if including the Survey and Manage standard as a part of the Plan was a policy choice by the Agencies in 1994, just as eliminating the standard is the Agencies' policy choice in 2004, the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now"); *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1247–49 (W.D. Wash. 2009) (same)). As

16

evidenced by Griffin Half Moon, and as KS Wild is painfully aware, these Survey and Manage requirements are no longer required. However, that does not mean that BLM has explained, as this case law requires, why it has failed to provide any conservation measures for great gray owls in the Griffin Half Moon planning area.

It is true that the 2016 RMP FEIS explains why BLM decided to eliminate the Survey and Manage program *generally* when it revised its RMP. AR AR 007214. However, neither the RMP FEIS nor the Griffin Half Moon REA *specifically* discuss why conservation measures for great gray owls outside of LSRs have been abandoned. This failure is particularly significant because prior analyses expressed concerns about the viability of great gray owls, and the reasons for those concerns have not changed. AR 008065–66.

KS Wild is also aware that the Ninth Circuit recently upheld the legality of the 2016 RMP in the face of a legal challenge brought by KS Wild and others. *Pac. Rivers v. Bureau of Land Mgmt.*, 2020 WL 2510759 (9th Cir. 2020). However, the fate of neither the Survey and Manage program nor great gray owls was at issue in that case. BLM has yet to explain, to the satisfaction of a court, why it has declined to protect a species that has clearly fallen through the cracks.

/// /// ///
/// /// ///
/// /// ///

C.    **Direct, Indirect, and Cumulative Effects on Pacific Fisher.**[9]

The Griffin Half Moon REA does not contain any discussion of the effects of the

proposed timber sale on Pacific fisher. The only place where any mention of the effects of the

Project on this species can be found is in an appendix to the REA – an inappropriate location for

a project-level effects analysis. Nor can tiering to the 2106 RMP FEIS "save the EA," *Klamath-*

*Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d at 997, because the general and

generic discussion found in the FEIS specifically does not consider site-specific environmental

consequences of localized projects, AR 007197–98. Thus, because BLM failed to consider "the

relevant factors and articulated a rational connection between the facts found and the choices

made," the REA and Decision Record and Finding of No Significant Impact (DR/FONSI) are

arbitrary, capricious, and not in accordance with law. *Arrington v. Daniels*, 516 F.3d 1106, 1112

(9th Cir.2008) (citations and internal quotation marks omitted).

1.    **Reliance on an Appendix to the REA for NEPA Compliance is
Unsupported and Unlawful.**

BLM and Murphy strenuously argue, but fail to demonstrate, that the agency's use of an

appendix to purportedly conduct an analysis of the effects of Griffin Half Moon on Pacific fisher

was lawful. BLM, 34–36; Murphy, 18–19. Pointedly absent in this rebuttal is any attempt to

distinguish the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019),

---

[9] KS Wild acknowledges that after the filing of its opening memorandum in support of its motion for summary judgment, the United States Fish and Wildlife Service declined to list the Pacific fisher as Threatened or Endangered in Oregon. 85 Fed. Reg. 29,532 (May 15, 2020). BLM asserts that "plaintiffs also argue that BLM violated NEPA, because the fisher is proposed for listing," and spends two pages recounting the chronology of the Griffin Half Moon timber sale and the eventual decision to not list the species in Oregon. BLM, 36-37. BLM's confused contention notwithstanding, KS Wild has *not* argued that listing status affects the agency's obligation to consider the direct, indirect, and cumulative effects to Pacific fisher. Instead, KS Wild has alleged that this analysis is required because the project may have a significant effect on this species, *regardless* of its listing status.

which held that deference to an agency's interpretation of its regulations is not warranted unless

the regulation is truly ambiguous. Neither opposing party even attempts to argue that 40 C.F.R. §

1502.18[10] is ambiguous, and as such, that it does not – by its plain language – apply to

environmental assessments. And, because NEPA is binding on all federal agencies and not BLM

alone, BLM's interpretation of the CEQ NEPA regulations is accorded no deference. *Grand*

*Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002). The opposing parties fail to wrestle

with this case law.

Perhaps because the law is clear, BLM concedes KS Wild's point, stating that "the

regulation that is the centerpiece of Plaintiffs' argument by its plain terms applies only to an EIS,

not an EA." BLM, 34–35. KS Wild agrees. Therefore this Court need look no further in holding

that Appendix C was an unlawful location for BLM to position its purported environmental

analysis.

