Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

THE HONORABLE MARK D. CLARKE

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT,**<br><br>Defendant,<br><br>**and**<br><br>**MURPHY COMPANY,**<br><br>Defendant-Intervenor. | Case No.:  1:19-cv-02069-CL<br><br>**DEFENDANT-INTERVENOR'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     KSWILD'S CRITICISM OF TIERING AND USE OF AN APPENDIX IN THIS
        CASE IS WITHOUT MERIT..............................................................................3

        A.      Tiering Under NEPA is Wholly Lawful ..................................................3

        B.      The Revised EA's Use of an Appendix is Wholly Lawful ....................11

III.    THE PROJECT COMPLIES WITH NEPA WITH RESPECT TO THE FISHER..........12

IV.     THE PROJECT COMPLIES WITH NEPA WITH RESPECT TO THE GREAT GREY
        OWL .................................................................................................................16

        A.      KSWild Continues to Challenge BLM's Decision in the 2016 RMP to Move
                Away from the Northwest Forest Plan's Survey and Manage Program, Despite
                KSWild Not Having Brought a Claim Against the 2016 RMP, and Despite the
                Ninth Circuit Having Upheld the 2016 RMP's New, Non-Survey and Manage
                Approach to Land Management ..............................................................16

        B.      Nothing in KSWild's Reply Brief Alters the Conclusion that BLM Took a
                Sufficiently Hard Look under NEPA at Project Impacts on the Great
                Gray Owl...............................................................................................19

V.      CONCLUSION...................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ........................................................................7

*Conservation Northwest v. Rey*,
    674 F. Supp. 2d 1232 (W.D. Wash. 2009), *rev'd*, 715 F.3d 1181 (9th Cir.
    2013) ..............................................................................................................19

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ......................................................................11

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).................................................................................. 17-18

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
    914 F.2d 1174 (9th Cir. 1990) ........................................................................2

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)...................................................................................11

*Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    Civ. No. 06-3076-PA, 2007 WL 2688125 (D. Or. Sept. 10, 2007).........................14

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ......................................................................6, 7

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.
    Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ........16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................................8

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*,
    No. 19-35008, 2020 WL 3866583 (9th Cir. July 9, 2020)...............................5, 6, 7

*Native Village of Nuiqsut v. Bureau of Land Mgmt.*,
    432 F. Supp. 3d 1003 (D. Alaska 2020) ........................................................10

*Pacific Rivers v. U.S. Bureau of Land Mgmt.*,
    No. 19-35384, 2020 WL 2510759 (9th Cir. May 15, 2020)...................6, 13, 17, 19

**STATUTES AND REGULATIONS**

42 U.S.C. § 4321 et seq.............................................................................................1

43 U.S.C. § 2601 et seq.............................................................................................1

40 C.F.R. § 1501.7(a)(3)...........................................................................................5

40 C.F.R. §§ 1502.1-.25.........................................................................................11

40 C.F.R. § 1502.18...............................................................................................11

40 C.F.R. § 1502.20............................................................................................4, 10

40 C.F.R. § 1506.3...................................................................................................5

40 C.F.R. § 1508.28.................................................................................................4

40 C.F.R. § 1509.9(a)(1)........................................................................................12

43 C.F.R. § 46.140(c)..............................................................................................4

43 C.F.R. § 46.310(3)............................................................................................12

43 C.F.R. § 46.315(a)............................................................................................12

I.      **INTRODUCTION.**

Defendant-Intervenor Murphy Company has moved the Court to uphold the Griffin Half

Moon Vegetation Management Project (the Project) and its Griffin Half Moon Timber Sale (the

Timber Sale) on the Bureau of Land Management's (BLM) Medford District.  Murphy Company

purchased the Timber Sale in 2018 – almost two years ago – to supply its White City veneer

plant with white fir timber volume.  *See generally* Declaration of John Murphy (Docket No. 12)

(discussing Murphy Company's operations, which collectively employ about 900 people in

Oregon, along with the Project's Timber Sale, which is comprised mostly of white fir that has

moved into the Project area due to historical fire suppression).  Through its motion, Murphy

Company has asked the Court to grant summary judgment in favor of Murphy Company and the

BLM under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., the only

environmental statute invoked by plaintiffs.  The briefing demonstrates that the Project, which

authorizes timber harvest on a little more than 900 acres of O&C Sustained Yield Act

timberlands dedicated by Congress for the express purpose of sustained-yield timber harvest, see

43 U.S.C. § 2601 et seq., almost all of which also are in BLM's Harvest Land Base, is wholly

lawful under NEPA.  This reply brief provides yet additional support for granting Murphy

Company's motion.

Plaintiffs Klamath Siskiyou Wildlands Center et al. (collectively KSWild) allege BLM

failed to disclose the effects of Project implementation on two species, the fisher and the great

gray owl.  The fisher is a Bureau Sensitive Species; the great gray owl has no special status.  But

rather than engaging with and trying to rebut Murphy Company's discussion of the Project's

compliance with NEPA, including through extensive disclosures in the environmental analyses

for the governing 2016 Southwestern Oregon Resource Management Plan (2016 RMP) regarding

**PAGE 1 --      DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

the potential effects of implementing BLM's forest management program on the acres at issue, KSWild instead obfuscates the issues by offering non-responsive and meritless arguments.

For example, KSWild repeatedly asserts that Murphy Company (and BLM) take the position that NEPA does not apply to land management projects on the O&C Sustained Yield Act acres at issue. *See, e.g.*, Pls.' Reply Mem. (Docket No. 42) at 1-2, 5 n.1. This is untrue – Murphy Company has never so asserted. Nor can the fact that BLM tiered the Project's NEPA analysis to the environmental analyses conducted for the 2016 RMP and its forest management program be equated with BLM claiming a NEPA exemption for future site-specific projects like this one. To the extent KSWild is making that assertion, KSWild fundamentally misunderstands the nature of tiering and incorporation by reference under NEPA. If BLM *were* claiming the Project is exempt from NEPA, the agency would not have prepared a revised environmental assessment (Revised EA) to determine whether the Project may have significant environmental effects such that BLM was required to prepare an environmental impact statement (EIS).

