Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT,**<br><br>**Defendant,**<br><br>and<br><br>**MURPHY COMPANY,**<br><br>**Defendant-Intervenor.** | Case No.:   1:19-cv-02069-CL<br><br>**DEFENDANT-INTERVENOR'S OBJECTIONS TO FINDINGS AND RECOMMENDATION** |

**DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

LEGAL STANDARDS .........................................................................................................3

I.      Review of Objections ..............................................................................................3

II.     Review Under the Administrative Procedure Act....................................................3

        A.      Arbitrary and Capricious Standard of Review...............................................3

        B.      Deference to Agency Scientific Decision Making.........................................4

III.    Tiering Under NEPA ...............................................................................................4

PROJECT OVERVIEW ........................................................................................................6

I.      The Griffin Half Moon Project and Timber Sale ...................................................6

II.     Relationship Between the Project and the Governing 2016 RMP ...........................9

ARGUMENT ......................................................................................................................11

I.      The Magistrate Judge Erred in Concluding BLM Insufficiently Disclosed
        Potential Project Impacts on the Great Gray Owl in Violation of NEPA ..............11

        A.      Key Errors in the F&R. ..............................................................................12

                1.      The Magistrate Judge Erred by Focusing Not on the Great Gray
                        Owl as a Species But Rather on Individual Owls in the Project
                        Area ...................................................................................................12

                2.      The Magistrate Judge Erred by Failing to Distinguish Between
                        Substantive and Procedural Obligations When Evaluating BLM's
                        Great Gray Owl NEPA Disclosures ...................................................13

                3.      The Magistrate Judge's Great Gray Owl NEPA Determination Also
                        Is Undermined by Multiple Erroneous Statements ..............................14

        B.      Contrary to the Magistrate Judge's Determination, BLM Took the
                Requisite NEPA "Hard Look" at Potential Project Impacts on the
                Great Gray Owl ..........................................................................................17

II.     The Magistrate Judge's Factually-Erroneous Dictum Regarding the 2016 RMP
        Should Not be Adopted................................................................................................22

III.   Alternatively, Murphy Company is Open to Exploring a Mediated
       Settlement of this Case...........................................................................................27

CONCLUSION...............................................................................................................28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Conservation Northwest v. Rey*,
   674 F. Supp. 2d 1232 (W.D. Wash. 2009), *rev'd*, 715 F.3d 1181 (9th Cir.
   2013) ...................................................................................................................18, 27

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) ..................................................................11, 12, 22

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...................................................................................24, 25, 26

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
   914 F.2d 1174 (9th Cir. 1990) ...................................................................... 6-7

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.
   Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ................ 3-4, 14

*Marsh v. Oregon Natural Res. Council*,
   490 U.S. 360 (1989)...........................................................................................4

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007)...........................................................................................3

*Nw. Envtl. Advocates v. NMFS*,
   460 F.3d 1125 (9th Cir. 2006) ........................................................................ 8-9

*Organized Village of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ...................................................................... 24, 25-26

*Pacific Rivers v. U.S. Bureau of Land Mgmt.*,
   Case No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018), 2018 WL 6735090,
   *adopted in full*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, No. 19-
   35384, 2020 WL 2510759 (9th Cir. May 15, 2020) ....................................... *passim*

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)................................................................................ 11-12, 13

**Statutes**

28 U.S.C.A. § 636(b)(1)........................................................................................3

5 U.S.C. § 706(2)(A) ............................................................................................................3

43 U.S.C. § 1701 et seq .......................................................................................................25

43 U.S.C. § 1712 .................................................................................................................25

42 U.S.C. § 4321 et seq .........................................................................................................1

43 U.S.C. § 2601 et seq .........................................................................................................6

**Other Authorities**

40 C.F.R. § 1501.7(a)(3) .....................................................................................................15

40 C.F.R. § 1502.20 ..........................................................................................................4, 5

40 C.F.R. § 1508.28 ..........................................................................................................4, 5

43 C.F.R. § 46.140(c) ...........................................................................................................5

43 C.F.R. § 1601.0-1 to 1601.0-8 ......................................................................................25

43 C.F.R. § 1610.5-3(a) ......................................................................................................27

FED. R. CIV. P. 72(b) .........................................................................................................1, 3

Local Rule 73-3 .....................................................................................................................1

## INTRODUCTION

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure (FCRP), Local Rule 73-3, and this Court's Order dated February 18, 2021, defendant-intervenor Murphy Company hereby objects to Magistrate Judge Clarke's Findings and Recommendation dated January 21, 2021 (F&R, ECF No. 49) regarding the Bureau of Land Management's (BLM) Griffin Half Moon Vegetation Management Project (Griffin Half Moon Project, or the Project).   Murphy Company specifically objects to the F&R's determination that BLM insufficiently disclosed potential Project impacts on the great gray owl under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.   F&R at 6-11.[1]

Plaintiffs Klamath Siskiyou Wildlands Center et al. (collectively KSWild) challenged the Griffin Half Moon Project's NEPA compliance with respect to two species, the great gray owl and the fisher.   Neither species is listed under the Endangered Species Act (ESA).[2]

The Magistrate Judge rightly concluded that potential Project impacts on the fisher were fully disclosed in the Griffin Half Moon Project's Revised Environmental Assessment (REA), and in the environmental analyses for the 2016 Southwestern Oregon Resource Management Plan (2016 RMP) to which the Project's REA properly tiered.   F&R at 11-14.

---

[1]   References in this brief to page numbers in filed documents are to those of the original document, not the ECF pagination displayed at the top of each page, which may differ from that of the original document.

[2]   The Magistrate Judge correctly noted that the fisher "was withdrawn from ESA listing" during the Project's "entire administrative process."   F&R at 13 (rightly pointing out that judicial review under the Administrative Procedure Act is limited to "only the record before the BLM at the time of the challenged decision").

