SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
 (541) 778-6626 | Phone
sangyeij@westernlaw.org

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

|  |  |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, | Civ. Case No. 1:19-cv-02069-CL |
| *Plaintiffs,* | PLAINTIFFS' RESPONSE TO OBJECTIONS TO MAGISTRATE'S FINDINGS AND RECOMMENDATION |
| vs. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| *Defendant,* | |
| and | |
| MURPHY COMPANY, | |
| *Defendant-Intervenor.* | |

# TABLE OF CONTENTS

I.     INTRODUCTION. ................................................................................ 1

II.    STANDARD OF REVIEW. ................................................................. 1

III.   BACKGROUND. ................................................................................. 2

     A.    The National Environmental Policy Act (NEPA). ............................. 2

     B.    Federal Land Policy and Management Act (FLPMA). ..................... 6

     C.    Great Gray Owl (*Strix nebulosa*). ................................................... 8

IV.   MAGISTRATE CLARKE'S FINDINGS AND RECOMMENDATION
     REGARDING GREAT GRAY OWLS SHOULD BE AFFIRMED. ...................... 16

     A.    A.The Griffin Half Moon Project Violates the National Environmental Policy
     Act Because the BLM Failed to Consider the Project's Direct, Indirect, and
     Cumulative Effects on Great Gray Owls. ............................................... 17

     B.    Tiering to the 2016 Resource Management Plan Cannot Cure BLM's Failure
     to Consider the Direct, Indirect, and Cumulative Effects of the Griffin Half
     Moon Project on Great Gray Owls. ................................................... 23

     C.    Magistrate Judge Clarke Did not Inappropriately Graft a Substantive
     Requirement onto NEPA's Procedural Provisions. ......................... 28

V.    THIS MATTER IS NOT SUITABLE AT THIS JUNCTURE FOR
     SETTLEMENT. ................................................................................. 30

VI.   CONCLUSION. ................................................................................. 31

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)........................................................ 21

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) .................................. 3, 17, 19, 25

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983).................................. 3

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ........... passim

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013).......................... 21

*Conservation Nw. v. Rey*, 674 F.Supp.2d 1232 (W.D. Wash. 2009)..................................... 12, 25

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) . 4, 25

*Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ...................................... 16

*Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922 (9th Cir. 1999)............................ 5

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006)........................... 21, 22

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir. 2003)........................ 4

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) .............................. 5

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) ......... 24

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002).......................................... 4

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ...................... 17

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002).................. 21

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006)............................. 5

*Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380 (9th Cir. 1953)............................ 11

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)....................... 2

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................................. 3

*Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 2014 WL 525116 (D. Or. 2014)...... 4

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004) ........................ 24, 27, 28

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ................................................ 17, 24, 25

*Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279 (9th Cir. 1986) ............................................ 11

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) .................................................................. 16

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) ............................ 20

*Mullis v. U.S. Bank. Ct.*, 828 F.2d 1385 (9th Cir. 1987)) ............................................................. 11

*N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886 (9th Cir. 1992) ........................................................ 5

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ................... 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) ..................... 4

*Native Ecosystem Council v. Judice*, 2019 WL 1131231 (D. Mont. 2019) .................................. 26

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) ........................ 22

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003 (D. Alaska 2020) .. 25, 26

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ......... 11

*Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) ......................... 21

*Olmstead v. United States*, 277 U.S. 438 (1928), *overruled in part by Berger v. State of New York*, 388 U.S. 41 (1967), *and overruled in part by Katz v. United States*, 389 U.S. 347 (1967) ....................................................................................................................................... 31

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ............. 4, 16, 23

*Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007) ...................................... 18

*Oregon Wild v. Bureau of Land Mgmt.*, 2015 WL 1190131 (D. Or. 2015) .................................. 21

*Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012 (9th Cir. 2012), *vacated*, 570 U.S. 901 (2013) ..................................................................................................................................... 21

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) ............................................... 5

iii

*Portland Audubon Soc. v. Lujan*, 795 F. Supp. at 1506, *modified* 1992 WL 176353 (D. Or. July 16, 1992), *and aff'd sub nom. Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993) ................................................................................................................ 6, 8

*Presley v. Etowah County Comm'n*, 502 U.S. 491 (1992) ............................................. 4

*Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) ........................................ 5

*Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991), *aff'd sub nom. Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir. 1991) ......................................... 30

*Ursack, Inc. v. Sierra Interagency Black Bear Group*, 2009 WL 2422784 ( N.D. Cal. 2009) .... 11

## Federal Statutes

5 U.S.C. § 706 ................................................................................................................ 2

28 U.S.C. § 636(b)(1)(C) .............................................................................................. 2

42 U.S.C. § 4332(2)(C) ................................................................................................ 2

43 U.S.C. § 1701 .......................................................................................................... 6

43 U.S.C. § 1701 note (b) ............................................................................................. 7

43 U.S.C. § 1701(a)(2) ................................................................................................. 6

43 U.S.C. § 1701(a)(8) ................................................................................................. 6

43 U.S.C. § 1712 .......................................................................................................... 6

43 U.S.C. § 1732 .......................................................................................................... 6

43 U.S.C. § 2601 ....................................................................................................... 6, 7

## Federal Regulations

40 C.F.R. § 1508.28 ...................................................................................................... 5

40 C.F.R. § 1508.7 ................................................................................................ 4

40 C.F.R. § 1508.8 ........................................................................................... 4, 20

40 C.F.R. § 1508.8(a) ........................................................................................... 4

40 C.F.R. § 1508.8(b) ........................................................................................... 4

40 C.F.R. §§ 1501.3, 1501.4 (1978) .................................................................. 14

43 C.F.R. § 1610.5-3(a) ........................................................................................ 6

**Miscellaneous**

DICTIONARY OF FORESTRY (1st ed. 1998) ............................................................ 13

FED. R. CIV. P. 56(a) ............................................................................................. 1

FED. R. CIV. P. 72(b)(3) ........................................................................................ 2

Pub. L. 94-579 (1979) ....................................................................................... 6, 7

U.S. Department of the Interior, Bureau of Land Management, Oregon, and U.S. Department of
     Agriculture, Forest Service Regions 5 and 6, *Survey protocol for great gray owl (Strix
     nebulosa) within the range of the Northwest Forest Plan, Version 4.0* (April 20, 2020),
     https://www.fs.fed.us/r6/sfpnw/isssp/documents4/sp-bi-strix-nebulosa-20171017.pdf .......... 11

## I.    INTRODUCTION.

In his Findings and Recommendation, Magistrate Judge Clarke thoroughly evaluated the Bureau of Land Management's (BLM) compliance with the National Environmental Policy Act (NEPA) with respect to the agency's analysis of the Griffin Half Moon Project's direct, indirect, and cumulative effects on great gray owls. Magistrate Clarke correctly concluded that because neither the Project's Revised Environmental Assessment (REA) nor the agency's resource management plan (RMP) contained an analysis of the Project's effects on this charismatic resident of the Project area, that BLM violated the law.

Neither BLM nor Murphy Company (Murphy) raise any factual or legal errors committed by Magistrate Clarke in reaching his Findings and Recommendation. Instead, the opposing parties flyspeck the opinion, quibbling with isolated phrases or perspectives with which the opposing parties clearly disagree. But simply because plaintiffs Klamath-Siskiyou Wildlands Center et al (KS Wild) has the better legal argument in this case does not render Magistrate Clarke's Findings and Recommendation erroneous. Instead, the administrative record in this case is clear: the BLM simply never considered how the Griffin Half Moon Project would affect great gray owls. No amount of flyspecking can create an adequate NEPA analysis where one does not exist. Consequently, Magistrate Judge Clarke's Findings and Recommendation (F&R) should be affirmed.