In addition, BLM's NEPA regulations – like the CEQ regulations – also clearly state that

an appendix is only to be used in conjunction with an EIS, not an EA. *See* 43 C.F.R. § 46.430(a)

("The *environmental impact statement* must include these associated analyses, studies, or

surveys, either in the text or in an appendix or indicate where such analysis, studies or surveys

may be readily accessed by the public") (emphasis added). The only place in BLM's NEPA

---

[10] "If an agency prepares an appendix to an *environmental impact statement* the appendix shall
(a) Consist of material prepared in connection with an environmental impact statement (as
distinct from material which is not so prepared and which is incorporated by reference (§
1502.21)); (b) Normally consist of material which substantiates any analysis fundamental to the
impact statement; (c) Normally be analytic and relevant to the decision to be made; [and] (d) Be
circulated with the environmental impact statement or be readily available on request" (emphasis
added). Neither BLM nor Murphy address KS Wild's arguments in its opening brief that
Appendix C to the Griffin Half Moon REA, titled "Issues Considered but not Analyzed in
Detail," does not contain the type of information described in the regulation, thus further
indicating that Appendix C is an inadequate vehicle upon which to base BLM's NEPA
compliance. KS Wild, 24–25.

regulations where an appendix is mentioned is in 43 C.F.R. § 46.430(a), which – like 40 C.F.R. § 1502.18 – only applies to EISs, not EAs. Thus, BLM's regulations afford the agency no quarter on this issue.

Should this Court inquire further, however, BLM's remaining arguments on this issue are unpersuasive as well. For example, BLM argues that BLM's NEPA regulations, which allow BLM to prepare an EA (or REA) "in any format useful to facilitate planning, decision-making, and appropriate public participation," and that EA "may be accompanied by any other planning or decision-making document." BLM, 35 (citing 43 C.F.R. §§ 46.315(a), (b)). BLM then contends that Appendix C was therefore the appropriate location for the agency's analysis of the Project's effects on Pacific fisher. BLM, 35. But the agency neglects to fully quote 43 C.F.R. § 46.315(b), which goes on to say that "the portion of the document that analyzes the environmental impacts of the proposal and alternatives must be clearly and separately identified and not spread throughout or interwoven into other sections of the document." 43 C.F.R. § 46.315(b). No such demarcation is found with respect to Appendix C. Similarly, even assuming that Appendix C contained the requisite analysis, the location of this analysis in an appendix – whereas the remainder of the agency's analysis of Project effects is found in the body of the REA – runs afoul of 43 C.F.R. § 46.315(b), which prohibits "spread[ing analysis] throughout or interwoven into other sections of the document." *Id.*

### 2. Tiering to the RMP FEIS is Inadequate.

BLM and Murphy argue that the 2016 RMP FEIS contained analysis regarding the Project's effects on Pacific fisher. BLM, 9–10, 35; Murphy, 19–20. Specifically, BLM states that because the 2016 RMP "predicted that for harvest land base acreage, fisher denning habitat would decline but that in reserve lands, denning habitat would increase," suggesting that this determination was the last word on project-level effects to the species. BLM, 9. But as stated

*supra* Section II.A., nothing in the law allows BLM to rely on suitable habitat in reserve land use allocations as a substitute for conducting a site-specific project-level analysis. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997.

Similarly, BLM observes that because BLM determined that the Griffin Half Moon timber sale "would not exceed the fisher-effects predictions in the 2016 RMP or trend the fisher towards further protective listing," then no analysis beyond that conducted in the RMP FEIS was required. BLM, 10, 33, 39; Murphy, 22–23. Importantly, however, there is no deliberative evidence in the REA or administrative record that supports this contention: there are no notes, reports, emails, or other documentation wherein BLM examined the effects analysis for Pacific fisher in the RMP FEIS, considered how the Griffin Half Moon timber sale would affect the species, and then came to an informed conclusion regarding site-specific effects. Instead, the agency appears only to have undertaken a mathematical exercise, concluding that 933 acres was less than 2.6 million acres (the scale of effects analysis of the RMP), and so the effects of the Griffin Half Moon timber sale must be "less than" those considered in the RMP FEIS. But as with the effects to great gray owls, the self-evident observation that a 933-acre timber sale was unlikely to have environmental consequences exceeding the predictions of effect in a programmatic analysis is no substitute for conducting a site-specific, project-level analysis. Under the opposing parties' legal theory taken to its logical conclusion, it would be impossible to ever exceed the effects analyzed in the RMP FEIS unless timber harvest occurred on more acres than managed by BLM, which is clearly an impossibility. This Catch-22 is not the law.

In response to KS Wild's argument that the RMP did not consider the site-specific effects to Pacific fisher and that the RMP specifically required project-level analysis, BLM states that "BLM ... made its findings using project-specific data and a variety of habitat considerations."

BLM, 38; Murphy, 22 (quoting the REA that BLM conducted a "preliminary analysis ... to determine potential effects to fisher"). There are at least two problems with this retort.

One, as stated *supra*, there is no deliberative evidence in the record that BLM in fact conducted this "preliminary analysis"[11] or any subsequent analysis. BLM has pointed to no document or record citation that demonstrates how BLM "used" "project-specific data" or "a variety of habitat considerations" to do anything: there are no reports, biological calculations, or other evidence of BLM's examination of how the Griffin Half Moon timber sale would affect Pacific fisher.[12] The "habitat considerations" BLM purportedly considered also remain unidentified.