Nor has Murphy Company asserted that it is "unlawful . . . to implement *any* wildlife protections whatsoever on O&C lands." Pls.' Reply Mem. at 16 (emphasis in original). In reality, it is the Ninth Circuit that has held the O&C Sustained Yield Act is a "timber production" dominant use statute which disallows conflicting uses. *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1183-84 (9th Cir. 1990). Whether a particular wildlife protection conflicts with the dominant use of O&C Sustained Yield Act acres for timber production is a fact-specific inquiry, with no such inquiry being before the Court in this case.

Nor is it true that Murphy Company neglected to inform the Court that the D.C. District Court held last year that the 2016 RMP violates the O&C Sustained Yield Act. Pls.' Reply Mem. at 15. Murphy Company plainly informed the Court of that fact in footnote 1 of its

**PAGE 2 --     DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

opening brief, further explaining that the parties' remedy briefing in that case does not seek

wholesale invalidation of the 2016 RMP, which will continue to govern the lands at issue for the

foreseeable future.

KSWild's repeated use of hyperbole casts a long shadow on plaintiffs' arguments as a

whole. As Murphy Company discusses below, plaintiffs' arguments are not well-taken and do

not support invalidation of the Project.

II.    <u>**KSWILD'S CRITICISM OF TIERING AND USE OF AN APPENDIX IN THIS CASE IS WITHOUT MERIT**</u>.

KSWild's attacks on tiering under NEPA and on the use of an appendix to an EA are not

well taken. Contrary to KSWild's assertions, BLM properly tiered the Project's NEPA analysis

to the extensive environmental analyses conducted in connection with promulgation of the 2016

RMP and its forest management program for the Harvest Land Base in southwestern Oregon.[1] It

also was wholly proper under NEPA for BLM to include an appendix to the Project's Revised

EA. KSWild's criticism of tiering and the use of an appendix have one thing in common,

namely KSWild's effort to have the Court don blinders to BLM's NEPA disclosures regarding

the fisher and the great gray owl.

A.    <u>**Tiering Under NEPA is Wholly Lawful**</u>.

BLM properly tiered the Project's environmental analysis to that for the 2016 RMP. *See,*

*e.g.*, AR_003179 (Finding of No Significant Impact 1) (stating that the Project's Revised EA

"tiered to and incorporated by reference as appropriate broader scale analyses documenting the

environmental and human effects of a forest management program analyzed in the Proposed

---

[1]  Murphy Company's defense of the propriety of tiering in this case does not mean Murphy Company agrees, implicitly or otherwise, with KSWild's allegations regarding a lack of "site-specific analysis." *See* KSWild Reply Mem. at 5. Tiering and site-specific analysis are not mutually exclusive.

**PAGE 3 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

Resource Management Plan and Final Environmental Impact Statement for Western Oregon

(2016 PRMP/FEIS)"). Murphy Company explained in its opening brief (at pages 5-6) that

tiering under NEPA is an encouraged process whereby an agency evaluates the potential

environmental impacts of a proposed action based on prior NEPA environmental analysis. 40

C.F.R. § 1508.28 ("Tiering refers to the coverage of general matters in broader environmental

impact statements . . . with subsequent narrower statements or environmental analyses . . .

incorporating by reference the general discussions and concentrating solely on the issues specific

to the statement [or environmental assessment] subsequently prepared"); *id.* § 1502.20 (tiering is

encouraged "to eliminate repetitive discussions of the same issues and to focus on the actual

issues ripe for decision at each level of environmental review (§ 1508.28)"). Department of

Interior regulations likewise provide that an EA "prepared in support of an individual proposed

action can be tiered to a programmatic or other broader-scope environmental impact statement."

43 C.F.R. § 46.140(c).

Here, BLM reasonably concluded that tiering to the environmental analyses for the 2016

RMP was proper with respect to Project impacts on the environment. *See, e.g.*, AR_003187

(Finding of No Significant Impact 9) ("As previously noted, the analysis of effects has been

completed within the context of the 2016 ROD/RMP and the anticipated effects are within the

scope, type, and magnitude of effects anticipated and analyzed in the 2016 ROD/RMP."); 

AR_003164 (Decision Record 8) (reporting likewise). *See also* AR_003228 (Revised EA 11)

(stating that the Revised EA and its "effects analysis tier to the 2016 PRMP/FEIS for Western

Oregon. . . . Where [an] issue has already been sufficiently addressed by the analysis in the 2016

PRMP/FEIS, the issue is generally not addressed in detail in this EA, or if it is, the EA analysis is

generally a site-specific extension of the FEIS analysis"). Through tiering, BLM was able to

**PAGE 4 --     DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

concentrate its NEPA analysis "on the issues not already addressed" in the environmental

analyses for the 2016 RMP.  AR_003388 (Revised EA D-9).  The new Ninth Circuit case that

KSWild filed with the Court pursuant to a Notice of Supplemental Authority recognizes that this

is how NEPA tiering works.  *N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*, No. 19-35008,

2020 WL 3866583, at *10 (9th Cir. July 9, 2020) ("Tiering refers to the incorporation by

reference in subsequent EISs or EAs, which concentrate on issues specific to the current

proposal, of previous broader EISs that cover matters more general in nature.").

 KSWild's multi-pronged attack on tiering in this case is without merit.

 For example, KSWild criticizes BLM for failing to analyze in detail the "effects of the

Griffin Half Moon project on either great gray owls or Pacific Fisher, even though the public

raised significant concerns about the Project's effects on these species."  KSWild Reply Mem. at

5.  But it is BLM, not the public, that determines whether issues have potential NEPA

significance.  To illustrate, during the scoping process, BLM is tasked with identifying and

eliminating "from detailed study the issues which are not significant or which have been covered

by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the

statement to a brief presentation of why they will not have a significant effect . . . or providing a

reference to their coverage elsewhere."  40 C.F.R. § 1501.7(a)(3).  The fact that one or more

members of the public raises a concern about a species does not mean the concern automatically

rises to the level of NEPA significance, as was the case with the fisher and great gray owl at

issue here.