Page-1  **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

But the Magistrate Judge wrongly concluded that BLM improperly tiered to the environmental analyses for the 2016 RMP with respect to potential Project impacts on the great gray owl.  The Magistrate Judge's error stemmed from a too-narrow focus on the individual great gray owls in the Project area rather than on the species as a whole, coupled with a blurring of the distinction between procedural and substantive obligations in the context of NEPA, a purely procedural statute.  *See, e.g.*, F&R at 6 (characterizing KSWild's great gray owl challenge as resting on an allegation that the Project "failed to implement appropriate measures to protect great gray owls," when NEPA contains no such substantive requirement).  The Magistrate Judge's great gray owl recommendation also included erroneous dictum stating that defendants had "yet to explain" why the 2016 RMP "declined to protect the great gray owl," F&R at 9, when in fact: (1) KSWild did not challenge the 2016 RMP in this case; (2) the 2016 RMP *does* protect the great gray owl by employing an improved, non-Northwest Forest Plan land management approach that has withstood the test of litigation by these very plaintiffs; and (3) the briefing reiterated for the Magistrate Judge why the 2016 RMP replaced the Northwest Forest Plan's survey and manage measures with a different and better land management approach involving a larger network of late-successional reserve habitat for the benefit of species like the great gray owl.

Because the Magistrate Judge erred in evaluating BLM's great gray owl NEPA disclosures, the Court should not adopt the F&R's recommendation regarding the Project's NEPA compliance on that issue.  Instead, based on its de novo review, the Court should uphold the Griffin Half Moon Project in its entirety under NEPA and grant summary judgment in favor of Murphy Company and BLM.

Page-2 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

## LEGAL STANDARDS

Application of the following legal standards compels rejection of the F&R's great gray owl NEPA recommendation.

## I.    Review of Objections.

When a party objects to any part of a magistrate judge's findings and recommendation, the district court's charge is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C.A. § 636(b)(1).   The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  *Id.   See also* FRCP 72(b)(3) (setting forth the de novo standard of review and the district court's suite of potential actions on timely objections).   Here, the reviewing Court should reject the Magistrate Judge's NEPA recommendation regarding BLM's disclosure of potential Project impacts on the great gray owl and instead uphold the Griffin Half Moon Project in its entirety.

## II.    Review Under the Administrative Procedure Act.

### A.    Arbitrary and Capricious Standard of Review.

NEPA challenges to agency land management decisions are reviewed under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review.   5 U.S.C. § 706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").   The APA's arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment (or that of a plaintiff) for that of the agency.   *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009).   Under this standard, an agency's decision should be upheld unless the agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' . . . offered an explanation 'that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"   *McNair*, 537 F.3d at 987 (citation omitted).

### B.    Deference to Agency Scientific Decision Making.

Federal agencies are owed substantial deference by bodies reviewing agency action, particularly agency action involving scientific matters.   *McNair*, 537 F.3d at 988.   *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (deference to an agency's decision is particularly appropriate where questions of scientific methodology or technical expertise are involved).   Review should be at its *most* deferential where, as here, an agency is addressing difficult issues within its area of special expertise.   *McNair*, 537 F.3d at 993.

## III.   Tiering Under NEPA.

Tiering under NEPA is a process whereby an agency evaluates the potential environmental impacts of a proposed action based on prior NEPA environmental analysis.   *See* 40 C.F.R. § 1508.28 ("Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement [or environmental assessment] subsequently prepared").   The Council on Environmental Quality, the agency that promulgates NEPA regulations, encourages tiering "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for

decision at each level of environmental review (§ 1508.28)."   *Id.* § 1502.20.    Thus, when a

broad, programmatic environmental impact statement (EIS) like that for the 2016 RMP already

has been prepared and the agency is preparing a subsequent EA for an action "included within

the entire program . . . (such as a site specific action) the subsequent [EA] need only summarize

the issues discussed in the broader statement and incorporate discussion from the broader

statement by reference . . . ."   *Id.*

      Department of Interior regulations similarly encourage tiering.    43 C.F.R. § 46.140(c)

(explaining that "[a]n environmental assessment prepared in support of an individual proposed

action can be tiered to a programmatic or other broader-scope environmental impact statement").

For the Griffin Half Moon Project, BLM properly tiered its environmental analysis to that for the

2016 RMP.   *See, e.g.*, AR_003179 (Finding of No Significant Impact 1) (stating that the Griffin

Half Moon REA "tiered to and incorporated by reference as appropriate broader scale analyses

documenting the environmental and human effects of a forest management program analyzed in

the" EIS for the 2016 RMP).

      The Magistrate Judge acknowledged that a site-specific EA like that prepared for the

Griffin Half Moon Project may properly tier to a prior programmatic EIS like the 2016 RMP EIS

so long as the programmatic analysis "contemplate[d] specific activities within a planning area."

F&R at 8.    But the F&R also suggests the Magistrate Judge was requiring more, namely that the

tiered-to document should have "consider[ed] the impacts of the site-specific Project on great

gray owls."    F&R at 8.    Such a standard goes too far and would obviate the need for tiering –

if the original document (here the 2016 RMP EIS) had evaluated the impacts of the site-specific

project (here the Griffin Half Moon Project) on the species at issue, there would have been no

need for a subsequent NEPA document.

## PROJECT OVERVIEW

### I.    The Griffin Half Moon Project and Timber Sale.

The Griffin Half Moon Project, and its Griffin Half Moon Timber Sale purchased by Murphy Company, are located on BLM lands in southwestern Oregon.   AR_003220 (REA 3). Murphy Company operates a veneer plant in nearby White City and purchased the Griffin Half Moon Timber Sale because it has a heavy white fir component that will supply the White City veneer plant with raw materials to sustain operations and support hundreds of jobs.   Declaration of John Murphy (Murphy Decl., ECF No. 12) ¶¶ 2, 8-9.

The modest Project will treat approximately 933 acres, all of which are O&C Sustained Yield Act timberlands.[3]  AR_003220 (REA 3).   Congress mandated that O&C Sustained Yield Act timberlands be managed for the dominant use of permanent forest production under the principles of sustained-yield timber management.   *See, e.g.*, *Pacific Rivers v. U.S. Bureau of Land Mgmt.*, Case No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018), 2018 WL 6735090, at *17 ("[C]ourts have repeatedly held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber production."), *adopted in full*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, No. 19-35384, 2020 WL 2510759 (9th Cir. May 15, 2020).   This means Congress dedicated the timberlands at issue to the dominant use of "timber production," not "wildlife habitat conservation."   *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d

---

[3]  The O&C Sustained Yield Act is the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 2601 et seq., a "timber production" dominant use statute which disallows conflicting uses.   *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1183-84 (9th Cir. 1990).