## II.    STANDARD OF REVIEW.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[1] Judicial

---

[1] BLM raises an objection that Magistrate Judge Clarke's citation to the Federal Rules of Civil Procedure and the well-accepted standard of review on summary judgment was somehow inappropriate. BLM, 15. While it is true that in record review cases such as this that a court need

review of agency actions under the Federal Land Policy and Management Act (FLPMA) and

NEPA and their implementing regulations is governed by the Administrative Procedure Act

(APA). 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir.

2012). Under the APA, "[t]he reviewing court shall...hold unlawful and set aside agency action,

findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

      This Court reviews de novo the portions of a Magistrate Judge's findings and

recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(C). This Court "may accept,

reject, or modify, in whole or part the findings and recommendations made by the magistrate

judge," and "may also receive further evidence or recommit the matter to the magistrate judge

with instructions." *Id.*; *see also* FED. R. CIV. P. 72(b)(3).

**III.**        **BACKGROUND.**

      **A.**      **The National Environmental Policy Act (NEPA).**

      Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all

federal agencies to assess the environmental impact of proposed actions that may significantly

affect the quality of the environment. 42 U.S.C. § 4332(2)(C). The Council on Environmental

Quality (CEQ) promulgated regulations binding on all federal agencies, including the BLM. It is

black letter law that "the National Environmental Policy Act has twin aims. First, it places upon

[a federal] agency the obligation to consider every significant aspect of the environmental impact

of a proposed action. Second, it ensures that the agency will inform the public that it has indeed

considered environmental concerns in its decisionmaking process." *Kern v. Bureau of Land*

---

not inquire into "facts" because they are found in the administrative record prepared by the
agency, Magistrate Clarke's citation to the Federal Rules does not undermine his legal
conclusions.

*Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (*quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)) (internal quotation marks omitted). Thus, the "purpose" of NEPA is to apprise the public, not just agency decision makers, of the environmental consequences of a federal action. *Id*.

Federal defendants and intervenors disagree, arguing that in this case, the disclosure and discussion of the effects of the Griffin Half Moon timber sale on great gray owls is not required because this analysis "would not assist [BLM] in making a better-informed decision." BLM, 8, 19-21; Murphy, 21. But the BLM is not the only target for an informed environmental analysis: NEPA also requires the BLM to "*inform the public* that it has indeed considered environmental concerns in its decisionmaking process." *Kern*, 284 F.3d at 1066 (emphasis added). In this case, the BLM has failed to meet this obligation, instead relying on the environmental analysis allegedly contained in the agency's 2016 final environmental impact statement (FEIS) supporting its revised Resource Management Plan (RMP). But as discussed *infra*, neither the RMP nor its FEIS contain any site-specific analysis of the localized effects of the Griffin Half Moon project on either great gray owls or Pacific Fisher, even though the public raised significant concerns about the Project's effects on these species throughout Project development.

For an agency's decision to be considered reasonable under NEPA, a decision record and finding of no significant impact (DR/FONSI) must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. Agency action is valid only if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). If the agency fails to take a "hard look" at the consequences of its action and consider important aspects of the

3

problem in its environmental assessment (EA), its decision is arbitrary and capricious. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010).

To support a determination of non-significance in an EA, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.8; *Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 2014 WL 525116, at *2 (D. Or. 2014); *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011). Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7.

Importantly, while courts will frequently defer to an action agency "when the agency is making predictions, within its special expertise, at the frontiers of science," *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003), self-serving agency determinations of NEPA adequacy do not enjoy similar deference. For example, deference is not owed when "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 799 (9th Cir. 2005) (internal citations omitted), and "deference does not mean acquiescence," *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508 (1992). Moreover, "the court owes no deference to the [BLM's] interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [BLM] alone." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002).

The CEQ NEPA regulations permit the "tiering" of site-specific environmental analysis to programmatic analysis in some cases:

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to statement subsequently prepared.

40 C.F.R. § 1508.28. The "broader environmental impact statement" is usually referred to as a "programmatic" analysis, which occurs for the Resource Management Plan and sometimes also for other types of decisions. In the context of federal forest management, the Ninth Circuit has explained that

> ...the programmatic stage [is] the level "at which the [agency] develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an environmental impact statement ('EIS'), and adopts an amendable forest plan to guide management of multiple use resources." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n. 2 (9th Cir. 1999). Following the programmatic stage is the "implementation stage during which individual site specific projects, consistent with the forest plan, are proposed and assessed." *Id*. A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (*quoting N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992) (quotation marks omitted)).

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). However, once an agency decides to implement a site-specific project, such as a timber sale, then the agency must consider the site-specific impacts of the action in that project's environmental analysis. *Id.* at 1095-96; *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006); *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1993). Indeed, "nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific [environmental analysis]." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

Importantly, while the Griffin Half Moon timber sale is located on Oregon and California (O&C) lands, nothing in the Oregon and California Lands Act (O&C Act), 43 U.S.C. § 2601, absolves BLM of its duties under NEPA: in fact, the opposite is true. *Portland Audubon Soc. v. Lujan*, 795 F. Supp. 1489, 1506 (D. Or. 1992) ("No language in [the O&C Act] empowers this court to exempt O&C lands from the requirements of NEPA"), *modified* 1992 WL 176353 (D. Or. July 16, 1992), *aff'd sub nom. Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993).

### B.    Federal Land Policy and Management Act (FLPMA).

Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq*. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values" and "will provide food and habitat for fish and wildlife" among other multiple uses. 43 U.S.C. § 1701(a)(8).

FLPMA requires the BLM to develop land use plans called "resource management plans" (RMPs) that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a). The BLM revised the southern Oregon RMP for the Ashland Resource Area of the Medford District in 2016. The southern Oregon RMP applies to the Griffin Half Moon timber sale.

In their Objections to Magistrate Judge Clarke's F&R, the BLM and Murphy argue that "the F&R erred because its analysis was premised on an inapplicable FLPMA land-management standard." BLM, 14; Murphy, 15.[2] Similarly, the parties complain that Magistrate Clarke "ignored" the fact that the lands at issue in this case are also managed according to the Oregon and California Lands Act of 1937 (O&C Act), which they argue undermines the Findings and Recommendation. BLM, 13-14; Murphy, 7, 16-17. These protestations are without merit. The Findings and Recommendation are premised on the fact that the Griffin Half Moon REA does not conduct an adequate NEPA analysis of the direct, indirect, and cumulative effects of the Project on great gray owls. F&R, 6-11. A review of these pages reveals that the Magistrate was focused on NEPA and its case law, not FLPMA. The Court also specifically acknowledged that the Project authorized "commercial timber harvest on lands formally designated for timber harvest in the BLM's 2016 Resource Management Plan (RMP) and the Oregon and California Lands Act, 43 U.S.C. § 2601, et seq." *Id.* at 2. There is nothing in the Court's analysis to suggest it was imputing some "inappropriate standard" on its review of the BLM's compliance with NEPA, or that it was unaware that the lands at issue are O&C lands.[3]

---

[2] Murphy points out that "there is no "viability" requirement on these BLM lands," Murphy, 15, which is accurate. But KS Wild has not alleged a species viability claim. It has argued, and the Magistrate correctly held, that the BLM has a NEPA obligation to assess the direct, indirect, and cumulative effects of the Griffin Half Moon Project on great gray owls. That the BLM's actions may result in the failure of great gray owls to persist in the planning area, AR 013960-61, while perhaps true, is a substantive issue not before the Court.