Two, BLM plays yet another a shell game with the scale of its purported analysis in order to conclude that the effects of the Griffin Half Moon timber sale are less than those estimated in the RMP FEIS. BLM explains that it "looked to northern spotted owl habitat in the area, a proxy for fisher habitat, and found that 97% of [spotted owl] habitat would remain" after project implementation. BLM, 39. However, the "spotted owl analysis area" is 46,652 acres (73 square miles),[13] AR 003312, which is much larger than either the Griffin Half Moon project area (970 acres, AR 003218), or the acres that actually will be harvested (933 acres). Concluding that 97% of spotted owl habitat across 73 square miles will remain post-project tells the public and decisionmaker nothing about how the timber sale will affect Pacific fisher populations in the

---

[11] Presumably this preliminary analysis would be in the record, but neither Murphy nor BLM offers a record citation to it.
[12] BLM asserts that "Plaintiffs also ignore the other fisher-specific documents that BLM took into account, including FWS's final species report for the fisher ... and a study of fisher in Oregon." BLM, 39. While these studies are listed in the administrative record, there is no evidence that BLM read them or included their findings in the REA; and, regardless, these studies conduct no sort of site-specific project-level analysis.
[13] BLM manages about 45% of this acreage.

970-acre Project area. And, because the Project area is in the Harvest Land Base and not a Late-Successional Reserve, the fact that the RMP predicted there would be more habitat at the end of 50 years in reserves is irrelevant to how the Griffin Half Moon timber sale will affect Pacific fisher in the Project area.

In sum, because BLM failed to consider the direct, indirect, and cumulative effects on Pacific fisher from the Griffin Half Moon timber sale, the Project violates NEPA and is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A); *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (agency action is arbitrary and capricious "if the agency ... entirely failed to consider an important aspect of the problem").

## III.    THE GOVERNMENT'S UNPERFECTED MOTION TO STRIKE SHOULD BE DENIED.

BLM alleges that KS Wild's opening brief "rel[ies] heavily on a series of post-hoc declarations," and seems to ask this Court to strike these standing declarations. BLM, 29. This is inappropriate for several reasons. First, BLM does not indicate which declarations or which portions of them it finds objectionable, nor does it explain which "points not brought to BLM's attention during its public process" these declarations raise. *Id*. Therefore, there is inadequate ground for KS Wild or this Court to evaluate and address the government's criticism.

Second, BLM has filed no motion to strike to accompany its protestations, and as the government is well aware, the local rules forbid combining a motion "with any response, reply, or other pleading." LR 7-1(b). A single paragraph in BLM's summary judgment brief is not an appropriate motion to strike. *See Harley-Davidson Credit Corp. v. Turudic*, 2012 WL 5411771 at * 1 (D. Or. Nov. 6, 2012) ("Accordingly, insofar as the parties file motions in combination with any of their responses or replies, they are in violation of Local Rule 7-1 and are denied"); *cf*. LR 56-1(b) ("Rather than filing a motion to strike, a party must assert any evidentiary objections in

its response or reply memorandum. Evidentiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a).").

Similarly, the unperfected motion to strike is inappropriate because BLM did not certify that it conferred with plaintiffs' counsel regarding its motion as required by LR 7-1(a) and LR 56-1(b). As the government's counsel is well aware, this Court "may deny any motion that fails to meet this certification requirement." LR 7-1(a)(3); *see also* LR 56-1(b). Citing these provisions and *Turudic*, the government's counsel in this case successfully urged Judge Panner in another case to deny an unperfected motion, which Judge Panner did. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1116 FN9 (D. Or. 2015).

Finally, the stipulated schedule in this case expressly states that "The parties agree that a stand-alone motion to supplement the administrative record, and/or a stand-alone motion to strike extra-record evidence, along with stand-alone response(s), without reply briefing, would be the appropriate means of raising these concerns pursuant to LR 26-3(c)." ECF No. 24, 3. The Court adopted this schedule and requirement. ECF No. 25. Therefore, BLM's unperfected motion to strike should be denied.

## IV.    CONCLUSION.

For the forgoing reasons, the court should GRANT Plaintiffs' motion for summary judgment and VACATE the Griffin Half Moon timber sale, Revised Environmental Assessment, Decision Notice, and Finding of No Significant Impact.

Date:   June 26, 2020.                     Respectfully submitted,

                                             /s/ Susan Jane M. Brown
                                            Susan Jane M. Brown (OSB #054607)
                                            Western Environmental Law Center
                                            4107 NE Couch Street
                                            Portland, Oregon 97232
                                            (503) 914-1323 | Phone

brown@westernlaw.org

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT**

**OF MOTION FOR SUMMARY JUDGMENT** was served on the following parties by this

court's electronic court filing (ECF) system:

Billy J. Williams, OSB # 901366
United States Attorney, District of Oregon
Sean E. Martin, OSB # 054338
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone: (503) 727-1010

    *Attorneys for Defendant*

Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

    *Attorneys for Defendant-Intervenor Murphy Company*

Date:  June 26, 2020.        Respectfully submitted,

                        /s/ Susan Jane M. Brown
                    Susan Jane M. Brown (OSB #054607)
                    Western Environmental Law Center
                    4107 NE Couch Street
                    Portland, Oregon 97232
                    (503) 914-1323 | Phone
                    brown@westernlaw.org

                    *Counsel for Plaintiffs*