 Relatedly, KSWild alleges BLM ignored the NEPA goal of informing the public and

instead focused selfishly on its own deliberative process.  KSWild Reply Mem. at 4-5 (asserting

that just because the 2016 RMP created sideboards around BLM's site-specific decisionmaking

authority, the public still should have been provided with more information about the Project in

**PAGE 5 --** **DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

the NEPA process). This argument is a red herring. Not only did the Revised EA and other Project NEPA documents provide the public with sufficient information about potential Project impacts, the public also was fully engaged (or had the opportunity for full engagement) in the extensive NEPA process for the 2016 RMP, to which the Project tiers. *See, e.g.*, AR_008260-70 (discussing public and governmental entity engagement in development of the 2016 RMP). Indeed, three of the four plaintiffs in this case (Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands) subsequently sought to convince this Court and the Ninth Circuit that the 2016 RMP came up short under NEPA, but lost on both fronts, with the Ninth Circuit quickly ruling (only 10 days after oral argument) that BLM's analyses for the 2016 RMP complied with NEPA. *See generally Pacific Rivers v. U.S. Bureau of Land Mgmt.*, No. 19-35384, 2020 WL 2510759 (9th Cir. May 15, 2020).

Nor is it true that the "tiering case law" relied on by KSWild is "on fours with the facts of the present case."[2] KSWild at 7. In *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004), the plaintiff challenged two timber sales supported by two separate EAs each of which tiered to the governing resource management plan and its EIS. The two sales

---

[2] After filing its reply brief, KSWild provided the Court with the new *Northern Alaska* tiering decision discussed above. But *Northern Alaska*, which involved BLM's sale of oil and gas leases on the National Petroleum Reserve-Alaska, is not on point. *Northern Alaska* involved a programmatic EIS that explicitly stated it would "'fulfill the NEPA requirements for the first oil and gas lease sale." 2020 WL 3866583, at *14. *See also id.* (observing that the EIS also stated that if "'BLM finds its existing analysis to be adequate for a second or subsequent sale, the NEPA analysis for such sales may require only an administrative determination of NEPA adequacy,'" rather than new site-specific NEPA analysis). Thus, unlike this case, the EIS served as both a programmatic EIS *and* "as the necessary site-specific analysis for future lease sales." *Id.*, at *9. *See also id.*, at *14 (deferring to BLM's express determination that the earlier programmatic EIS "*was* the [site-specific] EIS for the [subsequent] lease sale") (emphasis in original). Here, no one takes the position that the environmental analyses for the 2016 RMP concomitantly serve as the site-specific NEPA analysis for the Project. If BLM had taken that position, it would not have prepared a Revised EA for the Project.

**PAGE 6 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

originally were part of a larger project that had been broken up into four separate projects apparently to expedite implementation of each timber sale. *Id.* at 992. The plaintiff expressed concern about the incremental impacts of the successive timber sales "in combination with other major activities in the watershed," *id.* at 991, which was a Tier 1 Key Watershed "deemed to contribute directly to the survival and restoration of at-risk salmonids." *Id.* at 992. The court ruled in favor of the plaintiff based on insufficient consideration of the incremental environmental impacts of the four successive sales, particularly on the Tier 1 Key Watershed. *Id.* at 997. That fact pattern does not resemble the fact pattern in this case.

Similarly, the fact pattern in *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998), does not mirror ours. *Blackwood* invalidated five post-wildfire salvage logging projects – each supported by an EA that apparently tiered to a governing forest plan prepared several years prior to the catastrophic wildfire – due to the lack of cumulative effects analysis regarding sedimentation resulting from implementing the five salvage sales in the same burned watershed. Of particular concern was the lack of disclosure regarding "increased sediment loading to the waterways that would cause irreparable damage to" salmonid and bull trout populations already impacted detrimentally by post-fire sedimentation. *Id.* at 1213. That sort of cumulative effects concern regarding the impacts of multiple projects taking place in the same burned watershed is absent in this case. Moreover, as the Ninth Circuit recently reiterated in *Northern Alaska*, the tiering at issue in *Blackwood* was unlawful because the forest plan that was tiered to "'d[id] not, and could not, evaluate the impacts of catastrophic fire, or the additional environmental impacts that large scale logging of severely burned areas could bring,'" because the forest plan predated the catastrophic wildfire. *Id.*, 2020 WL 3866583, at *10 (quoting *Blackwood*).

**PAGE 7 --      DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

Also without merit is KSWild's assertion that BLM's tiering determination "appears out of thin air in the Finding of No Significant Impact," and allegedly unsupported by "deliberative evidence in the administrative record." KSWild Reply Mem. at 8.[3]  For example, as Murphy Company explained in its opening brief, BLM in the Revised EA summarized the fisher disclosures in the 2016 RMP EIS regarding the minimal impacts of BLM's forest management program on fisher and fisher habitat, AR_003359 (Revised EA at C-8), and pointed out that the insignificant negative impact to fisher habitat from Project implementation was "anticipated under the RMP." AR_003360 (Revised EA at C-9).  Murphy Company Opening Mem. (Docket No. 30) at 22-23. *See also* AR_003173 (Response to Comments 4) (explaining that the environmental analyses for the 2016 RMP, to which the Project tiers, analyzed the effects of full implementation of BLM's forest management program on the fisher and found essentially no effect on the species).  As for the great gray owl, a species having no special status under the 2016 RMP, BLM considered the science submitted about this species during the NEPA process and explained that management for the species now is provided not by protecting nest sites in the Harvest Land Base but by the protection of a "large [Late-Successional Reserve] Network that . . . provides management for species such as the [great gray owl, a former survey and manage species] (USDI BLM 2016b, pp. 27-28)." AR_003341 (Revised EA B-4).  *See also* AR_003172 (Response to Comments 3) (explaining that the 2016 RMP's management approach replaced the

---

[3]  In addition to the briefing in this case that demonstrates "deliberative evidence" in support of BLM's Finding of No Significant Impact, it has long been the law in APA cases that a reviewing court will "'uphold a decision [even] of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting 1974 Supreme Court decision for this tenet of administrative law).  Contrary to KSWild's suggestion, there is no requirement that the agency prepare "meeting notes, memos, reports, or other documentation" of the steps leading up to a decision not to prepare an EIS.  KSWild Reply Mem. at 8.  *See also id.* at 21 (repeating the erroneous assertion verbatim).