1174, 1184 (9th Cir. 1990).   Consistent with that dominant use, almost all of the timberlands at issue (96%) are located in the 2016 RMP's Harvest Land Base, AR_003218 (REA 1), the land allocation dedicated to long-term sustained-yield timber management.   AR_006284 (2016 RMP 6).   Notably, the Magistrate Judge failed to acknowledge that the O&C Sustained Yield Act timberlands at issue in this case are timber production, not multiple use management, lands. *Pacific Rivers*, 2018 WL 6735090, at *17 ("[T]he O&C Act is not a 'multiple use mandate for public federal forestland management.'").   *Cf.* F&R at 2 (suggesting the opposite by describing the Federal Land Policy and Management Act's (FLPMA) general multiple use goals, which do not apply in the context of O&C Sustained Yield Act lands like those in the Project area).

Not all Harvest Land Base acres are managed the same way.   Under the 2016 RMP, the Harvest Land Base has "sub-allocations to guide forest management based on large-scale forest conditions . . . ."  AR_003219 (REA 2).   Here, all of the Harvest Land Base acres are in the Low Intensity Timber Area sub-allocation.   AR_003219 (REA 2).   For such timberlands, the 2016 RMP directs BLM to use "regeneration harvest . . . to produce complex early-successional ecosystems and adjust the age-class distribution while contributing toward meeting the" 2016 RMP's timber production targets.   *See generally* AR_6342-43 (2016 RMP 64-65).

The stands selected for timber harvest also are declining in vigor and in need of active management.   The lands that will be treated "are overstocked and are experiencing declining vigor and growth rates due to high levels of density-related competition that has primarily occurred from lack of disturbance (i.e., fire.)."   AR_003219 (REA 2).   Due to historical fire suppression, the stands selected for timber harvest "have developed understories of shade tolerant white fir . . . which are often very dense."   AR_003233 (REA 16).   The Project's heavy

white fir component, a side effect of the shortsighted historical land management practices that
sought to exclude fire from the landscape, will be treated by Project implementation.

BLM remained responsive to stakeholder input throughout the NEPA process.    In
response to public comment, the Decision Record approved a more modest version of the Project
than originally proposed, even though the lands are set aside for the very purpose of timber
production.  *See generally* AR_003157-69 (Decision Record).  *See also* AR_003163 (Decision
Record 7) (acknowledgment by BLM that the Selected Alternative will produce less timber than
originally proposed).    BLM's original proposed action would have treated most stands via
regeneration harvest that left 40-60 square feet of tree basal area per acre and "10-20 percent
canopy cover retention."   AR_003233 (REA 16).    But after considering comments on the
Project, BLM authorized less timber harvest through a mix of regeneration harvest (two units),
high retention regeneration harvest (seven units), white fir regeneration harvest (two units) and
commercial thinning (three units).    AR_003163 (Decision Record 7).    Unlike standard
regeneration harvest, high retention regeneration harvest leaves basal areas of 60-100 square feet
per acre with an associated canopy cover retention of 30-40 percent.    AR_003246 (REA 29).
White fir regeneration harvest retains basal areas of 60-80 square feet per acre with a retained
canopy cover of 30-40 percent.    AR_003250 (REA 33).    And commercial thinning results in
retained basal areas of 100-140 square feet per acre with a retained canopy cover of 35-50
percent.    AR_003251 (REA 34).

BLM's decision to retain additional trees in the Project area reflects the agency's
commitment to a robust NEPA process.    *See Nw. Envtl. Advocates v. NMFS*, 460 F.3d 1125,
1138 (9th Cir. 2006) (stating approvingly in the context of NEPA that an agency "remained open

Page-8 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

to input from stakeholders" as shown by its conduct).   The Magistrate Judge did not

acknowledge this, instead stating without support that the Project's harvest techniques are

"colloquially known as 'clear cutting' because nearly all of the trees are cleared from the

harvested area."   F&R at 3.   There is no basis for this statement, which also is inconsistent with

the Magistrate Judge's subsequent statement that most of the canopy would be retained post-

treatment.   *Id.*

## II.    Relationship Between the Project and the Governing 2016 RMP.

BLM properly tiered its NEPA analysis for the Project to the extensive environmental

analyses conducted by BLM in connection with promulgation of the 2016 RMP and its forest

management program for the Harvest Land Base in southwestern Oregon.   The Harvest Land

Base is the land allocation designated for continual timber production – that is the purpose of

these lands, the total acreage of which is dwarfed by that set aside in the 2016 RMP for wildlife

conservation purposes.   *See, e.g.*, AR_006321 (2016 RMP 43) (showing that under the 2016

RMP, 31% of the acreage in the planning area is allocated to late-successional reserves and 15%

is allocated to riparian reserves, not to mention the 18% of the acreage allocated to District-

Designated Reserves, whereas only 20% of the acreage is in the Harvest Land Base).

The 2016 RMP provides the land management direction for the Harvest Land Base acres

at issue, all of which again are O&C Sustained Yield Act acres where the dominant use

established by Congress is sustained-yield timber production.   The 2016 RMP "provides a

system of land use allocations that together provide a strategy for forest management and a

sustainable supply of timber while contributing to the conservation and recovery of threatened

and endangered species within the planning area . . . ."   AR_003218 (REA 1).   The habitat

Page-9 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

needs of wildlife species like the great gray owl are provided for by such strategies as maintaining "a network of large blocks of forest to be managed for late-successional forests" and protecting "older and more structurally-complex multi-layered conifer forests." AR_006279 (2016 RMP 1).   The need for a sustainable supply of timber is provided for by timber sales from the Harvest Land Base, like the Griffin Half Moon Timber Sale.

The 2016 RMP has withstood all legal challenges brought by three of the plaintiffs in this case (Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands), who unsuccessfully challenged the 2016 RMP under NEPA, the ESA and the O&C Sustained Yield Act in both the District Court and Ninth Circuit.   *See generally Pacific Rivers*, 2018 WL 6735090, *adopted in full*, 2019 WL 1232835, *aff'd*, 2020 WL 2510759.   In upholding the *Pacific Rivers* decision, the Ninth Circuit confirmed that BLM's analyses for the 2016 RMP complied with NEPA.   The Ninth Circuit also rejected the assertion that BLM had not "provided a 'reasoned explanation' for any change in its management approach."   2020 WL 2510759, at *2.   The change in BLM's land management approach effected by the 2016 RMP and upheld by the Ninth Circuit includes BLM's reasoned decision to replace the Northwest Forest Plan's survey and manage measures with a larger network of late-successional reserve habitat designed to protect numerous species, including the great gray owl.   Yet inexplicably, the Magistrate Judge criticized BLM in dictum for having "yet to explain to this Court why it declined to protect the great gray owl in the RMP."   F&R at 9.   The 2016 RMP does protect the great gray owl, it just employs a different approach to doing so, one that has withstood the litmus test of litigation.