[3] BLM states that "FLPMA expressly provides that 'in the event of conflict with or inconsistency between' FLPMA and the O&C Act, the O&C Act 'shall prevail' over FLPMA regarding 'management of timber resources.' 43 U.S.C. § 1701 note (b), Pub. L. 94-579, section 701 (1976)." BLM, 14. BLM has neither argued nor demonstrated that there is in fact an actual conflict regarding the management of timber resources between FLPMA and the O&C Act in this case such that the O&C Act trumps the provisions of FLPMA pertaining to the provision of fish and wildlife habitat. And, even if BLM had demonstrated an actual conflict between the two laws, this is immaterial to compliance with NEPA, which is required regardless of the nature of land at issue. *Portland Audubon Soc. v. Lujan*, 795 F. Supp. at 1506, *modified* 1992 WL 176353

7

C.      **Great Gray Owl (*Strix nebulosa*).**

The great gray owl (*Strix nebulosa*) is a very large owl distinguished by its gray plumage; large, circular facial discs surrounding bright yellow eyes; and lack of ear tufts. Administrative Record (AR) 018293, 013961, 021675. Considered rare and the prognosis for their long-term survival and existence unclear, the great gray owl occurs at low densities within its range,[4] which includes the Griffin Half Moon planning area. AR 014023-30, 018293, 009359, 013158, 013168, 021675, 021907 ("populations of great gray owls are in peril (declining or experiencing some demographic trauma) or are likely to be in peril in the future given current land management practices"), 021910 ("researchers most aware of the owl's ecology in eastern and central Oregon and in California suggest that persistence of the species is less certain in these areas"), 021911 ("the loss of nesting habitat in central and eastern Oregon has been identified as the most immediate threat to great gray owl persistence in that region...determined management of nesting habitat should be a priority, without which local persistence of the species will be in jeopardy"). Scientific research on the species explains that "The overall North American Great Gray Owl long-term (>10 yr) population trend is unknown. There are no long-term, rigorous or standardized Great Gray Owl breeding population trend data on a range-wide, regional or local scale. There is circumstantial evidence that some local and/or regional populations have either remained stable, increased or decreased over periods of <10 yr>." AR 018294; *see also*, 009366, 013158, 021675 ("the great gray owl remains poorly understood...we have found no studies that

---

(D. Or. July 16, 1992), *and aff'd sub nom. Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993).

[4] Murphy argues that because the owl is widely distributed, that its conservation status is secure. Murphy, 15. Not according to the best available science. AR 012159–60 (discussing "population declines in great gray owl populations across their western range in the Sierra Nevada *and Pacific Northwest*") (emphasis added).

examine great gray owl population characteristics"), 021676, 021863 ("the Committee on the Status of Endangered Wildlife in Canada considers great gray owls vulnerable or a species at risk because of low or declining numbers") (internal quotations omitted).

Great gray owls require preexisting nest structures in forest stands that are adjacent to open foraging habitat, preferentially with hunting perches. AR 014029, 014023, 018295-96, 021681. The availability of nest sites and suitable foraging habitat are considered the most important factors limiting great gray owl populations. AR 018294, 021686. Great gray owls often nest in stick nests built by large corvids and diurnal raptors. AR 014023, 014026, 018295, 018297, 021909. These sites occur more frequently in older forest stands with larger trees. AR 014026, 018297, 009366, 021686, 021908-09. Great gray owls also make frequent use of nest boxes and artificial nests. AR 014029, 018295, 021681. "In Oregon, great gray owls typically nest in the same home range year after year (Bull et al. 1989a). They will change nest sites but usually move < 5 km. Some birds in Oregon stay in the same area year round if snow is not deep; others move to areas with less snow." AR 021687.

Shorter timber harvest rotation periods, overstory removal, and selective removal of large-diameter trees has reduced natural nest-site availability. AR 014026, 018292 ("Intensive timber management typically removes large diameter and deformed nest trees, leaning trees used by juveniles for roosting before they can fly and stands with dense canopy closure used by juveniles and adults for cover and protection"), 018295 ("forest management activities that reduce the number of nest sites (e.g., fire suppression, disease control, and shorter rotation periods) have the potential to reduce Great Gray Owl breeding densities"), 018297, 009366, 021686. Great gray owls most frequently nest in late-successional stands dominated by mature

and old growth Douglas fir or ponderosa pine located near natural forest edges. AR 014023, 014026, 021681, 021897-98, 021908-09.

The southwestern Oregon great gray owl population is important to support the California population of great gray owls that are listed under the California Endangered Species Act. AR 009358, 013168, 013158, 012155, 005771-72, 021911. The Oregon population is a crucial link between the primary great gray owl range further north and the otherwise isolated population of California great gray owls, and is thus critical to the species long-term survival. AR 018296 ("Great Gray Owl population declines from ancestral levels have been reported in California (Winter 1986). These were attributed to habitat changes, e.g., fire suppression and overharvesting of forests"), 012155 ("The Sierra Nevada population of great gray owls may be at high risk of population decline or extinction due to a number of threats," making owls dispersing from Oregon important to the metapopulation); AR 005771-72, 021898 ("The similarities are so great between northeastern California's forest vegetation (Klamath N.F.) and that which occurs in Oregon's southcentral Cascades that Miller (1991) undertook a detailed habitat analysis to assess the great gray owl's status in the northern California extension of the Cascade Range but he found no owls occupying his California study site"), 021911.

Given the scientific concern about the species' persistence, in 1994 great gray owls were listed as a "Survey and Manage" species by the BLM and Forest Service, which required the federal land management agencies to survey for the species and protect it from disturbance with no-harvest buffers. The Northwest Forest Plan, of which the Survey and Manage Program is a part, states that "[s]pecific mitigation measures for the great gray owl, within the range of the northern spotted owl, include the following: provide a no-harvest buffer of 300 feet around meadows and natural openings and establish 1/4-mile protection zones around known nest sites,"

10

and required the development of a survey protocol by 1995. AR 021092. The great gray owl

survey protocol, which was developed by Medford District BLM wildlife biologist Steven

Godwin among others, currently states that after an owl site (either a pair or resident single) is

located,

> a 30 acre management area is delineated for nests or paired owls [or resident singles],
> covering the best potential habitat for the species. Within these 30 acres, management
> treatments are limited to the protection or improvement of nesting habitat. In addition, a
> ¼ mile protection zone is created around each nest/pair. Within this protection zone, a
> 300 ft buffer is established around meadows and natural openings greater than [or equal
> to] 10 acres. Within these buffers, treatments are limited to protection or improvement of
> nesting habitat.

U.S. Department of the Interior, Bureau of Land Management, Oregon, and U.S. Department of

Agriculture, Forest Service Regions 5 and 6, *Survey protocol for great gray owl (Strix nebulosa)*

*within the range of the Northwest Forest Plan, Version 4.0* (April 20, 2020),

https://www.fs.fed.us/r6/sfpnw/isssssp/documents4/sp-bi-strix-nebulosa-20171017.pdf, at 31

(brackets in original).[5]

Between 1994 and 2016, the BLM prepared and implemented several timber sales in and

around the Griffin Half Moon planning area. AR 000001-1511. In conformance with its Survey

---

[5] The 2004 version of the survey protocol is available in the administrative record for the Griffin
Half Moon project, AR 013952-014003, but it was superseded by version 4.0 in 2016. *See also*,
AR 014029 (scientific publication recommending that due to new findings "a reassessment of the
current protocol used by the USFS and BLM to monitor Great Gray Owls in the Pacific
Northwest...seems appropriate"). The 2016 protocol, also developed in part by Medford District
BLM wildlife biologist Steven Godwin, is a government publication publicly available on a
government website, and therefore this Court may take judicial notice of its contents. *See Mack
v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986); *Mullis v. U.S. Bank. Ct.*, 828
F.2d 1385, 1388 (9th Cir. 1987*); Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380,
385 (9th Cir. 1953) (judicial notice of records of administrative bodies); *Ursack, Inc. v. Sierra
Interagency Black Bear Group*, 2009 WL 2422784, *6 ( N.D. Cal. 2009) (judicial notice of
agency materials posted on agency website); *New Mexico ex rel. Richardson v. Bureau of Land
Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of information on
government websites in APA case).

and Manage obligations at the time, BLM surveyed for, located, and protected with no-harvest buffers at least three great gray owl sites: Indian Highway, Howard 12, and Indian Access. *Id*.; AR 000055 (Howard 12 map), AR 000248 (Indian Access map). These sites completely or partially overlap with Griffin Half Moon timber sale units 12-1, 13-2, 13-3A, 13-3B, 13-4, and 15-1. *Compare id. with* AR 003159-61 (timber harvest units maps). The Griffin Half Moon timber sale includes logging units that were previously deferred as non-harvest wildlife buffers for the great gray owl pursuant to the Northwest Forest Plan's Survey and Manage program. AR 000001-1511, 000055, 000248.