**PAGE 8 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

former Northwest Forest Plan protections for survey and manage species with a larger Late Successional Reserve system that protects great gray owl habitat and "continues to provide management" protections for the great gray owl).

Finally, KSWild disingenuously asserts that BLM's use of tiering, which allowed BLM to focus its analysis on Project-specific issues not addressed in the 2016 RMP environmental analyses, rests on a truism. KSWild Reply Mem. at 8, 21 (accusing BLM of relying on the mere fact that the site-specific Project encompasses a smaller geographic area than was assessed for the 2016 RMP). It is not true that BLM simply compared the approximately 900 acres of timber harvest at issue in this case with the upper limit of authorized timber harvest acreage over the life of the 2016 RMP and, finding the Project smaller in comparison, called it good. Rather, as Murphy Company discussed in its opening brief and discusses further herein, BLM evaluated the fisher and great gray owl environmental analyses for the 2016 RMP in connection with determining whether Project impacts on those species were potentially significant under NEPA. *See, e.g.*, Murphy Company Opening Mem. at 19-24 (discussing BLM's assessment for the fisher); *id.* at 25-29 (discussing BLM's assessment for the great gray owl). For example, regarding the fisher, BLM disclosed that during the first decade of implementing the 2016 RMP, the total authorized timber harvest would not affect the size of the fisher population. *See, e.g.*, AR_003359 (Revised EA C-8) (observing that total timber harvest in the first decade of 2016 RMP implementation might reduce the fisher population by one or so animals). For the great gray owl, BLM observed that the species had no special status under the 2016 RMP's new management approach, which replaced the Northwest Forest Plan's survey and manage paradigm with a different, and better, approach to protecting older and more structurally-complex forests that provide important habitat for former survey and manage species like the owl. *See, e.g.*,

**PAGE 9 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

HAGLUND KELLEY LLP
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201  (PL10)

AR_003274 (Revised EA 57).  Among other things, because of the plainly insignificant impact of the Project's timber harvest on the fisher, and the fact that the Project's timber harvest was wholly consistent with the 2016 RMP's new approach to land management for former survey and manage species, BLM concluded the fisher and great gray owl impacts were not potentially significant impacts that required further analysis.

In sum, the 2016 RMP environmental analyses carefully considered the impacts on the fisher and great gray owl from implementing BLM's forest management program for southwestern Oregon.  The acres dedicated to timber harvest in the 2016 RMP include those at issue in this case, all of which are O&C Sustained Yield Act acres dedicated by Congress to sustained-yield timber harvest.  Thus, contrary to KSWild's assertion, the discussion of NEPA tiering in *Native Village of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003 (D. Alaska 2020), is instructive.  *Cf.* KSWild Reply Mem. at 5-6 (criticizing Murphy Company for citing *Native Village* as an illustrative recent tiering decision).  Because the programmatic NEPA analyses to which this Project tiers considered the impacts of implementing BLM's forest management program, that analysis provides the context for this Project, and BLM was not required to "repeat that analysis 'unless new and significant environmental impacts arise that were not previously considered.'"  *Native Village*, 432 F. Supp. 3rd at 1025 (omitting citation to Ninth Circuit case law).  The Project did not implicate new and significant environmental impacts not previously considered, *see, e.g.*, AR_003179 (Finding of No Significant Impact 1), so BLM reasonably tiered its NEPA analysis to that for the 2016 RMP and focused "on the actual issues ripe for decision" at the site-specific Project level.  40 C.F.R. § 1502.20.  BLM acted reasonably in doing so in full compliance with NEPA.  The Court should decline KSWild's invitation to ignore the relevant disclosures in the 2016 RMP environmental analyses.

**PAGE 10 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

B.      **The Revised EA's Use of an Appendix is Wholly Lawful**.

Also without merit is KSWild's suggestion that BLM is prohibited from using an appendix in the context of an EA.  KSWild Reply Mem. at 18-20.  KSWild constructs its argument on the faulty foundation that Murphy Company and BLM must distinguish *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), a recent Supreme Court case involving judicial deference (*Auer* deference) to an agency's interpretation of its own ambiguous rules.  In invoking *Kisor*, KSWild criticizes Murphy Company (and BLM) for failing to argue that 40 C.F.R. § 1502.18 is ambiguous – basically claiming victory as a result of this alleged failure.  But 40 C.F.R. § 1502.18 is inapplicable here.  On its face, the regulation applies only to EISs, not EAs like the Revised EA at issue in this case.  *See id.* ("If an agency prepares an appendix to an environmental impact statement . . . .").  In fact, 40 C.F.R. § 1502.18 is included in a section of the 40 C.F.R. regulations – Part 1502 – that applies solely to EISs, not EAs.  *See generally* 40 C.F.R. §§ 1502.1-.25.  As the Ninth Circuit stated in the context of another EIS NEPA regulation found in 40 C.F.R. Part 1502, "the regulation by its own terms only applies" to EISs, not EAs.  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).

In a leap of illogic, KSWild next asserts that it agrees 40 C.F.R. § 1502.18 doesn't apply to the Revised EA for the Project – again claiming victory as a result.  KSWild Reply Mem. at 19.  This makes no sense.  It simply is not true that the NEPA regulations relied on by KSWild (which again pertain only to EISs) "clearly state that an appendix is only to be used in conjunction with an EIS, not an EA."  *Id.*  Rather, the NEPA regulations pointed to by KSWild discuss the nature of an EIS appendix and have nothing to do with the content of an EA.