The habitat needs of species like the great gray owl were fully assessed during the NEPA

process leading up to BLM's adoption of the 2016 RMP and its integrated strategy for forest management.   The analysis of potential Griffin Half Moon Project effects was "completed within the context of" those prior NEPA analyses, to which the Project tiers.   AR_003187 (Finding of No Significant Impact 9).   Ultimately, BLM rightly concluded that the Project's "anticipated effects are within the scope, type, and magnitude of effects anticipated and analyzed" during the NEPA process leading to adoption of the 2016 RMP.   Thus, contrary to the Magistrate Judge's determination, the potential environmental impacts of the proposed timber harvest on great gray owls were fully considered and disclosed during development of the 2016 RMP to which the Griffin Half Moon Project tiers.   The Project thus complies with NEPA's "hard look" requirement, as is discussed below.

## **ARGUMENT**

**I.**    **The Magistrate Judge Erred in Concluding BLM Insufficiently Disclosed Potential Project Impacts on the Great Gray Owl in Violation of NEPA.**

The Magistrate Judge wrongly concluded that neither the REA nor the EIS for the 2016 RMP to which the REA tiered contained sufficient disclosures regarding potential Project impacts on the great gray owl.   *See generally* F&R at 6-11.   The Magistrate Judge's error rests largely (but not exclusively) on two things: (1) a failure to recognize that NEPA disclosures focus on potentially affected species, not individual members of such species, *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (*EPIC*); and (2) a blurring of alleged substantive versus procedural obligations when evaluating KSWild's NEPA claim regarding the great gray owl, even though NEPA is a purely procedural statute that does not dictate any substantive environmental result.   *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 350 (1989).   The Magistrate Judge's great gray owl determination also is infused

with conflicting and erroneous statements regarding such topics as the 2016 RMP's approach to

protecting former survey and management species like the great gray owl, and the owl's current

status, among other things.

The following discussion first sets forth the Magistrate Judge's errors.   It then

demonstrates for the Court why BLM's great gray owl disclosures satisfied NEPA.

A.    **Key Errors in the F&R.**

1.    **The Magistrate Judge Erred by Focusing Not on the Great Gray Owl as a Species But Rather on Individual Owls in the Project Area.**

First, the Ninth Circuit has held in no uncertain terms that NEPA "direct[s] the agency to

consider the degree of adverse effect on a species, not the impact on individuals of that species."

*EPIC*, 451 F.3d at 1010 (so stating in the context of evaluating an EA's disclosures regarding

potential project impacts on three northern spotted owl nest sites).   BLM accordingly focused its

NEPA disclosures on the great gray owl as a species, both in the REA and in the EIS for the

2016 RMP to which the REA tiers.   Yet in evaluating BLM's great gray owl disclosures in the

REA, the Magistrate Judge focused not on the great gray owl as a species but rather on "the three

great gray owl sites located within the planning area that were buffered by the BLM in previous

timber sale planning efforts."   F&R at 7.   Likewise, in evaluating BLM's great gray owl

disclosures in the 2016 RMP EIS, the Magistrate Judge too-narrowly assessed the agency's

disclosures through the lens of the "great gray owls within the" Griffin Half Moon Project area.

F&R at 9.   By focusing on individual owls rather than the great gray owl as a species, the

Magistrate Judge erred and erroneously found BLM's NEPA disclosures wanting.

Page-12 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

2.     **The Magistrate Judge Erred by Failing to Distinguish Between Substantive and Procedural Obligations When Evaluating BLM's Great Gray Owl NEPA Disclosures.**

Second, it is black letter law that NEPA is a purely procedural statute.   *Robertson*, 490 U.S. at 350.    Despite acknowledging the procedural nature of NEPA, F&R at 5, the Magistrate Judge's discussion of KSWild's great gray owl NEPA claim impermissibly blurred the line between procedural and substantive requirements.   *See, e.g.*, F&R at 6 (describing the claim as stemming from an alleged failure "to implement appropriate measures to protect great gray owls"); F&R at 7 (wrongly describing defendants as having defended the NEPA claim by arguing "the Project includes sufficient protections for great gray owls"); F&R at 8 (observing that survey and manage measures formerly "protected the great gray owl" but then stating in error that the 2016 RMP "eliminated substantive protections for great gray owls"); F&R at 9-10 (contradicting itself when acknowledging that the 2016 RMP *does* "provide[] explicit protections to great gray owls" in the form of extensive habitat reserves, but then dismissing the relevance of disclosures regarding the 2016 RMP's reserve network because "the Project is not located in this late successional reserve land use allocation").

NEPA does not require BLM to protect the great gray owl or any other species – it is not a substantive statute.   The Magistrate Judge's repeated references to "protecting" the great gray owl thus reflect the improper imposition on BLM of a substantive obligation not found in NEPA. Governing case law is clear that it is impermissible under NEPA to impose an obligation on an agency where such obligation is not found in the statute.    For example, in the Ninth Circuit's seminal *McNair* opinion, an en banc panel held that a requirement – affirmatively addressing uncertainties in a project's EIS – could not be engrafted onto NEPA's purely procedural "hard

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

look" requirement where neither the statute nor its implementing regulations imposed such an obligation.  *McNair*, 537 F.3d at 1001.   By blurring the line between procedural disclosures regarding the great gray owl and substantive measures to protect individual owls, the Magistrate Judge erred and erroneously found BLM's NEPA disclosures wanting.

### 3.   The Magistrate Judge's Great Gray Owl NEPA Determination Also is Undermined by Multiple Erroneous Statements.

Third, the Magistrate Judge's great gray owl NEPA determination is undermined further by various erroneous factual and legal statements.