In 2016, the BLM revised its RMP and jettisoned its participation in the Survey and Manage program. As a result, BLM is no longer required by its RMP to survey for and protect great gray owls. In reaching that decision, the BLM's final environmental impact statement (FEIS) supporting the 2016 RMP states that an earlier agency analysis[6] "identified that the great gray owl would be likely to have sufficient habitat rangewide, but insufficient habitat in a portion of its range, because it would not be included on the BLM or U.S. Forest Service sensitive species lists and protection of known nest sites was uncertain based on 'inconsistent' protections in individual management plans (USDA FS and USDI BLM 2007, pp. 285–286)." AR 008065-66. *These two pages represent the totality of the BLM's "analysis" of the RMP's effect on great*

---

[6] This analysis was successfully challenged in federal court as arbitrary, capricious, and not in accordance with law. *Conservation Nw. v. Rey*, 674 F.Supp.2d 1232 (W.D. Wash. 2009). BLM faults Magistrate Clarke for recognizing that the BLM's prior analysis was legally infirm, stating that "the F&R fails to acknowledge that that BLM made clear it was only relying on those portions of the prior analysis that were not invalidated." BLM at 33. While this is true in so far as it goes, counsel does not specify the import of this acknowledgement, which "portions of the prior analysis" were *not* invalided but are relevant here, or why the statement provides any grounds to reverse Magistrate Clarke's Findings and Recommendation. The point is that BLM has long recognized that the ability of great gray owls to persist is unknown, that the Project's activities are known to cause significant adverse effects, and yet BLM has failed to disclose how the Project will affect this species.

*gray owls.*[7] Moreover, the Griffin Half Moon timber sale is not located within reserve land use allocations: it is located within the Harvest Land Base.

The scientific literature on great gray owls has also examined the types of habitat manipulation that adversely affect the species and provided management recommendations. Regeneration[8] timber harvest removes suitable habitat for great gray owls, and the species does not use harvested areas for most of their life functions. AR 014028-29. Other "forestry practices that reduce the number of potential nest sites include the removal of diseased trees, removal of large trees, and forest stand alteration not compatible with the habitat requirements for nest-building species." AR 021686, 012159-60. The federal government's survey protocol for the great gray owl explains:

> The following activities are generally expected to result in significant negative effects on habitat, life cycle, microclimate or life support systems or persistence of Great Gray Owls at the project location.
>
> 1.  Activities that modify suitable nesting habitat or fall potential nest trees....
>
> Examples include but are not limited to:
> *   Timber harvest
>     *   Regeneration harvest
>     *   Commercial thinning
> *   Post and pole thinning
> *   Road construction/reconstruction
> *   Guy line or tail hold trees

---

[7] BLM states that AR 008053-54 contain additional analysis pertaining to the great gray owl. BLM, 6. Not so. These two pages refer to Survey and Manage species generally, and contain no analysis of any effects to great gray owls specifically from either the RMP or the Project.

[8] The opposing parties take issue with Magistrate Clarke's observation that "the harvest techniques authorized by the Project include commercial thinning and 'regeneration harvest, colloquially known as 'clear cutting' because nearly all of the trees are cleared from the harvested area." BLM, 4; Murphy, 9; Findings and Recommendation, 3. Magistrate Clarke is correct that "regeneration" harvest is often known as "clear cutting." The Dictionary of Forestry defines "regeneration method" as "a cutting procedure by which a new age class is created; the major methods are clearcutting...." DICTIONARY OF FORESTRY 151 (1st ed. 1998). In turn, "clearcut" is defined as "a stand in which essentially all trees have been removed in one operation...*see*, regeneration method...." *Id*. at 30.

- Logging landings/expansion
- Trail construction/reconstruction using any motorized equipment

AR 013960- 013961.[9] "In summarizing what we know about the character of forest and meadow

types used by the great gray owl in western U.S.,"

> A two-part theme repeats itself: great gray owls use old-growth forests near openings.
> The old-growth forests provide large-diameter (over 50 cm dbh) trees or snags having
> abandoned raptor nests, and the openings provide huntable populations of rodents.
> During the past century, human activities, including widespread harvesting of mature and
> old-growth forests, have reduced the abundance of potential nest trees. Furthermore, the
> altering of natural (pre-settlement) fire regimes have disrupted the generation and
> maintenance of a distinctive fire mosaic covering the western North American landscape.

> Timber harvesting, whether clearcuts or even selective removal of large-diameter trees,
> has reduced nesting opportunities for all forest raptors, including great gray owls. Studies
> show that logging can and does generate "temporary meadows" capable of supporting
> rodent populations used by breeding great gray owls. But unlike naturally occurring
> mountain meadows, forest clearings created by logging undergo rapid forest re-
> establishment; successional development makes the usefulness of such openings short-
> lived. Some montane grasslands have experienced gradual conifer invasions, attributable
> to reduced fire occurrence and fostered by shifting climatic cycles. This means shrinking
> great gray owl foraging habitat throughout western North America. Sustaining

---

[9] BLM attempts to downplay the government's own recognition in the survey protocol that
regeneration harvest like that proposed in the Project will have "significant negative effects on
habitat, life cycle, microclimate or life support systems or persistence of Great Gray Owls at the
project location," AR  013960-61, by stating this observation is "consistent with BLM's project
disclosures that harvest can threaten the species' habitat," BLM, 22. This retort is inaccurate for
two reasons. First, there is nothing in REA that states that the Project will have "significant
negative effects habitat, life cycle, microclimate or life support systems or persistence of Great
Gray Owls at the project location:" the REA is completely devoid of any site-specific analysis of
effects to great gray owls, so the REA cannot be "consistent with" the protocol's recognition of
significant adverse effects. Indeed, had such a disclosure been made, BLM should have prepared
an environmental impact statement for the project. 40 C.F.R. §§ 1501.3, 1501.4 (1978)
(preparation of an EIS is required when significant effects *may* or *will* occur); *Blackwood*, 161
F.3d at 1216 ("An EIS is required of an agency in order that it explore, more thoroughly than an
EA, the environmental consequences of a proposed action whenever substantial questions are
raised as to whether a project *may* cause significant [environmental] degradation") (emphasis in
original, internal citations omitted). Second, the protocol acknowledges that such regeneration
harvest will have "significant negative effects on...[the] persistence of Great Gray Owls at the
project location," which undermines BLM's litigation theory that there is no concern regarding
the continued persistence of the species. Instead, government species experts who designed the
protocol – including the BLM wildlife biologist assigned to this Project – recognize that great
gray owls are *unlikely* to persist where regeneration harvest occurs.

14

populations of great gray owls is possible, but only as a product of innovative ecosystem forest management.

AR 021900-01.