Finally, KSWild at least acknowledges that different regulations apply to EAs.  KSWild Reply Mem. at 20.  And none of those regulations forbid an EA's use of an appendix.  For

**PAGE 11 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

example, the regulation titled "How to format an environmental assessment" directs BLM that an EA "may be prepared in any format useful to facilitate planning, decision-making, and appropriate public participation." 43 C.F.R. § 46.315(a). The regulation titled "Contents of an environmental assessment" sets forth the minimum requirements of an EA, *id.* § 46.310(a), and explains that the "level of detail and depth of impact analysis should normally be limited to the minimum needed to determine whether there would be significant environmental effects." *Id.* § 46.310(3). *See also* 40 C.F.R. § 1509.9(a)(1) (defining an EA as "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"). Put simply, nothing prohibits an EA from including an appendix, which is why courts within the Ninth Circuit routinely uphold NEPA decisions based on EAs with appendices. *See* Murphy Company Opening Mem. at 18 (offering examples).

In sum, KSWild's effort to have the Court ignore relevant information because it is found in an EA appendix is meritless.

## III.    THE PROJECT COMPLIES WITH NEPA WITH RESPECT TO THE FISHER.

Murphy Company's opening brief thoroughly demonstrated that BLM's analysis of potential Project impacts on the fisher satisfied NEPA. Murphy Company Opening Mem. at 19-24. KSWild's attempt to rebut that showing is anemic. *See generally* KSWild Reply Mem. at 18-23. Summary judgment should be granted in favor of Murphy Company and BLM on KSWild's fisher claim.

KSWild first complains about BLM's use of an appendix, *id.* at 18-20, which Murphy Company rebutted above.

PAGE 12 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.

KSWild next complains about BLM's use of NEPA tiering, *id.* at 18, 20-21, which Murphy Company also rebutted above except for one point, namely KSWild's implicit challenge to the 2016 RMP's changed approach to land management.  *See id.* at 20-21 (criticizing the 2016 RMP's dedication of some BLM lands to the Harvest Land Base for timber harvest coupled with the dedication of far more acres to reserves for the benefit of species like the fisher).[4]  KSWild impliedly criticizes the 2016 RMP's changed management approach even though that land management approach was upheld by the Ninth Circuit in a case brought by three of the plaintiffs in this case. *Pacific Rivers*, 2020 WL 2510759, at *2 (concluding that BLM "provided a 'reasoned explanation' for any change in its management approach").  But KSWild has not attempted to bring a claim challenging the 2016 RMP in this case, presumably because KSWild recognizes plaintiffs would be precluded from re-litigating their unsuccessful challenge to the 2016 RMP.  And rightly so.

Finally, KSWild refuses to acknowledge that BLM made site-specific disclosures regarding the insignificant impacts of the Project on the fisher, including site-specific disclosures that tiered to the 2016 RMP environmental analyses.  KSWild Reply Mem. at 21-22.  A particularly salient excerpt from Murphy Company's opening brief (ignored by KSWild) explains that based on the environmental analyses for the 2016 RMP, to which the Project's site-specific NEPA analysis tiers, even *full* implementation of the 2016 RMP's forest management program would not significantly affect the fisher:

> in the first decade of implementing [BLM's] new land management approach under the 2016 RMP . . . the fisher population would decrease slightly, but . . . the projected "reduction in the fisher population . . . would constitute a loss of < 1

---

[4]  Under the 2016 RMP, 31% of the acreage in the planning area is allocated to late-successional reserves, and 15% is allocated to riparian reserves (not to mention the 18% of the acreage that is allocated to District-Designated Reserves), whereas only 20% of the acreage is allocated to the Harvest Land Base.  AR_006321 (2016 RMP 43).

**PAGE 13 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

percent of the current estimated population in the decision area (1,292 fishers) and would not reduce the fisher population below any known, critical population thresholds." AR_008098 (2016 RMP EIS 879). In fact, by 2023, implementation of the 2016 RMP would result in only two fewer fishers in the entire planning area, hardly a significant effect. AR_008968 (2016 RMP EIS 1713). During that same time period, BLM projected that timber harvest under the 2016 RMP would result in a decrease of 6,025 acres (6.1%) of total fisher habitat in the Harvest Land Base. AR_008964 (2016 RMP EIS 1709) (displaying in Table S-57 that total fisher habitat within the Harvest Land Base would decrease from 99,214 to 93,189 acres in the first decade of 2016 RMP implementation).

Murphy Company Opening Mem. at 21. In light of this information, i.e. that (1) full implementation of the first decade of BLM's forest management plan would detrimentally affect less than 1% of the fisher population; (2) by 2023 full implementation of BLM's forest management plan would result in no more than two fewer fishers; and (3) that the timber harvest backdrop for these insignificant impacts on the fisher would include a reduction of slightly more than 6,000 acres of fisher habitat in the Harvest Land Base, BLM's conclusion that the Project's approximately 900 acres of timber harvest would not result in significant environmental impacts on the fisher is reasonable. It also is well-supported, *see, e.g.*, AR_003359-60 (Revised EA C-8 to C-9), KSWild's complaint about the alleged lack of "deliberative evidence" notwithstanding. KSWild Reply Mem. at 22.

As part of its refusal to acknowledge BLM's site-specific disclosures regarding the insignificant impacts of the Project on the fisher, KSWild accuses BLM of playing a "shell game" by evaluating potential impacts on the fisher through the use of northern spotted owl habitat as a proxy for fisher habitat. KSWild at 22. Not so. Not only does KSWild's argument constitute implicit acknowledgement that BLM *did* make site-specific fisher disclosures, but this Court also has acknowledged (in another KSWild case) that BLM has "discretion to use northern spotted owl habitat as a surrogate for fisher habitat." *Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, Civ. No. 06-3076-PA, 2007 WL 2688125, at *6 (D. Or. Sept. 10, 2007). The

**PAGE 14 --   DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

size of the northern spotted owl analysis area thus is immaterial – because the owl analysis area

is a proxy for the fisher, the analysis areas are the same.