For example, the F&R both chides BLM for the 2016 RMP's alleged failure to protect the great gray owl while subsequently acknowledging that the 2016 RMP does in fact protect the species.  *Compare* F&R at 8 (stating in error that when BLM's 2016 RMP discontinued the Northwest Forest Plan's survey and manage measures, the "RMP eliminated substantive protections for great gray owls") *with* F&R at 9 (acknowledging that the 2016 RMP "provides explicit protections to great gray owls by delimiting enhanced reserve lands").   And as described above in connection with the improper delineation between procedural and substantive obligations, the Magistrate Judge's apparent concern that the Project insufficiently "protects" the great gray owl infuses a substantive obligation into a NEPA analysis where none exists.

Similar to the above, the F&R incorrectly describes the great gray owl as a "precarious species," F&R at 10, when it is no such thing.   The briefing in this case referred the Magistrate Judge to the record which shows that the great gray owl, though uncommon, "enjoys a wide distribution in Oregon."   AR_013148 (Birds of Oregon 322).   To the extent the Magistrate Judge was echoing KSWild's equally incorrect suggestion during briefing that the great gray

owl's viability was questionable, there is no "viability" requirement on these BLM lands. Under the former Northwest Forest Plan, the concept of "viable" populations derived from the Forest Service's species viability requirement, a requirement that itself derived from the National Forest Management Act which is inapplicable to BLM.   AR_007214-15 (2016 RMP EIS 21-22). BLM informed the public in the EIS for the 2016 RMP that the maintenance of species viability was "not a part of the purpose for this RMP revision.   There is no comparable regulation for maintaining 'viable populations' in the BLM's regulations implementing the FLPMA or O&C Act," AR_007215 (2016 RMP EIS 22), let alone in procedural NEPA.

Further, the F&R suggests BLM was required to provide a more detailed great gray owl effects analysis because some members of the public expressed strong feelings for the species. F&R at 10 (describing the great gray owl as being "subject to high public interest" before concluding that BLM's NEPA disclosures were insufficient).   Public interest in a species does not dictate the level of detail in a NEPA effects analysis.   It is up to BLM, not the public, to determine which issues specific to a particular project warrant more detailed analysis.   During the scoping process, BLM was tasked with identifying and eliminating "from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect . . . or providing a reference to their coverage elsewhere." 40 C.F.R. § 1501.7(a)(3).   When public comments asked BLM to analyze a stand-alone alternative "that would avoid heavy thinning or regeneration harvest in treatment units that were previously deferred" under survey and manage measures for the great gray owl, BLM explained why it declined to do so, i.e., because the 2016 RMP's approach to land management, which

Page-15 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

employs a "larger Late-Successional Reserve network" than did the former Northwest Forest

Plan with its survey and manage measures, obviated the need for such a discussion of effects.

AR_003274 (Revised EA 57).

 Additionally, the F&R wrongly criticizes the Project for being located not in a reserve

land allocation, where an extensive network of lands has been set aside for species like the great

gray owl, but rather in the Harvest Land Base.   F&R at 10.   Of course the Project is located in

the Harvest Land Base – the Harvest Land Base is the only place the Project could be located

since the majority of lands governed by the 2016 RMP are set aside as wildlife reserves where

timber harvest is off limits.   The Harvest Land Base comprises the small subset of timberlands

set aside by BLM for sustained-yield timber production, not wildlife protection.   The Project's

necessary location in the Harvest Land Base does not render immaterial disclosures in the REA

and the 2016 RMP EIS regarding the 2016 RMP's system of habitat reserves.   The REA and the

2016 RMP EIS to which it tiered fully disclosed the workings of the 2016 RMP's network of

habitat reserves for the benefit of species like the great gray owl, regardless of where individual

members of the species are located.   When the NEPA inquiry is properly framed as focusing on

effects to the species, it simply is not true that the 2016 RMP EIS's disclosures regarding the

"Reserve Network land allocation" are "irrelevant to the specific effects of the Project."   F&R at

10.

 Finally, as noted above in the Project Overview section describing the Griffin Half Moon

Project and Timber Sale, the Magistrate Judge's analysis appears premised on the mistaken

belief that the timberlands at issue are subject to multiple use management.   F&R at 2.   They

are not.   Although FLPMA generally embodies multiple use goals, those multiple use goals are

Page-16 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

subservient to the O&C Sustained Yield Act's timber production dominant use:

> FLPMA specifically provides that if there is any conflict between its provisions and the O&C Act related to management of timber resources . . . the O&C Act prevails (i.e., takes precedence) (43 U.S.C. 1701 note (b)).   Thus, **the multiple-use management direction of the FLPMA does not apply to the O&C lands that are suitable for timber production**.

AR_007199 (2016 RMP EIS 6) (emphasis added).   The Magistrate Judge nowhere acknowledged that the timberlands in the Griffin Half Moon Project and Timber Sale are O&C Sustained Yield Act acres suitable for timber production.   In fact, the F&R suggested just the opposite at the outset, F&R at 2, by setting forth FLPMA's general multiple use goals which are irrelevant in this case.

By infusing the F&R with erroneous statements like those identified above, the Magistrate Judge erred and erroneously found BLM's NEPA disclosures wanting.

**B.    Contrary to the Magistrate Judge's Determination, BLM Took the Requisite NEPA "Hard Look" at Potential Project Impacts on the Great Gray Owl.**

BLM took a NEPA "hard look" at Project impacts on the great gray owl, including by tiering to the environmental analyses for the 2016 RMP and then explaining in the REA the agency's reasonable conclusion that further detailed consideration of potential Project impacts on the species was not warranted.   It helps to start by examining the great gray owl analysis in the 2016 RMP EIS, keeping in mind that the great gray owl is not a special status species, and that no law requires BLM to protect individual great gray owls in the Project area.   AR_003172 (Decision Record – Attachment 1 at 3).   *See also* AR_006592 (2016 RMP 314) (special status species are those that are ESA listed or proposed for listing, ESA candidate species, state-listed species, or Bureau Sensitive Species).