In order to "sustain populations of great gray owls," scientists recommend surveys to identify great gray owl sites; protection of key habitat features such as perches, large diameter live and dead (snags) trees, and sufficient canopy cover; restoration and maintenance of natural meadows with prescribed and managed fire; and application of no-disturbance buffers of at least 250-300 meters around meadows and known sites. AR 018296-97, 009358, 009366-67, 021910. Some researchers have observed that

> The causes of the recent population bottlenecks detected in the microsatellite data for western great gray owls are unknown, but by extension of logic, habitat degradation, and fragmentation of western forests and landscapes driven by the influence of increasing human development and management activities may be associated with population declines in great gray owl populations across their western range in the Sierra Nevada and Pacific Northwest. Similar reductions in population size have been attributed to recent anthropogenic modifications of the natural landscape (e.g., Trzcinski et al., 1999; Butler et al., 2004). Regardless of cause, population bottlenecks and reductions in genetic diversity are important considerations to address for future management approaches for the great gray owl.

AR 012159-60.

The Griffin Half Moon timber sale planning area is home to perhaps the best known population of great gray owls in Oregon, and because observing a great gray owl in the wild is one of the most sought-after accomplishment for birders, visitors from near and far come to the planning area to view great grays, injecting the local economy with important recreation-based revenue. AR 005771; Clements Decl., ¶¶ 11-19, 21, 35-36; Fuller Decl., ¶¶ 1-133; Moy Decl., ¶¶ 11-12, 15; Rio Decl., ¶¶ 4-5; Thiemann Decl., ¶¶ 2-5, 7-8, 11, 13-15; Trail Decl., ¶¶ 3-6. Working in partnership with the BLM and others including the BLM, the local Rogue Valley Audubon Society has an ongoing project to increase great gray owl nesting habitat by providing

nesting platforms. AR 005771-72. Nine of the platforms are located in the project planning area,

three of which are in timber sale areas that will be logged under the Griffin Half Moon timber

sale. AR 005771-72. As documented by Rogue Valley Audubon Society members and others,

there have been at least 16 active great gray owl nests with owlets (young of the year) in recent

years in the Project planning area, both in broken trees and on the man-made platforms. *Id.* Five

of these sixteen nests are located in the planning area. *Id.*

## IV.    MAGISTRATE CLARKE'S FINDINGS AND RECOMMENDATION REGARDING GREAT GRAY OWLS SHOULD BE AFFIRMED.

There can be little doubt that the Griffin Half Moon REA and the administrative record

for this case contain an inadequate NEPA analysis of the Project's effects on great gray owls:

there is next to nothing (and in some cases, nothing at all) to support BLM's Finding of No

Significant Impact. Despite this, BLM and Murphy urge this Court to defer to the agency's

analysis, particularly because the agency is "addressing difficult issues within its area of special

expertise," Murphy, 4, 22, suggesting that BLM complied with the Administrative Procedure Act

(APA) when it "rel[ies] on the reasonable opinions of its own qualified experts," BLM, 11, 19-20

(citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

However, there is no analysis or data concerning the Project's effects on great gray owls

in the REA or administrative record, so there is nothing to which this Court can defer. *Or. Nat.

Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer

to a void"). Similarly, as the D.C. District Court has held, "Although the court must defer to an

agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores,

the analysis of its experts." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997).

BLM's expertise was never engaged – there is zero evidence in the administrative record of any

BLM "expert" analyzing effects on these two species[10] – leaving only a void to which this Court

cannot defer. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

In its Griffin Half Moon REA, Decision Record, and Finding of No Significant Impact,

BLM "entirely failed to consider" effects on great gray owls – "an important aspect of the

problem" – rendering the Project and its decision arbitrary, capricious, and not in accordance

with NEPA. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010); 5 U.S.C. §

706(2)(A). Because BLM failed to "consider[] the relevant factors and articulate[] a rational

connection between the facts found and the choices made," its decision is arbitrary and

capricious and Griffin Half Moon should be vacated. *Arrington v. Daniels*, 516 F.3d 1106, 1112

(9th Cir. 2008) (citations and internal quotation marks omitted). Magistrate Judge Clarke's

Findings and Recommendation should therefore be affirmed.

   A.    **The Griffin Half Moon Project Violates the National Environmental Policy
         Act Because the BLM Failed to Consider the Project's Direct, Indirect, and
         Cumulative Effects on Great Gray Owls.**

The Griffin Half Moon Revised EA (REA) analyzed three issues "in detail:" the effects

of the Project on fish, aquatic habitat, and water quality including peak flow; the effects of the

Project on northern spotted owls; and whether harvested areas on the Dead Indian Plateau could

be successfully reforested. AR 003229. The Griffin Half Moon REA does not address the direct,

indirect, or cumulative effects of the project on great gray owls, thereby rendering the REA

---

[10] As acknowledged *infra*, there is only a single half-page email in the record from Steven
Godwin, an author of the great gray owl survey protocol criticized by federal defendants, BLM,
22, stating that a scientific article did not change the "approach" taken to managing the species in
the planning area. AR 001872. Beyond this acknowledgement, which does not include analysis,
the record is devoid of the BLM utilizing its alleged expertise, undermining the agency's call for
judicial deference.

arbitrary, capricious, and not in accordance with NEPA.[11] *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (requiring a hard look at the direct, indirect, and cumulative effects of an agency's action); *Blackwood*, 161 F.3d at 1214 (rejecting reliance on forest plan EIS and requiring site-specific environmental analysis).

The REA does not discuss the timber sale's direct, indirect, and cumulative effects on the three known great gray owl sites located within the planning area that were buffered by the BLM in previous timber sale planning efforts, despite repeated calls from the public to do so given the high public interest[12] in this wildlife species and its habitat needs that are incompatible with the proposed regeneration harvest and heavy thinning prescriptions. AR 005866-005867, 005771-005772, 005775-78, 004031-32, 003129-31, 003135-36, 003138-39, 003144-47, 004014-15, 004017-18, 004023-25, 005781; Clements Decl., ¶¶ 2-39 (including exhibits); Fuller Decl., ¶¶ 1-

---

[11] In passing, BLM argues that it need not conduct this analysis because "BLM would have run afoul of its 2016 RMP if it attempted to defer or forego timber harvest of stands in the Harvest Land Base for great gray owls (AR 6405) outside the direction of the 2016 RMP. Further NEPA analysis of that issue would have been academic and not required under NEPA." BLM, 19 (internal quotations omitted). This is a stunning claim, and not surprisingly it is not supported by any case law or legal citation. And, it does not cure the NEPA deficiency: the BLM could have conducted a site-specific effects analysis with respect to great gray owls and then decided to move forward with the timber harvest anyway, consistent with the RMP. While such a decision could be described as callous towards the needs of at-risk wildlife, as BLM repeatedly points out in its Objections, NEPA is not a substantive statute: it only requires a particular procedure. BLM failed to follow those procedures.

[12] The BLM and Murphy state that "a particular species' popularity with members of the public is not appropriate basis to require a particular form of NEPA analysis," and fault Magistrate Judge Clarke for observing that, in fact, great gray owls are of high public interest. BLM, 22; Murphy, 15. But Magistrate Clarke did not key his Finding that BLM failed to assess the direct, indirect, and cumulative effect of the Project on great gray owls on the fact that the species is of high public interest: he based it on the fact that neither the REA nor the FEIS for the 2016 RMP contains the requisite analysis. F&R, 7 ("The REA thus does not adequately discuss the Project's direct, indirect, and cumulative effects on the three known great gray owl sites located within the planning area that were buffered by the BLM in previous timber sale planning efforts"). Magistrate Judge Clarke's observation does not undermine his legal conclusions, and the opposing parties provide no case law to the contrary.

133; Moy Decl., ¶¶ 8-16; Rio Decl., ¶¶ 2-12; Sexton Decl., ¶¶ 3-12; Thiemann Decl., ¶¶ 1-17 (including exhibits); Trail Decl., ¶¶ 1-7; Willis Decl., ¶¶ 3-7. Although the federal government's own survey protocol explains that the very type of forest management proposed in the Project – regeneration harvest and heavy commercial thinning – is "generally expected to result in significant negative effects on habitat, life cycle, microclimate or life support systems or persistence of Great Gray Owls at the project location," AR 013960, the BLM did not conduct any environmental analysis of the Griffin Half Moon timber sale on great gray owls.