The Revised EA disclosed the fact that fishers "use similar habitat to" northern spotted

owls. AR_003312 (Revised EA 95). In fact, the Project's northern spotted owl analysis area

incorporated habitat "generated from radio telemetry locations of male and female fisher known

to occur in this area . . . ." *Id.* The Revised EA further disclosed that under all action

alternatives, "more than 97% of existing suitable" spotted owl habitat in the northern spotted owl

analysis area would go untreated. AR_003315 (REA 98). This means that more than 97% of

fisher habitat also will remain after Project implementation. *See also* AR_003359 (REA C-8)

(reiterating that northern spotted owl "habitat has been determined to be a reasonable proxy for

fisher habitat"). This is not a shell game – it is site-specific information that KSWild wants the

Court to ignore.

KSWild offers nothing more in its unsuccessful attempt to prevail on its NEPA claim.

But Murphy Company's opening brief provided yet additional evidence regarding BLM's

Project-specific NEPA analysis with respect to the fisher. For example:

- BLM disclosed that some Project implementation effects "would be relatively short-term, as understory vegetation typically returns within five years . . . . Additionally, treatments would retain key habitat characteristics such as large snags and coarse woody debris (CWD) to maintain existing and provide for further habitat for fishers." AR_003360 (Revised EA C-9);

- The main effect on fishers likely would be "[d]isturbance from treatment activities," an effect of little consequence given that "fishers are highly mobile" and have "large home ranges," enabling them to avoid disturbances. *Id.*;

- Project Design Features "would minimize impacts to fishers." *Id. See also* AR_003256 (Revised EA 39) (disclosing that the Project incorporates Project Design Features to "reduce the potential for adverse impacts to resources");

- Protective conservation measures for fishers, which are displayed in Table 2-4, AR_003265 (Revised EA 48), include the retention of large down wood and snags,

**PAGE 15 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

maintaining habitat within stands used for denning, and retaining 80% canopy cover within 50 feet of known den sites. *Id*;

- Because fishers potentially use debris piles for denning and/or resting, BLM included restrictions on when debris piles associated with logging activities could be "burned, chipped or made available for firewood cutting" to ensure their availability for fishers. AR_003266 (Revised EA 49);

- Fishers in the Project area are located in close proximity to other, abundant, habitat, including "to the northeast . . . a large Late-Successional Reserve (LSR) that is located on USFS-administered land . . . [and] to the south, east, and west, the Cascade-Siskiyou National Monument and 2016 RMP Late-Successional Reserve provides large areas with habitat suitable for fisher life history purposes." AR_003360 (Revised EA C-9).

For all of these reasons, BLM took a NEPA "hard look" at the potential impacts of the Project on the fisher. Because the potential impacts were not significant, additional detailed analysis of Project impacts on the fisher "was not carried forward for further analysis." *Id.* The record supports BLM's expert determination with respect to fishers, and the Court should defer to BLM's scientific determination. *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009). *See also id.* at 993 (judicial review should be at its *most* deferential where an agency is addressing difficult issues within its area of special expertise).

## IV.    THE PROJECT COMPLIES WITH NEPA WITH RESPECT TO THE GREAT GREY OWL.

### A.    KSWild Continues to Challenge BLM's Decision in the 2016 RMP to Move Away From the Northwest Forest Plan's Survey and Manage Program, Despite KSWild Not Having Brought a Claim Against the 2016 RMP, and Despite the Ninth Circuit Having Upheld the 2016 RMP's New, Non-Survey and Manage Approach to Land Management.

Remarkably, despite KSWild not having brought a claim against the 2016 RMP in this case, KSWild continues to argue that BLM has failed to provide a rational explanation for the 2016 RMP having replaced survey and manage requirements for species like the great gray owl with a new, and better, approach to land management. *See generally* KSWild Reply at 16-17. In

**PAGE 16 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

addition to raising an argument that does not pertain to either one of its claims, KSWild also rehashes an argument that it lost in this Court and in the Ninth Circuit and cannot now relitigate. Further, KSWild wholly ignores Murphy Company's informational argument that demonstrated to the Court that BLM did provide a rational explanation for its decision to replace the Northwest Forest Plan and its survey and manage program with a new, and better, approach to land management when it adopted the 2016 RMP.  KSWild's argument thus fails on multiple levels.

First, a simple examination of KSWild's complaint (Docket No. 1) confirms that KSWild is not challenging the 2016 RMP in this case.  KSWild's two claims focus narrowly on the Project's allegedly inadequate NEPA disclosures regarding Project impacts on the fisher and the great gray owl.

Second, even if KSWild had brought a claim against the 2016 RMP, the Ninth Circuit already rejected KSWild's challenge to the 2016 RMP's new, non-Northwest Forest Plan approach to managing BLM lands in southwestern Oregon.  Again, three of the plaintiffs in this case – Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands – unsuccessfully challenged the 2016 RMP on the grounds that BLM had failed to provide a reasoned explanation for replacing Northwest Forest Plan protections (which include the survey and manage measures) with a different land management approach.  The Ninth Circuit rejected that challenge, instead confirming that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it promulgated the 2016 RMP.  *Pacific Rivers*, 2020 WL 2510759, at *2.  This issue has been decided conclusively in BLM's favor.

Finally, even though a challenge to the 2016 RMP's new approach to land management is not before this Court, Murphy Company's opening brief illustrated for the Court how BLM fully satisfied the so-called *Fox* factors for a lawful change in agency policy when it promulgated the

**PAGE 17 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

2016 RMP.  Murphy Company Opening Mem. at 13-16.  *See generally F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency may lawfully change course so long as the agency is aware of its policy change, which is itself statutorily permissible, coupled with the agency believing the policy change is better and offering "good reasons for the new policy").