Page-17 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

The 2016 RMP moved away from the former Northwest Forest Plan's survey and manage measures for good reason.[4]   The 2016 RMP's approach to land management instead features "a larger Late-Successional Reserve network than" was provided for under the Northwest Forest Plan (which was the No Action alternative during the NEPA process for the 2016 RMP), and the protection of "older and more structurally-complex forests."   AR_006306 (2016 RMP 28).   Structurally-complex forests comprise "high-quality habitat" for former survey and manage species like the great gray owl.   AR_008066 (2016 RMP EIS 848).   The 2016 RMP protects this habitat from timber harvest, unlike the Northwest Forest Plan which did not. *Id.*   In addition, "the acreage of Mature and Structurally-complex forest (which is a broader category than older and more structurally-complex multi-layered conifer forests) in the decision area would increase over time," *id.*, more so under the 2016 RMP than under the former Northwest Forest Plan.   AR_008067 (2016 RMP EIS 849) (illustrated by Figure 3-150).   This habitat type also supports former survey and manage species like the great gray owl. AR_008066 (2016 RMP EIS 848).

During development of the 2016 RMP, BLM disclosed that the great gray owl was a survey and manage species under the Northwest Forest Plan.   AR_008064 (2016 RMP EIS

---

[4]   The Northwest Forest Plan's survey and manage measures were mitigation measures that applied to about 400 species within the range of the northern spotted owl.   *Conservation Northwest v. Rey*, 674 F. Supp. 2d 1232, 1238 (W.D. Wash. 2009) (discussing the history of the survey and manage requirements), *rev'd*, 715 F.3d 1181 (9th Cir. 2013).   Survey and manage species were not organisms listed as threatened or endangered under the ESA, nor were survey and manage measures designed to guarantee species persistence.   Rather, survey and manage measures were applied to species that were apparently uncommon, or about which the agencies lacked sufficient information to know whether other Northwest Forest Plan provisions sufficiently protected them.   *Id.*

846).    BLM also disclosed that an earlier analysis (conducted by the Forest Service and BLM

prior to development of the 2016 RMP with its intensive habitat preservation approach to land

management) had determined that without the survey and manage measures, the great gray owl

"would be likely to have sufficient habitat rangewide [to support stable populations] but

insufficient habitat in a portion of [its] range (USDA FS and USDO BLM 20017)."    *Id.    See*

*also* AR_008065 (2016 RMP EIS 847) (explaining that the determination necessarily assumed

the "land use allocations of the Northwest Forest Plan" since the analysis predated development

of the 2016 RMP).    But the impetus for investigating whether there was sufficient habitat to

support stable populations derived from a Forest Service requirement that did not apply to BLM.

As mentioned above, it derived from the Forest Service's species viability requirement, a

requirement that in turn derived from the National Forest Management Act, a statute inapplicable

to BLM.    AR_007214-15 (2016 RMP EIS 21-22).    BLM thus plainly informed the public in the

2016 RMP EIS that the maintenance of species viability was not a "purpose for this RMP

revision."    AR_007215 (2016 RMP EIS 22).

Still, BLM explained it was "possible to evaluate where known [great gray owl] sites

occur and how habitat would change over time" under the 2016 RMP.    AR_008065 (2016 RMP

EIS 847).    In fact, BLM's NEPA analysis for the 2016 RMP revealed that under the agency's

new land management approach, far more of the known great gray owl sites[5] on BLM lands

---

[5]    BLM explained that for the great gray owl, the number of known owl sites was "the number
of fauna observations in GeoBOB [BLM's Geographic Biologic Observations regional database,
*see* AR_007716 (2016 RMP EIS 523)]."    AR_008945 (2016 RMP EIS 1590).    The number of
fauna observations was used "an indicator of relative differences among the alternatives and the
Proposed RMP."    *Id.*

Page-19  **DEFENDANT-INTERVENOR'S OBJECTIONS
TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

would fall within protected habitat reserves compared with the Northwest Forest Plan.
AR_008065-66 (2016 RMP EIS 847-48).   In other words, more of the habitat used by this
species based on known observations would be protected under the 2016 RMP then under the
former Northwest Forest Plan.   The difference was striking – out of 1,228 known sites, 800 are
in protected reserves under the 2016 RMP, whereas only 247 of the sites would have been
located in reserves under the Northwest Forest Plan.   AR_008944 (2016 RMP EIS 1689) (Table
S-36, illustrated by the no action alternative).   *See also* AR_008938 (2016 RMP EIS 1683)
(showing that by 2063, great gray owl habitat is projected to increase to 64,255 acres compared
with the 45,157 acres of existing habitat in 2013, an increase of 142%).   In short, the 2016 RMP
protects "most of the existing habitat for Survey and Manage species and would result in an
increase in the total amount of habitat [for such species] over time."   AR_008068 (2016 RMP
EIS 850).

    BLM's REA for the Griffin Half Moon Project explained the agency's reasonable
conclusion that further detailed consideration of potential Project impacts on the great gray owl
was unwarranted.   *Cf.* F&R at 3-4 (erroneously stating that "[t]he REA does not mention great
gray owls").   In the REA's discussion of alternatives and actions considered but not analyzed in
further detail, BLM disclosed it had considered avoiding "heavy thinning or regeneration harvest
in treatment units that were previously deferred [under Northwest Forest Plan survey and
manage measures] to protect known great gray (GGO) owl sites."   AR_003274 (REA 57).   But
BLM explained that survey and manage measures are not part of the 2016 RMP, which instead
employs a large network of habitat reserves for the benefit of species like the great gray owl.   *Id.*
BLM candidly acknowledged that "timber harvest can threaten GGO habitat."   AR_003341

(REA B-4).   But it pointed out that the 2016 RMP "allocates a large LSR Network that accomplishes the goal of protecting older and more structurally-complex forests, and provides management for species such as the GGO (USDO BLM 2016b, pp. 27-28)."   *Id.*   Indeed, the 2016 RMP includes 75% of BLM lands in some form of reserve land allocation.   AR_008068 (2016 RMP EIS 850).   Put simply, BLM fully disclosed that the 2016 RMP's large reserve network would protect the great gray owl as a species by protecting its habitat, while the Harvest Land Base/O&C Sustained-Yield Act acres in the Project area would provide for timber production, not wildlife conservation.

Ultimately, BLM reasonably concluded that Project impacts on the great gray owl did not need to undergo further detailed consideration.   The management of great gray owl sites "previously protected as no harvest buffers under [survey and manage measures] has been decided under" the 2016 RMP.   AR_003172 (Decision Record – Attachment 1 at 3).   BLM's analysis of potential effects on the great gray owl was "completed within the context of the 2016 ROD/RMP and tiers to the 2016 PRMP/FEIS.   [The Finding of No Significant Impact] is consistent with the 2016 ROD/RMP and the anticipated effects are within the scope, type, and magnitude of effects anticipated and analyzed int eh 2016 ROD/RMP."   AR_003187 (Finding of No Significant Impact 9).