While the environmental assessment "is where the [agency's] defense of its position must be found," *Blackwood*, 161 F.3d at 1214, the Griffin Half Moon REA contains only two paragraphs about great gray owls, both of which are silent on the effects of the Project on the species and rely on the 2016 RMP for any information about great grays. AR 003274, 003341; *but see also*, AR 003358 (observing that pocket gophers, a prey species of great gray owls, would not be affected by the project). Beyond these three oblique references to the great gray owl in the REA, there are only two additional records in the entire administrative record for the Project, aside from published literature citations, that mention great gray owls: a half-page email that states that a scientific article reporting on the possible genetic isolation of great gray owls just south of the project area in California did not change the "approach" taken to managing the species in the planning area, AR 001872, and a three sentence email that concludes that the Project's effects on great gray owls was a "considered but not addressed in detail" issue, AR 004676. This paucity of information does not suffice as a "hard look" at the Project's direct, indirect, and cumulative effects on great gray owls because there is no deliberative evidence that the BLM can point to demonstrate that it has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington*, 516 F.3d at 1112.

Nor does the REA analyze whether there may be additional but undocumented great gray owl sites in the planning area and how timber harvest may directly, indirectly, and cumulatively affect them, even though the public highlighted the fact that there are numerous sightings of the species in the planning area and in proposed harvest units. Instead, the REA states that "the RMP allocates a larger Late-Successional Reserve network than the previous plan. This accomplishes the goal of protecting older and more structurally-complex forests, and continues to provide management for many of the formerly Survey and Manage species as Bureau Sensitive species."[13] AR 003274. But because the Griffin Half Moon timber sale is not in a Late-Successional Reserve, the known great gray owls in the planning area will not be protected from timber harvest, and extant but undocumented sites will likewise receive no protection. This is a potentially significant environmental effect that should have been disclosed and analyzed in the REA. The BLM's failure to do so violates NEPA. 40 C.F.R. § 1508.8; *Muckleshoot Indian Tribe v. U.S. Forest Serv*., 177 F.3d 800, 809–11 (9th Cir. 1999) (holding that analysis that "focuses solely on the beneficial impact" and does not analyze the adverse effects of the proposed action violates NEPA).

Apparently tacitly acknowledging that the Griffin Half Moon REA does not include an analysis of the direct, indirect, and cumulative effects to the great gray owls in the Griffin Half Moon planning area, the opposing parties make the astonishing argument that NEPA does not require this analysis, and instead, a species-level analysis – allegedly contained in the RMP FEIS – is acceptable. The parties cite to *Env't Prot. Info. Ctr. v. U.S. Forest Serv*., 451 F.3d 1005 (9th

---

[13] The great gray owl is not a Bureau Sensitive Species. Federal Defendant's Answer, ¶ 70 ("the great gray owl is not a BLM sensitive species in Oregon and is not a BLM special status species in Oregon"). It therefore receives no special "management" protections.

Cir. 2006) (*EPIC*) for this holding, but an inspection of that case reveals that it cannot sustain the weight BLM and Murphy assign to it.[14]

As an initial matter, no court has similarly held that an adequate NEPA analysis need only focus on the species-level and not on the effects of a proposed action on individuals of a species. Indeed, Ninth Circuit NEPA case law has repeatedly required an effects analysis on individual members of a species. *See generally, Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973–74 (9th Cir. 2002) (upholding Forest Service wildlife individual-level effects analysis); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–85 (9th Cir. 2011) (invalidating EIS for failing to take a hard look at project effects to wildlife individuals); *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005) (same); *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) (holding that the Department of Commerce must consider the environmental effects of hunting regulations on local populations of whales in addition to effects on larger populations in its EA); *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1024–30 (9th Cir. 2012), *vacated*, 570 U.S. 901 (2013) (invalidating EIS for failing to conduct an "analysis of environmental consequences of [the project] on individual fish species in the Sierra" and rejecting federal defendants' tiering argument).

In *EPIC*, the Ninth Circuit considered whether adverse effects to three northern spotted owl sites were "significant" under NEPA and therefore required the preparation of an EIS. There,

---

[14] *EPIC*'s progeny in the lower courts have clarified its holding only applies to cases involving the ESA and the significance of a project's environmental effects on species viability. *See Oregon Wild v. Bureau of Land Mgmt.*, 2015 WL 1190131, at *10 (D. Or. 2015) ("In *EPIC*, the Ninth Circuit recognized that species viability is the relevant standard for assessing a project under the Endangered Species Act, but the standard is adverse effect under NEPA"); *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1277 (D. Or. 2013) (referencing both the biological assessment and the biological opinion for northern spotted owls in reaching its finding of no significant impact despite negative impacts to individual owls).

the Court explained that because the Forest Service disclosed the effects to these owls in the

project environmental assessment, and, bolstered by Fish and Wildlife Service's "no jeopardy"

biological opinion, harm to those owl sites would not be significant for NEPA purposes and no

EIS was required. *EPIC*, 451 F.3d at 1010. Although the opinion does state that "the NEPA

regulations direct the agency to consider the degree of adverse effect on a species, not the impact

on individuals of that species," read in context, the Court is referring to significance for the

purposes of preparing an EIS, not to whether the Forest Service disclosed the direct, indirect, and

cumulative effects of the action in the first instance. *Id*. In fact, in *EPIC* – as opposed to in this

case – the agency *did* disclose the direct, indirect, and cumulative effects of the project on

individual owls; but the *EPIC* Court declined to find that these effects required the preparation of

an EIS.

The case that *EPIC* cites immediately after the quoted sentence for support, *Native

Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005), is another "significance"

case that addresses whether an EIS is required, not whether the effects disclosure occurred in the

first instance:

> Under Native Ecosystem's theory, any information included in an EA and its supporting
> NEPA documents that admits impacts on wildlife species and their habitat would trigger
> the preparation of an EIS. Not only would such a standard deter candid disclosure of
> negative information, it does not follow that the presence of some negative effects
> necessarily rises to the level of demonstrating a significant effect on the environment. We
> decline to interpret NEPA as requiring the preparation of an EIS any time that a federal
> agency discloses adverse impacts on wildlife species or their habitat or acknowledges
> information favorable to a party that would prefer a different outcome. NEPA permits a
> federal agency to disclose such impacts without automatically triggering the "substantial
> questions" threshold. In short, NEPA requires us to determine whether the Forest Service
> took a "hard look" at the environmental consequences of a proposed action.

*Id*. at 1240. In concluding that the Forest Service took a "hard look" at the environmental

consequences, the *Native Ecosystems Council* Court found that the agency's analysis was

"thorough and candid," and that the effects analyzed did not rise to the level of significance

requiring an EIS. *Id*.  That is not the situation here, where BLM did not assess the level of effects

at all. Read together, neither *EPIC* nor *Native Ecosystems Council* in fact limit NEPA's

disclosure requirement to only assessing the effects of a project on the species rather than on

individuals of that species.

The BLM also argues that it has taken the requisite hard look at how the Project will

affect great gray owls by pointing to its responses to public comments. BLM, 16. However, the

response to comments cited by BLM contains no analysis of any kind: instead, it simply

reiterates BLM's oft-stated position that the RMP FEIS assessed the effects to great gray owls

and a larger Late-Successional Reserve (LSR) system than the prior RMP would adequately

protect owls located in reserves (which is not where the Griffin Half Moon timber sale is

located). AR 003172. This is not analysis. And, while this passage does also state that "In the

REA, Appendix B, Scientific Literature Submitted During Scoping, BLM considered the science

submitted regarding the management of GGOs and their habitat," there is *no* deliberative

information in the record showing that BLM "considered" this information in any way: there are

no reports, analysis, emails, or any other evidence that BLM deliberated about the Project's

effects on great gray owls. Consequently, no deference to the agency is due. *Or. Nat. Desert

Ass'n*, 625 F.3d at 1121 ("We cannot defer to a void").