KSWild entirely ignores this information.  But the reality is that BLM made a conscious change of course to adopt a different land management strategy in the 2016 RMP, one that did not include the Northwest Forest Plan's survey and manage protections.  BLM explicitly stated that "this RMP revision would replace . . . the Northwest Forest Plan for the management of BLM-administered lands in western Oregon."  AR_007214 (2016 RMP EIS 21).  And BLM specifically addressed its departure from the survey and manage measures, explaining that by adopting the 2016 RMP, BLM no longer needed survey and manage measures "to protect species associated with older and more structurally-complex forests.  This is because the purpose of this RMP revision includes maintaining older and more structurally-complex multi-layered conifer forests . . . ."  AR_007215 (2016 RMP EIS 22).  Murphy Company's opening brief also showed that BLM satisfied the second and third *Fox* factors, explaining that it was wholly permissible for BLM to adopt a new, non-Northwest Forest Plan land management approach in the 2016 RMP, and that BLM's conscious adoption of the 2016 RMP demonstrated the agency's belief that its new land management approach is a better approach to resource management in the Project area.  Murphy Company Opening Mem. at 15.  Finally, Murphy Company demonstrated that BLM provided good reasons for why it did not need Northwest Forest Plan survey and manage measures in the 2016 RMP, explaining that:

> the purpose of this RMP revision includes maintaining a network of large blocks
> of forest . . . . All action alternatives and the Proposed RMP therefore allocate a

**PAGE 18 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

Late-Successional Reserve network, where sustained-yield timber harvest would not occur, that is larger than what is provided in the Northwest Forest Plan and broadly encompasses "old-growth forests." Each alternative and the Proposed RMP would more than sufficiently address maintenance of older and more structurally-complex forests, without the need for additional mitigation like that provided by Survey and Manage.

AR-007215 (2016 RMP 22). Because of BLM's robust explanation of why its new, non-Northwest Forest Plan approach to land management was entirely rational, the Ninth Circuit confirmed that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it departed from the Northwest Forest Plan survey and manage measures through adoption of the 2016 RMP.[5] *Pacific Rivers*, 2020 WL 2510759, at *2.

B.  <u>Nothing in KSWild's Reply Brief Alters the Conclusion that BLM Took a Sufficiently Hard Look under NEPA at Project Impacts on the Great Gray Owl.</u>

Similar to the fisher discussed above, Murphy Company's opening brief demonstrated that BLM's analysis of potential Project impacts on the great gray owl satisfied NEPA. Murphy Company Opening Mem. at 25-29. Unlike the fisher, however, which is a Bureau Sensitive Species, the great gray owl has no special status. And as BLM pointed out, "NEPA does not require a detailed, stand-alone effects analysis with regard to every species of wildlife." BLM

---

[5] KSWild also implies, mistakenly, that the "viability" of the great gray owl is at risk. KSWild Reply Mem. at 17. *See also id.* at 14 (same). In addition to "viability" being a Forest Service concept inapplicable to BLM land management requirements, AR_007214-15 (RMP EIS 21-22), the record shows that the great gray owl, though uncommon, "enjoys a wide distribution in Oregon." AR_013148 (Birds of Oregon 322). Further, survey and manage species under the old land management plan were not organisms listed as threatened or endangered under the ESA, nor were survey and manage measures designed to guarantee species viability. Rather, survey and manage measures were applied to species that were apparently uncommon, or about which the agencies lacked sufficient information to know whether other Northwest Forest Plan elements provided them with sufficient protection. *See, e.g.*, *Conservation Northwest v. Rey*, 674 F. Supp. 2d 1232, 1238 (W.D. Wash. 2009) (discussing the history of the survey and manage requirements), *rev'd*, 715 F.3d 1181 (9th Cir. 2013).

**PAGE 19 --   DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

HAGLUND KELLEY LLP
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201 (PL10)

Opening Mem. (Docket No. 41) at 22.  If NEPA did so require, the result would be analysis

paralysis and a halt to forest management.

Impliedly recognizing this, KSWild suggests BLM was required to provide a more-

detailed, stand-alone effects analysis for the great gray owl because some members of the public

express strong feelings for the species.  KSWild Reply Mem. at 9.  But as discussed above in

part II.A, it is up to BLM, not the public, to determine which issues specific to the Project

warrant further, more detailed analysis.  And in this case, when public comments urged BLM to

analyze a stand-alone alternative "that would avoid heavy thinning or regeneration harvest in

treatment units that were previously deferred" under survey and manage protections for the great

gray owl, BLM explained why it declined to do so, i.e., that the 2016 RMP's new, non-survey

and manage approach to land management with its "larger Late-Successional Reserve network"

obviated the need for such an alternative and discussion of effects.  AR_003274 (Revised EA

57).

KSWild's specific efforts to rebut the arguments of Murphy Company and BLM gain no

traction.

KSWild first criticizes the agency, *see* KSWild Reply Mem. at 10, for pointing out that "a

seasonal restriction is in place [for the Project] that restricts project activities within 0.25 miles of

raptor nests between March 1 and July 15, and a PDF is in place that retains raptor nest trees;

both measures would help to protect GGOs (REA, p. 48)."  AR_003172 (Response to Comments

3).  According to KSWild, those protections are inapplicable to the great gray owl because the

heading of Table 2-4 says it applies to Bureau Special Status species, which the great gray owl is

not.  The heading notwithstanding, Table 2-4 discloses that certain protections apply to raptor

species generally – the table's heading does not change that fact.  *See* AR_003265 (Revised EA

**PAGE 20 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

48).  Relatedly, KSWild complains that people may not know the great gray owl is a raptor.  No doubt there are many words in the Project's environmental documents – indeed in every NEPA document – that are unfamiliar to some readers.  But that does not render each and every NEPA decision per se arbitrary and capricious.  Further, the science relied on heavily by KSWild also informs the reader that the great gray owl is a raptor – look at the Hull article discussed in KSWild's briefing, for example.[6]  AR_012154 ("The great gray owl (*Strix nebulosa*) is a large-bodied raptor species . . . .").