Because the land management direction for the Project's Harvest Land Base and O&C Sustained Yield Act acres was decided in the 2016 RMP, analyzing potential impacts on great gray owl sites previously excluded from harvest by survey and manage measures "would not have provided the Authorized Officer an opportunity to make a better-informed decision." AR_003172 (Decision Record – Attachment 1 at 3).   Again, BLM concluded in its NEPA

analysis for the 2016 RMP that implementing the agency's forest management program as a whole still would protect "most of the existing habitat for Survey and Manage species and would result in an increase in the total amount of habitat [for such species] over time."   AR_008068 (2016 RMP EIS 850).   BLM thus took the necessary NEPA hard look at the Project's potential impacts on the great gray owl as a species, which is the proper focus under NEPA.   *EPIC*, 451 F.3d at 1010 ("NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species.").   This Court should afford BLM's decision substantial deference upon review, reject the Magistrate Judge's great gray owl determination, and uphold the Project's great gray owl disclosures as sufficient under NEPA.

II.    **The Magistrate Judge's Factually-Erroneous Dictum Regarding the 2016 RMP Should Not be Adopted.**

The foregoing demonstrates that BLM took the requisite NEPA "hard look" at potential Project impacts on the great gray owl in the REA and in the 2016 RMP EIS to which the REA tiered.   The Court thus should reject the Magistrate Judge's great gray owl NEPA conclusion. But in addition, the Magistrate Judge offered a gratuitous statement in dictum regarding the 2016 RMP that should be rejected by this Court.   Specifically, the Magistrate Judge stated in dictum that "BLM has yet to explain to this Court why it declined to protect the great gray owl in the RMP . . . ."   F&R at 9.   This errant comment (which invites litigation mischief) should be rejected for at least three reasons.

First, whether BLM did or did not provide the Magistrate Judge with support for the 2016 RMP's substantive protections for the great gray owl is irrelevant in this case.   KSWild did not challenge the 2016 RMP's treatment of the great gray owl.   A simple examination of KSWild's

Page-22 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

complaint confirms that KSWild did not raise a substantive challenge to the 2016 RMP's land management strategy.    Rather, KSWild's two NEPA claims focused narrowly on the Project's allegedly inadequate NEPA disclosures regarding Project impacts on the fisher and the great gray owl.

Second, as discussed above, the Magistrate Judge acknowledged that the 2016 RMP *does* protect the great gray owl by employing an improved, non-Northwest Forest Plan land management approach.    F&R at 9-10 ("The RMP provides explicit protections to great gray owls by delimiting enhanced reserves lands, a provision expected to increase the species' habitat over time.").    The 2016 RMP's approach to land management has withstood the test of litigation by these very plaintiffs.    Indeed, even if KSWild had brought a claim against the 2016 RMP, which it did not, the Ninth Circuit already rejected KSWild's challenge to the 2016 RMP's new and improved, non-Northwest Forest Plan approach to managing BLM lands in southwestern Oregon.    Again, KSWild unsuccessfully challenged the 2016 RMP on the grounds that BLM had failed to provide a reasoned explanation for replacing Northwest Forest Plan protections (which include the survey and manage measures) with a different land management approach. The Ninth Circuit rejected that challenge, instead confirming that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it promulgated the 2016 RMP.    *Pacific Rivers*, 2020 WL 2510759, at *2.    This issue has been decided conclusively in BLM's favor.

Third, the briefing in this case *did* provide the Magistrate Judge with the very explanation found wanting, even though the issue was not directly before the Magistrate Judge and hence need not have been addressed.    The briefing plainly reiterated for the Magistrate Judge why the

2016 RMP rationally replaced the Northwest Forest Plan's survey and manage measures with a different and better land management approach involving a larger network of late-successional reserve habitat for the benefit of species like the great gray owl.   *See, e.g.*, Murphy Company Opening Brief, ECF No. 40, at 13-16.   The Magistrate Judge appears to have wholly ignored Murphy Company's informational argument, which is set forth below for the Court's convenience.

The record shows that BLM satisfied the so-called *Fox* factors when it moved away from the Northwest Forest Plan in the 2016 RMP.   *See generally F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency may lawfully change course so long as the agency is aware of its policy change, which is itself statutorily permissible, coupled with the agency believing the policy change is better and offering "good reasons for the new policy"). The Ninth Circuit has articulated the four *Fox* requirements for an agency's lawful policy change as follows:   "the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy."   *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).

First, BLM made a conscious change of course to adopt a different land management strategy in the 2016 RMP.   BLM explicitly stated in the 2016 RMP EIS that "this RMP revision would replace the 1995 RMPs and thereby replace the Northwest Forest Plan for the management of BLM-administered lands in western Oregon."   AR_007214 (2016 RMP EIS 21).   BLM specifically addressed its departure from the survey and manage measures, explaining that by adopting the 2016 RMP, BLM no longer needed survey and manage measures

Page-24 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

"to protect species associated with older and more structurally-complex forests.   This is because the purpose of this RMP revision includes maintaining older and more structurally-complex multi-layered conifer forests . . . ."   AR_007215 (2016 RMP EIS 22).   *See also* AR_006305 (2016 BLM RMP 27) (acknowledging that its new approach to land management would not include the Northwest Forest Plan's survey and manage measures).   Thus, like the FCC in *Fox*, BLM's awareness of its changed position was abundantly clear.   *Fox*, 556 U.S. at 517 (observing that FCC "forthrightly acknowledged that its recent actions have broken new ground," thereby demonstrating awareness of the agency's changed position).

Second, it was wholly permissible for BLM to develop a new land management approach.   The governing statute, FLPMA, 43 U.S.C. § 1701 et seq., did not require BLM to manage the public lands in western Oregon under the Northwest Forest Plan.   Rather, FLPMA generally directs BLM to "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a), leaving the contents of such RMPs to the discretion of the agency within the sideboards identified in the statute.   *Id.* § 1712(c) (listing criteria for RMP development and revision).   *See also* 43 C.F.R. § 1601.0-1 to 1601.0-8 (setting forth the process and principles for developing and revising RMPs); AR_007213 (2016 RMP EIS 20) (explicitly stating that the Northwest Forest Plan "did not change the authority of the BLM, provided under the FLPMA and its promulgating regulations, for amending or revising RMPs").