**B.      Tiering to the 2016 Resource Management Plan Cannot Cure BLM's Failure
          to Consider the Direct, Indirect, and Cumulative Effects of the Griffin Half
          Moon Project on Great Gray Owls.**

Despite the opposing parties' protestations to the contrary, the Griffin Half Moon REA

does not contain the "hard look" at the Project's effects on great gray owls as required by NEPA.

Acknowledging that the Griffin Half Moon REA does not contain the requisite analysis of the

Project's effects on great gray owls, BLM, 15, 17, the BLM and Murphy argue that the requisite

analysis may be found in the environmental impact statement for the BLM's 2016 resource

management plans (RMPs). BLM, 6, 8, 16, 24-35; Murphy, 1-2, 5, 11-13, 17-22. But the RMP

FEIS does not actually analyze the effect of the Project on great gray owls, instead stating that

the existence of Late-Successional Reserves will result in more habitat for great grays over time

in that land use allocation.[15] AR 008065-66. This statement says nothing about the actual

environmental consequences from the Griffin Half Moon timber sale on the great gray owls

located in that planning area, which is *not* within a Late-Successional Reserve, so "tiering to the

RMP EIS cannot save the EA...." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,

387 F.3d 989, 997 (9th Cir. 2004); *Blackwood*, 161 F.3d at 1214 ("It does not support the

proposition that any scale of logging project is exempt from a project-specific EIS simply

because an EIS for a forest plan contemplates that logging may occur").

    Even assuming for the sake of argument that great gray owls in LSRs would be

"protected,"[16] that fact is irrelevant to how the Project affects great grays in the planning area,

which is in the HLB. There is no authority for the opposing parties' position that the BLM need

not conduct a site-specific effects analysis simply because of the mere existence of a land use

---

[15] BLM argues that "Agencies may use and rely on habitat-at-proxy methodologies to predict species impacts." BLM, 6 (citing *Lands Council v. McNair*, 629 F.3d 1070, 1081 (9th Cir. 2010) and *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004)). It is true that the Ninth Circuit has upheld the *Forest Service's* use of habitat as a proxy for wildlife population numbers on national forests under the National Forest Management Act, *McNair*, 629 F.3d at 1081, and the *Fish and Wildlife Service's* use of habitat as a proxy for assessing jeopardy under the Endangered Species Act, *Gifford Pinchot Task Force*, 378 F.3d at 1066. However, neither the National Forest Management Act nor the Endangered Species Act is at issue in this case, thus distinguishing those two cases from the present situation.
[16] The legal question in this case does not pertain to "protecting" wildlife (a substantive question), but rather whether BLM disclosed and discussed the direct, indirect, and cumulative effects of the Griffin Half Moon timber sale on great gray owls (a procedural question).

allocation *in which the project does not occur*. In fact, the case law is to the contrary. *Ctr. For Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) (requiring a direct, indirect, and cumulative effects analysis of a project).

Moreover, prior agency analysis concluded that the reserve system was insufficient to protect rare species, thus necessitating the protections of the Survey and Manage program. *Conservation Nw. v. Rey*, 674 F.Supp.2d 1232, 1247 (W.D. Wash. 2009) ("in other words, the Reserves are not enough to ensure that certain rare or little-known species survive; Survey and Manage fills the gap"). The questionable persistence of the great gray owl led to its designation as a Survey and Manage species in 1994. AR 021092. Concern over the persistence of the species remained over the next two decades, and continues today. AR 008065–66. Despite this, there is no analysis, justification, or rationale anywhere in either the 2016 RMP FEIS or the Griffin Half Moon REA regarding the direct, indirect, and cumulative environmental consequences of the proposed timber sale on great gray owls. Consequently, the BLM "entirely failed to consider an important aspect of the problem," *McNair*, 629 F.3d at 1074, and did not consider "the relevant factors and articulate[] a rational connection between the facts found and the choices made," *Arrington*, 516 F.3d at 1112. These failures are arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

The cases cited by BLM and Murphy do not cast doubt on Magistrate Judge Clarke's F&R. For example, BLM cites *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003 (D. Alaska 2020), BLM at 30-31, and argues that tiering is appropriate here. However, in that case, the court held that "when a programmatic EIS *does* adequately consider the impacts of subsequent site-specific projects, a subsequent NEPA document need not repeat that analysis unless new and significant environmental impacts arise that were not previously considered."

25

*Native Vill.*, 432 F. Supp. 3d at 1025 (emphasis in original, footnoted citations omitted). Here, the programmatic RMP FEIS does not "consider the impacts of subsequent site-specific projects:" it only considers the general consequences of adopting a land management plan that covers 2.6 million acres without any kind of site-specific analysis. AR 007197–98.[17] BLM provides no citations to the RMP FEIS where this document allegedly conducted the requisite site-specific analysis of the effects of the Griffin Half Moon timber sale on wildlife species of concern in the area, as indeed it could not, because the RMP expressly does not contain this analysis. *Id.*

BLM similarly argues that an out-of-district court case supports the agency's reliance on tiering, but this case also does not support the government's argument. BLM at 29. In *Native Ecosystem Council v. Judice*, Judge Watters held that tiering was appropriate because "the RMP authorized the vegetation and riparian treatments at issue ... and also authorized grazing in the Planning Area in the EIS." 2019 WL 1131231 at *4 (D. Mont. 2019). Because the programmatic NEPA analysis resulted in a decision to authorize future grazing in a site-specific location, and because that analysis considered the site-specific effects of the decision to authorize grazing in that location, future analysis (which plaintiffs challenged in *Judice*) could rely on "the underlying data and analysis" in the RMP. *Judice*, 2019 WL 1131231 at *4. Coupled with "the EA's extensive analysis," tiering in *Judice* was therefore appropriate. *Id*. at *5.

---

[17] The RMP FEIS explains that "The Proposed RMP does not include any implementation decisions to be included in the eventual Records of Decision/RMPs. That is, the BLM anticipates that all of the decisions in the Records of Decision/RMPs will be land use plan decisions ... . Implementation decisions authorize implementation of on-the-ground projects. Land use plan decisions (land use allocations, management objectives, and management direction) do not directly authorize implementation of on-the-ground projects. Land use plan decisions guide and control future implementation decisions, which can be carried out only after completion of further appropriate NEPA analysis or documentation, consultation, and decision-making processes."

But those are not the facts in the present case. Here, the opposing parties have failed to point to anything in the RMP FEIS documenting the effects of the Griffin Half Moon timber sale on great gray owls.[18] Nor do the parties point to anything in the REA that conducts this analysis. Thus, in contrast to the RMP's "underlying data and analysis" and "the EA's extensive analysis" in *Judice*, no such robust analysis – at any level – is present in this case.

BLM also takes issue with Magistrate Clarke's citation to *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004), arguing that the case is inapplicable to the facts at bar. BLM at 31. BLM's attempts to distinguish the on-point tiering case law fare no better than its reliance on *Judice*. *See* BLM, 20, 24, 41. In *Klamath-Siskiyou Wildlands Ctr. v. BLM*, the Ninth Circuit held that tiering to the EIS for the applicable land management plan "cannot save the [project-specific] EA" because the programmatic EIS did not contain any site-specific, project-level analysis in the first instance. 387 F.3d at 997. These are the same facts in the present case, and the Ninth Circuit's holding rightly influenced Magistrate Clarke's Findings and Recommendation.