Turning to the Hull article, KSWild misrepresents to the Court that Hull supports the proposition that gene flow between the Oregon and California great gray owl populations is important to the survival of the California (southern Sierra Nevada) owls, and that "BLM's management of its lands may be contributing to" harmful genetic isolation of the California population.  KSWild Reply Mem. at 13-14.  Hull does not say this.  Hull actually states that the "Sierra Nevada population [of the great gray owl] is a "distinct and independent evolutionary lineage." AR_012159 (Hull at 217).  The California population is a distinct and independent evolutionary lineage – likely, the authors suggest, a separate subspecies – not because of BLM land management practices but rather because of "historical patterns [on a geologic timeframe] of isolation and reduction in suitable habitat caused by past climatic and geologic events."

[6]  KSWild also complains that the Project's protections for raptors are insufficient, including because Project implementation might impact undiscovered great gray owl nests.  KSWild Reply Mem. at 11.  BLM candidly acknowledged that "timber harvest can threaten [great gray owl] habitat." AR_003341 (Revised EA B-4).  Indeed, the Harvest Land Base and O&C Sustained Yield acres are not wildlife reserves.  But BLM further disclosed that the 2016 RMP "allocates a large LSR Network that accomplishes the goal of protecting older and more structurally-complex forests" for the benefit of former survey and manage species like the owl.  *Id.*  And as Murphy Company explained in its opening brief, the 2016 RMP's land management strategy provides ample forest reserve habitat to protect the great gray owl to a far greater degree than the Northwest Forest Plan.  Murphy Company Opening Mem. at 27.

**PAGE 21 --   DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

AR_012160 (Hull at 218).  Contrary to KSWild's assertion that gene flow between the Oregon

and California populations is "important" to the California population, KSWild Reply Mem. at

13, Hull concludes that such gene flow would be *harmful and inappropriate*:

> Given the genetic distinctiveness documented here, as well as previously
> recognized differences in life history characteristics, translocations and crossing
> (through captive management and breeding) of owls from allopatric populations
> [i.e., populations of related species occurring in separate, non-overlapping
> geographical areas] are inappropriate, and would diminish the distinct genetic
> characteristics of the southern Sierra Nevada population.

AR_0121162 (Hull at 220).  Pointing this out is not "post hoc rationalization."  KSWild Reply

Mem. at 13.  KSWild invokes that phrase more than once in response to Murphy Company and

BLM pointing out KSWild's inaccurate spin on scientific articles.  *See, e.g.*, *id.* at 12 (accusing

Murphy Company of "post hoc rationalization" because Murphy Company stated in footnote 3

of its opening brief that KSWild's cited science did not support the contention that the great gray

owl's viability was questionable).  Litigants have an obligation to bring misrepresentations of

administrative record documents to the Court's attention.

The remainder of KSWild's arguments on reply are equally unavailing.  For example,

KSWild seeks to minimize the great gray owl disclosures in BLM's response to comments, see

AR_003172 (Response to Comments 3), by asserting that regardless of the fact that the 2016

RMP employs a land management strategy that sets aside large areas of late-successional and

old-growth forests for the benefit of species like the owl, the Project is located on acreage

dedicated to timber production.  KSWild Reply Mem. at 12.  Of course the Project is located on

acreage set aside for timber production – the vast acreage set aside as wildlife reserves in the

2016 RMP are off limit to timber harvest.  And KSWild again questions whether BLM really

considered scientific literature submitted during the NEPA process due to an alleged lack of

"deliberative information," when in reality the record shows that BLM scientists were meeting

**PAGE 22 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

"one on one" to identify issues, AR_005721, and were instructed to "review the science submitted during scoping . . . and determine how to consider each article."  AR_005687.  *See also* AR_001872 (wildlife biologist's note to the record regarding his review of a late-submitted great gray owl article).

As Murphy Company concluded in its opening brief, BLM reasonably determined that Project impacts on the great gray owl did not need to undergo further detailed consideration. Nothing in KSWild's reply brief changes that conclusion.  The analysis of potential effects on the great gray owl was "completed within the context of the 2016 ROD/RMP and tiers to the 2016 PRMP/FEIS.  [The Finding of No Significant Impact] is consistent with the 2016 ROD/RMP [which does not use survey and manage protection measures] and the anticipated effects are within the scope, type, and magnitude of effects anticipated and analyzed in the 2016 ROD/RMP."  AR_003187 (Finding of No Significant Impact 9).  BLM concluded in its NEPA analysis for the 2016 RMP, to which this Project tiers, that implementing the agency's forest management program as a whole would protect "most of the existing habitat for Survey and Manage species and would result in an increase in the total amount of habitat [for such species] over time."  AR_008068 (2016 RMP EIS 850).  Project implementation, which will realize less than 0.5% of the timber harvest assessed in the 2016 RMP EIS on lands dedicated to the very purpose of timber production, is consistent with that determination.  AR_008068 (2016 RMP EIS 850).

For all of these reasons, BLM took the necessary NEPA "hard look" at the Project's potential impacts on the great gray owl.  The Court should afford BLM's decision substantial deference upon review and uphold the Project under NEPA.

**PAGE 23 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

## V.    <u>CONCLUSION</u>.

The Court should grant summary judgment in favor of Murphy Company and BLM and deny KSWild's motion for summary judgment.  The Griffin Half Moon Project and its Griffin Half Moon Timber Sale are wholly lawful under NEPA and should be allowed to proceed.

Dated this 17th day of July, 2020.

HAGLUND KELLEY LLP

By: /s/ Julie A. Weis
    Julie A. Weis, OSB No. 974320
    Michael E. Haglund, OSB No. 770230
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor Murphy Company

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the page limitation under LR 7-2(b) because it does not exceed 35 pages in length, excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

/s/ Julie A. Weis
Julie A. Weis, OSB No. 974320

**PAGE 25 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 17th day of July 2020, I served a true and accurate copy of the foregoing **DEFENDANT-INTERVENOR'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


/s/ Julie A. Weis
Julie A. Weis

**PAGE 26 --    DEFENDANT-INTERVENOR'S SJ REPLY MEM.**