Third, by consciously adopting the 2016 RMP, BLM demonstrated its belief that the new land management approach embodied therein is a better approach to resource management.   The Ninth Circuit explained in *Organized Village of Kake* that reviewing courts assume the existence of this factor based on the agency's intentional decision to take the challenged action.   795 F.3d

Page-25 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

at 967 (citing *Fox*, 556 U.S. at 515).    The commonsense basis for this assumption is that "the conscious change of course adequately indicates" the agency's belief that the new approach is better.    *Fox,* 556 U.S. at 515.

Fourth, BLM provided good reasons for the 2016 RMP's different and better non-Northwest Forest Plan approach to land management.    For example, BLM explained that the "purpose and need for this RMP revision clearly identified new scientific information that the Northwest Forest Plan did not address; the alternatives in the Draft RMP/EIS address this new scientific information."    AR_009095 (2016 RMP EIS 1840).    With respect to survey and manage measures in particular, BLM explained it would not need such measures because:

> the purpose of this RMP revision includes maintaining a network of large blocks of forest . . . . All action alternatives and the Proposed RMP therefore allocate a Late-Successional Reserve network, where sustained-yield timber harvest would not occur, that is larger than what is provided in the Northwest Forest Plan and broadly encompasses "old-growth forests."    Each alternative and the Proposed RMP would more than sufficiently address maintenance of older and more structurally-complex forests, without the need for additional mitigation like that provided by Survey and Manage.

AR-007215) (2016 RMP 22).    BLM thus offered good, "entirely rational," reasons for its new approach to land management.    *Fox*, 556 U.S. at 517.

The Ninth Circuit confirmed that "BLM . . . provided a 'reasoned explanation' for any change in its management approach" when it departed from the Northwest Forest Plan with its survey and manage measures through adoption of the 2016 RMP.    *Pacific Rivers*, 2020 WL 2510759, at *2.    Contrary to the Magistrate Judge's dictum, F&R at 9, the agency was not required to revisit the 2016 RMP's decision to move away from survey and manage measures when analyzing the potential impacts of the Project.    Because site-specific projects must be

consistent with the governing RMP, 43 C.F.R. § 1610.5-3(a), the Griffin Half Moon Project necessarily did not revisit BLM's prior programmatic decision.    It would have been improper and nonsensical for BLM to have done so when disclosing potential Project impacts on the great gray owl.

At the outset of this section, Murphy Company observed that the Magistrate Judge's errant comment offered in dictum invites litigation mischief.   It does.   As explained above, *see supra* note 4, the Northwest Forest Plan's survey and manage measures were mitigation measures that applied to about 400 species within the range of the northern spotted owl. *Conservation Northwest v. Rey*, 674 F. Supp. 2d 1232, 1238 (W.D. Wash. 2009), *rev'd*, 715 F.3d 1181 (9th Cir. 2013).   The Magistrate Judge's dictum could be read by some potential future litigants as an invitation to pick one of the 400 or so former survey and manage species as the species on which to challenge a BLM land management project on the grounds that BLM failed "to explain . . . why it declined to protect the" species du jour.   F&R at 9.   Not only would such a moving-target approach to BLM land management be bad for renewable natural resources and the people and communities who rely on congressionally-mandated timber sale offerings from these public lands, but it also would do no favors to the Court's docket and judicial resources.   It also would be wholly unwarranted given the Ninth Circuit's prior upholding of the 2016 RMP's approach to land management.

For all of these reasons, the Magistrate Judge's dictum should be rejected.

III.    **Alternatively, Murphy Company is Open to Exploring a Mediated Settlement of this Case.**

In the alternative, Murphy Company is open to exploring a mediated settlement of this

Page-27 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

case that would obviate the need for the Court to reject the Magistrate Judge's F&R as to the

great gray owl along with the Magistrate Judge's errant dictum regarding the 2016 RMP.

Murphy Company offers this suggestion given its desire to engage in economically productive

activities by harvesting timber from lands in the Project area that are dedicated by Congress to

sustained-yield timber production, so as to support its operations "in White City, Rogue River,

and Eugene, which collectively employ nearly 600 people."   Murphy Decl. ¶ 8 (also explaining

that Murphy Company's operations in the Project area would improve forest stand conditions).

Murphy Company presumes KSWild would be interested in exploring a mediated resolution

involving great gray owl habitat in the Project area given that its numerous declarations in this

case focused almost exclusively on the great gray owl.   *See, e.g.*, Declaration of Melvin N.

Clements, ECF No. 32 (testimony of retired law enforcement officer who photographs the great

gray owl); Declaration of Harry Fuller, ECF No. 33 (author and blogger who writes about the

great gray owl); Declaration of Pepper W. Trail, ECF No. 38 (ornithologist who penned a poem

about the great gray owl).   Murphy Company stands ready to negotiate in good faith, should the

Court support the concept of exploring a possible mediated settlement.

///

///

///

Page-28 **DEFENDANT-INTERVENOR'S OBJECTIONS TO F&R**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

## CONCLUSION

Based on the foregoing, and for the reasons set forth in BLM's objections, Murphy Company respectfully asks the Court to reverse the Magistrate Judge's F&R on the issue of the Griffin Half Moon Project's NEPA compliance with respect to the great gray owl.   The Court should conclude that the Project's analysis satisfied NEPA's requirement to disclose potential Project impacts on the great gray owl.   The Court otherwise should adopt and uphold the Magistrate Judge's F&R under NEPA and enter summary judgment in favor of Murphy Company and BLM on both of KSWild's claims.

RESPECTFULLY SUBMITTED this 26th day of February, 2021.

**HAGLUND KELLEY LLP**

By:____/s/ Julie A. Weis_____
    Julie A. Weis, OSB No. 974320
    Michael E. Haglund, OSB No. 770230
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor Murphy Company

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of February, 2021, I served the foregoing

**DEFENDANT-INTERVENOR'S OBJECTIONS TO FINDINGS AND**

**RECOMMENDATION** with the Clerk of the Court using the CM/ECF system, which will send

notification of this filing to the attorneys of record and all registered participants.


/s/ Julie A. Weis
Julie A. Weis

**CERTIFICATE OF SERVICE**