The opposing parties claim that "BLM rationally found that Griffin Half Moon would not have significant effects on the species not already analyzed in the 2016 FEIS," thus suggesting that tiering is appropriate. BLM at 24-26; Murphy at 20. This statement is inadequate to

---

[18] BLM states that "As in *Judice*, tiering here is appropriate because the Griffin Half Moon project implements the management directives already authorized in the 2016 RMP and that RMP already contemplated timber harvest (and its effects) within project area and surrounding lands." BLM, 29. BLM seems to be suggesting that simply because the timber sale "implements" the RMP, and because the RMP contemplated timber harvest generally, further site-specific analysis is not required. But this is not the holding of *Judice*, which instead concluded that *when an RMP authorizes <u>and</u> analyzes future site-specific action*, then tiering may be appropriate. Moreover, the government's argument proves too much: taken to its logical conclusion, it would mean that no site-specific environmental analysis is ever required, provided that the RMP simply contemplated the general effects of land management. This is neither the intent of the RMP FEIS, AR 007197–98, nor is it the law. *Blackwood*, 161 F.3d at 1214.

demonstrate NEPA compliance for two reasons. One, there is *no* deliberative evidence in the administrative record of how BLM came to its supposed "rational finding." There are no meeting notes, memos, reports, or other documentation showing that BLM looked at the effects analysis for great gray owls allegedly in the RMP FEIS, undertook an intentional and purposeful examination of the site-specific environmental consequences of the Project on great gray owls, compared the findings of effect from the RMP to this site-specific inquiry, and arrived at a rational conclusion that was supported by evidence in the administrative record. This failure is particularly notable given that a prominent great gray owl expert – Steven Godwin – is a wildlife biologist for the Medford District BLM and in fact was the biologist assigned to this Project, AR 003330: one would expect to see communications from this expert given the occurrence of this species in the Project area and the public's interest in it during Project development. Instead, BLM's conclusion appears out of thin air in the Finding of No Significant Impact.

And two, the 2016 RMP FEIS allegedly addresses the environmental consequences of implementing a land management plan over the course of at least the next decade on almost 3 million acres of land: the observation that the environmental effects of 933 acres of timber harvest "would not have significant effects on the species not already analyzed in the 2016 FEIS," BLM, 24, states the obvious, but does not comply with NEPA's requirement that the agency take a hard look at the site-specific effects of its actions. Shifting the scale of impact analysis "cannot save the EA." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997.

### C.    Magistrate Judge Clarke Did not Inappropriately Graft a Substantive Requirement onto NEPA's Procedural Provisions.

The BLM and Murphy argue that "it was legal error for the F&R to factor in the question of substantive protections in reviewing a NEPA claim," mischaracterizing KS Wild's claim that NEPA requires the BLM to assess the direct, indirect, and cumulative effects of the Griffin Half

Moon Project on great gray owls. BLM at 17; *accord* Murphy at 2, 13, 22. BLM explains that the Findings and Recommendation are in error because Magistrate Judge Clarke allegedly erroneously "fault[ed] BLM's provision of 'temporary, seasonal protections' to great gray owls" and agreed with "Plaintiffs' argument that BLM violated NEPA 'because it failed to implement appropriate measures to protect great gray owls.'" The Court should not acquiesce to BLM's revisionist fly-specking of the Findings and Recommendation. KS Wild neither brought a "substantive NEPA" claim in this case nor alleged that BLM failed to implement measures to protect great gray owls, but instead demonstrated that the BLM failed to assess the direct, indirect, and cumulative effects of the Griffin Half Moon Project on the owl. Magistrate Clarke's decision does not graft a substantive requirement onto NEPA's analysis procedures, but instead correctly observed that the "temporary, seasonable protections" afforded to raptor nest trees does not suffice as an effects analysis under NEPA. F&R, 6.

Although it is immaterial to his holding, KS Wild also points out that the "protections" favorably cited by Magistrate Judge Clarke in fact do *not* apply to great gray owls. The measures referred to by Magistrate Clarke are found in Table 2-4 of the REA, and include: 1) retention of the nest tree of known raptors; and 2) imposition of a seasonal operating restriction of .25 mile around known nest trees between March 1 and July 15. AR 003265. Table 2-4  is captioned "Conservation Measures for Known Bureau Special Status Terrestrial Wildlife Species in the Project Area," AR 003265, but great gray owls – as BLM averred in its Answer, ECF No. 20, ¶ 70 – are not Bureau Special Status Species. So, the proffered protections do not actually apply to great gray owls. Alternatively, it is possible that the REA is in error. If so, this is further evidence of the arbitrary and capricious nature of the REA. 5 U.S.C. § 706(2)(A).

Moreover, these measures are insufficient to address the needs of great gray owls. These owls have a number of specific habitat needs such as "leaners" – smaller trees that lean against the nest tree and other perching trees that allow recently fledged owlets to climb back into the nest tree before they are fully able to fly – in addition to the essential nest tree. AR 018296-97, 009358, 009366-67, 021910. Thus, it is highly unlikely that just protecting the nest tree is adequate for the life needs of great gray owls, but the public (and decision maker) cannot know because the REA conducts no analysis regarding the adequacy of these measures. Similarly, there is no analysis in the REA or administrative record regarding the seasonal restrictions and whether they are relevant to the life needs of the species (i.e., why these dates were chosen), what life function (nesting, breeding, feeding, etc.) they address, or whether they are adequate to safeguard these life functions. That there is no discussion anywhere in the REA or record about these measures belies the agency's claim that it took a hard look at this issue.

## V.    THIS MATTER IS NOT SUITABLE AT THIS JUNCTURE FOR SETTLEMENT.

The BLM and Murphy ask this Court to assign this case to mediated or judicial settlement should the Court affirm Magistrate Judge Clarke's Findings and Recommendations. BLM, 35; Murphy, 28. In BLM's view, such a settlement "may allow a workable project to go forward to benefit the local communities and economy." *Id.* While these are laudable goals, KS Wild "invokes a public interest of the highest order: the interest in having government officials act in accordance with law." *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd sub nom. Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir. 1991). Here, Magistrate Judge Clarke found a serious violation of federal environmental law, which should not be dismissed as lightly as the opposing parties suggest. As Justice Brandeis observed:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws,

30

existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J. dissenting), *overruled in part by Berger v. State of New York*, 388 U.S. 41 (1967), *and overruled in part by Katz v. United States*, 389 U.S. 347 (1967).

BLM should cure the legal deficiencies identified by the Court rather than belatedly seeking a settlement process that overlooks a circumvention of law.

## VI.   CONCLUSION.

For the forgoing reasons, Magistrate Judge Clarke's Findings and Recommendations should be AFFIRMED.

Date:   March 12, 2021.                    Respectfully submitted,

                                           /s/ Susan Jane M. Brown            .
                                         SUSAN JANE BROWN (OSB #054607)
                                         Western Environmental Law Center
                                         4107 NE Couch Street
                                         Portland, Oregon 97232
                                         (503) 914-1323 | Phone
                                         brown@westernlaw.org

                                         *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limitation under LR 7-2(b), because it contains less than 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, glossary, signature block, and any certificates of counsel.

Date:   March 12, 2021.            Respectfully submitted,

  /s/ Susan Jane M. Brown    .
SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

*Counsel for Plaintiffs*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below I served the forgoing PLAINTIFFS' RESPONSE

TO OBJECTIONS TO FINDINGS AND RECOMMENDATION with the Clerk of the Court

using the CM/ECF system, which will provide notification of this filing to the attorneys of record

and all registered entities.

Date:   March 12, 2021.                    Respectfully submitted,

                                  /s/ Susan Jane M. Brown            .
                                 SUSAN JANE BROWN (OSB #054607)
                                 Western Environmental Law Center
                                 4107 NE Couch Street
                                 Portland, Oregon 97232
                                 (503) 914-1323 | Phone
                                 brown@westernlaw.org

                                 *Counsel for Plaintiffs*

33